## BAKER ET AL. *v.* CARR ET AL.

No. 6.   Argued April 19–20, 1961.—Set for reargument May 1, 1961.—
Reargued October 9, 1961.—Decided March 26, 1962.

*Charles S. Rhyne* and *Z. T. Osborn, Jr.* reargued the cause for appellants. With them on the briefs were *Hobart F. Atkins, Robert H. Jennings, Jr., J. W. Anderson, C. R. McClain, Walter Chandler, Harris A. Gilbert, E. K. Meacham* and *Herzel H. E. Plaine.*

*Jack Wilson,* Assistant Attorney General of Tennessee, reargued the cause for appellees. With him on the briefs were *George F. McCanless,* Attorney General, and *Milton P. Rice* and *James M. Glasgow,* Assistant Attorneys General.

*Solicitor General Cox,* by special leave of Court, 365 U. S. 864, reargued the cause for the United States, as *amicus curiae,* urging reversal. With him on the briefs were *Assistant Attorney General Marshall, Acting Assistant Attorney General Doar, Bruce J. Terris, Harold H. Greene, David Rubin* and *Howard A. Glickstein.*

Briefs of *amici curiae,* in support of appellants, were filed by *J. Howard Edmondson,* Governor of Oklahoma, and *Norman E. Reynolds, Jr.* for the Governor; *W. Scott Miller, Jr.* and *George J. Long* for the City of St. Matthews, Kentucky; *Roger Arnebergh, Henry P. Kucera, J. Elliott Drinard, Barnett I. Shur, Alexander G. Brown, Nathaniel H. Goldstick* and *Charles S. Rhyne* for the National Institute of Municipal Law Officers; *Eugene H. Nickerson* and *David M. Levitan* for John F. English et al.; *Upton Sisson, Clare S. Hornsby, Walter L. Nixon, Jr.* and *John Sekul* for Marvin Fortner et al.; and *Theodore Sachs* for August Scholle.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This civil action was brought under 42 U. S. C. §§ 1983 and 1988 to redress the alleged deprivation of federal constitutional rights. The complaint, alleging that by means of a 1901 statute of Tennessee apportioning the members of the General Assembly among the State's 95 counties,[1] "these plaintiffs and others similarly situated,

---

[1] Public Acts of Tennessee, c. 122 (1901), now Tenn. Code Ann. §§ 3–101 to 3–107. The full text of the 1901 Act as amended appears in an Appendix to this opinion, *post,* p. 237.

are denied the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes," was dismissed by a three-judge court convened under 28 U. S. C. § 2281 in the Middle District of Tennessee.[2] The court held that it lacked jurisdiction of the subject matter and also that no claim was stated upon which relief could be granted. 179 F. Supp. 824. We noted probable jurisdiction of the appeal. 364 U. S. 898.[3] We hold that the dismissal was error, and remand the cause to the District Court for trial and further proceedings consistent with this opinion.

The General Assembly of Tennessee consists of the Senate with 33 members and the House of Representatives with 99 members. The Tennessee Constitution provides in Art. II as follows:

"Sec. 3. Legislative authority—Term of office.— The Legislative authority of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives, both dependent on the people; who shall hold their offices for two years from the day of the general election.

"Sec. 4. Census.—An enumeration of the qualified voters, and an apportionment of the Representatives in the General Assembly, shall be made in the year one thousand eight hundred and seventy-one, and within every subsequent term of ten years.

"Sec. 5. Apportionment of representatives.—The number of Representatives shall, at the several

---

[2] The three-judge court was convened pursuant to the order of a single district judge, who, after he had reviewed certain decisions of this Court and found them distinguishable in features "that may ultimately prove to be significant," held that the complaint was not so obviously without merit that he would be justified in refusing to convene a three-judge court. 175 F. Supp. 649, 652.

[3] We heard argument first at the 1960 Term and again at this Term when the case was set over for reargument. 366 U. S. 907.

periods of making the enumeration, be apportioned among the several counties or districts, according to the number of qualified voters in each; and shall not exceed seventy-five, until the population of the State shall be one million and a half, and shall never exceed ninety-nine; Provided, that any county having two-thirds of the ratio shall be entitled to one member.

"Sec. 6. Apportionment of senators.—The number of Senators shall, at the several periods of making the enumeration, be apportioned among the several counties or districts according to the number of qualified electors in each, and shall not exceed one-third the number of representatives. In apportioning the Senators among the different counties, the fraction that may be lost by any county or counties, in the apportionment of members to the House of Representatives, shall be made up to such county or counties in the Senate, as near as may be practicable. When a district is composed of two or more counties, they shall be adjoining; and no county shall be divided in forming a district."

Thus, Tennessee's standard for allocating legislative representation among her counties is the total number of qualified voters resident in the respective counties, subject only to minor qualifications.[4] Decennial reapportionment

---

[4] A county having less than, but at least two-thirds of, the population required to choose a Representative is allocated one Representative. See also Tenn. Const., Art. II, § 6. A common and much more substantial departure from the number-of-voters or total-population standard is the guaranty of at least one seat to each county. See, e. g., Kansas Const., Art. 2, § 2; N. J. Const., Art. 4, § 3, ¶ 1.

While the Tennessee Constitution speaks of the number of "qualified voters," the exhibits attached to the complaint use figures based on the number of persons 21 years of age and over. This basis seems to have been employed by the General Assembly in apportioning legislative seats from the outset. The 1870 statute providing for the first enumeration, Acts of 1870 (1st Sess.), c. 107, directed the courts of

in compliance with the constitutional scheme was effected by the General Assembly each decade from 1871 to 1901. The 1871 apportionment [5] was preceded by an 1870 statute requiring an enumeration.[6] The 1881 apportionment involved three statutes, the first authorizing an enumeration, the second enlarging the Senate from 25 to

the several counties to select a Commissioner to enumerate "all the male inhabitants of their respective counties, who are twenty-one years of age and upward, who shall be resident citizens of their counties on the first day of January, 1871 . . . ." Reports compiled in the several counties on this basis were submitted to the General Assembly by the Secretary of State and were used in the first apportionment. Appendix to Tenn. S. J., 1871, 41–43. Yet such figures would not reflect the numbers of persons qualified to exercise the franchise under the then-governing qualifications: (a) citizenship; (b) residence in the State 12 months, and in the county 6 months; (c) payment of poll taxes for the preceding year unless entitled to exemption. Acts of 1870 (2d Sess.), c. 10. (These qualifications continued at least until after 1901. See Shan. Tenn. Code Ann., §§ 1167, 1220 (1896; Supp. 1904).) Still, when the General Assembly directed the Secretary of State to do all he could to obtain complete reports from the counties, the Resolution spoke broadly of "the impossibility of . . . [redistricting] without the census returns of the voting population from each county . . . ." Tenn. S. J., 1871, 46–47, 96. The figures also showed a correlation with Federal Census figures for 1870. The Census reported 259,016 male citizens 21 and upward in Tennessee. Ninth Census of the United States, 1870, Statistics of the Population 635 (1872). The Tennessee Secretary of State's Report, with 15 counties not reported, gave a figure of 237,431. Using the numbers of actual votes in the last gubernatorial election for those 15 counties, the Secretary arrived at a total of 250,025. Appendix to Tenn. S. J., 1871, 41–43. This and subsequent history indicate continued reference to Census figures and finally in 1901, abandonment of a state enumeration in favor of the use of Census figures. See notes 7, 8, 9, infra. See also Williams, Legislative Apportionment in Tennessee, 20 Tenn. L. Rev. 235, 236, n. 6. It would therefore appear that unless there is a contrary showing at the trial, appellants' current figures, taken from the United States Census Reports, are apposite.

[5] Acts of 1871 (1st Sess.), c. 146.

[6] Acts of 1870 (1st Sess.), c. 107.

33 members and the House from 75 to 99 members, and the third apportioning the membership of both Houses.[7] In 1891 there were both an enumeration and an apportionment.[8] In 1901 the General Assembly abandoned separate enumeration in favor of reliance upon the Federal Census and passed the Apportionment Act here in controversy.[9] In the more than 60 years since that action, all proposals in both Houses of the General Assembly for reapportionment have failed to pass.[10]

---

[7] The statute authorizing the enumeration was Acts of 1881 (1st Sess.), c. 124. The enumeration commissioners in the counties were allowed "access to the U. S. Census Reports of the enumeration of 1880, on file in the offices of the County Court Clerks of the State, and a reference to said reports by said commissioners shall be legitimate as an auxiliary in the enumeration required . . . ." *Ibid.*, § 4.

The United States Census reported 330,305 male citizens 21 and upward in Tennessee. The Tenth Census of the United States, 1880, Compendium 596 (1883). The Tennessee Secretary of State's Report gave a figure of 343,817, Tenn. H. J. (1st Extra. Sess.), 1881, 12–14 (1882).

The General Assembly was enlarged in accordance with the constitutional mandate since the State's population had passed 1,500,000. Acts of 1881 (1st Extra. Sess.), c. 5; and see, *id.*, S. J. Res. No. III; see also Tenth Census of the United States, 1880, Statistics of the Population 77 (1881). The statute apportioning the General Assembly was Acts of 1881 (1st Extra. Sess.), c. 6.

[8] Acts of 1891, c. 22; Acts of 1891 (Extra. Sess.), c. 10. Reference to United States Census figures was allowed just as in 1881, see *supra*, n. 7. The United States Census reported 402,476 males 21 and over in Tennessee. The Eleventh Census of the United States, 1890, Population (Part I) 781 (1895). The Tennessee Secretary of State's Report gave a figure of 399,575. 1 Tenn. S. J., 1891, 473–474.

[9] Acts of 1901, S. J. Res. No. 35; Acts of 1901, c. 122. The Joint Resolution said: "The Federal census of 1900 has been very recently taken and by reference to said Federal census an accurate enumeration of the qualified voters of the respective counties of the State of Tennessee can be ascertained and thereby save the expense of an actual enumeration . . . ."

[10] For the history of legislative apportionment in Tennessee, including attempts made since 1901, see Tenn. S. J., 1959, 909–930;

Between 1901 and 1961, Tennessee has experienced substantial growth and redistribution of her population. In 1901 the population was 2,020,616, of whom 487,380 were eligible to vote.[11] The 1960 Federal Census reports the State's population at 3,567,089, of whom 2,092,891 are eligible to vote.[12] The relative standings of the counties in terms of qualified voters have changed significantly. It is primarily the continued application of the 1901 Apportionment Act to this shifted and enlarged voting population which gives rise to the present controversy.

Indeed, the complaint alleges that the 1901 statute, even as of the time of its passage, "made no apportionment of Representatives and Senators in accordance with the constitutional formula . . . , but instead arbitrarily and capriciously apportioned representatives in the Senate and House without reference . . . to any logical or reasonable formula whatever." [13]    It is further alleged

_____

and "A Documented Survey of Legislative Apportionment in Tennessee, 1870–1957," which is attached as exhibit 2 to the intervening complaint of Mayor West of Nashville, both prepared by the Tennessee State Historian, Dr. Robert H. White.   Examples of preliminary steps are: In 1911, the Senate called upon the Redistricting Committee to make an enumeration of qualified voters and to use the Federal Census of 1910 as the basis.  Acts of 1911, S. J. Res. No. 60, p. 315.  Similarly, in 1961, the Senate called for appointment of a select committee to make an enumeration of qualified voters.  Acts of 1961, S. J. Res. No. 47.  In 1955, the Senate called for a study of reapportionment.  Tenn. S. J., 1955, 224; but see *id.*, at 1403. Similarly, in 1961, the House directed the State Legislative Council to study methods of reapportionment.  Acts of 1961, H. J. Res. No. 65.

[11] Twelfth Census of the United States, 1900, Population (Part 1) 39 (1901) ; (Part 2) 202 (1902).

[12] United States Census of Population: 1960, General Population Characteristics—Tennessee, Table 16 (1961).

[13] In the words of one of the intervening complaints, the apportionment was "wholly arbitrary, . . . and, indeed, based upon no lawfully pertinent factor whatever."

that "because of the population changes since 1900, and the failure of the Legislature to reapportion itself since 1901," the 1901 statute became "unconstitutional and obsolete." Appellants also argue that, because of the composition of the legislature effected by the 1901 Apportionment Act, redress in the form of a state constitutional amendment to change the entire mechanism for reapportioning, or any other change short of that, is difficult or impossible.[14] The complaint concludes that "these plain-

[14] The appellants claim that no General Assembly constituted according to the 1901 Act will ·submit reapportionment proposals either to the people or to a Constitutional Convention. There is no provision for popular initiative in Tennessee. Amendments proposed in the Senate or House must first be approved by a majority of all members of each House and again by two-thirds of the members in the General Assembly next chosen. The proposals are then submitted to the people at the next general election in which a Governor is to be chosen. Alternatively, the legislature may submit to the people at any general election the question of calling a convention to consider specified proposals. Such as are adopted at a convention do not, however, become effective unless approved by a majority of the qualified voters voting separately on each proposed change or amendment at an election fixed by the convention. Conventions shall not be held oftener than once in six years. Tenn. Const., Art. XI, § 3. Acts of 1951, c. 130, § 3, and Acts of 1957, c. 340, § 3, provided that delegates to the 1953 and 1959 conventions were to be chosen from the counties and floterial districts just as are members of the State House of Representatives. The General Assembly's call for a 1953 Constitutional Convention originally contained a provision "relating to the appointment [sic] of representatives and senators" but this was excised. Tenn. H. J., 1951, 784. A Resolution introduced at the 1959 Constitutional Convention and reported unfavorably by the Rules Committee of the Convention was as follows:

"By Mr. Chambliss (of Hamilton County), Resolution No. 12—Relative to Convention considering reapportionment, which is as follows:

"WHEREAS, there is a rumor that this Limited Convention has been called for the purpose of postponing for six years a Convention that would make a decision as to reapportionment; and

tiffs and others similarly situated, are denied the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes." [15]  They seek a

"WHEREAS, there is pending in the United States Courts in Tennessee a suit under which parties are seeking, through decree, to compel reapportionment; and

"WHEREAS, it is said that this Limited Convention, which was called for limited consideration, is yet a Constitutional Convention within the language of the Constitution as to Constitutional Conventions, forbidding frequent Conventions in the last sentence of Article Eleven, Section 3, second paragraph, more often than each six years, to-wit:

" 'No such Convention shall be held oftener than once in six years.'

"Now, THEREFORE, BE IT RESOLVED, That it is the consensus of opinion of the members of this Convention that since this is a Limited Convention as hereinbefore set forth another Convention could be had if it did not deal with the matters submitted to this Limited Convention.

"BE IT FURTHER RESOLVED, That it is the consensus of opinion of this Convention that a Convention should be called by the General Assembly for the purpose of considering reapportionment in order that a possibility of Court enforcement being forced on the Sovereign State of Tennessee by the Courts of the National Government may be avoided.

"BE IT FURTHER RESOLVED, That this Convention be adjourned for two years to meet again at the same time set forth in the statute providing for this Convention, and that it is the consensus of opinion of this body that it is within the power of the next General Assembly of Tennessee to broaden the powers of this Convention and to authorize and empower this Convention to consider a proper amendment to the Constitution that will provide, when submitted to the electorate, a method of reapportionment." Tenn. Constitutional Convention of 1959, The Journal and Debates, 35, 278.

[15] It is clear that appellants' federal constitutional claims rest exclusively on alleged violation of the Fourteenth Amendment. Their primary claim is that the 1901 statute violates the Equal Protection Clause of that amendment. There are allegations invoking the Due Process Clause but from the argument and the exhibits it appears that the Due Process Clause argument is directed at certain tax statutes. Insofar as the claim involves the validity of those statutes

declaration that the 1901 statute is unconstitutional and an injunction restraining the appellees from acting to conduct any further elections under it. They also pray that unless and until the General Assembly enacts a valid reapportionment, the District Court should either decree a reapportionment by mathematical application of the Tennessee constitutional formulae to the most recent Federal Census figures, or direct the appellees to conduct legislative elections, primary and general, at large. They also pray for such other and further relief as may be appropriate.

## I.

### The District Court's Opinion and Order of Dismissal.

Because we deal with this case on appeal from an order of dismissal granted on appellees' motions, precise identi-

---

under the Due Process Clause we find it unnecessary to decide its merits. And if the allegations regarding the tax statutes are designed as the framework for proofs as to the effects of the allegedly discriminatory apportionment, we need not rely upon them to support our holding that the complaint states a federal constitutional claim of violation of the Equal Protection Clause. Whether, when the issue to be decided is one of the constitutional adequacy of this particular apportionment, taxation arguments and exhibits as now presented add anything, or whether they could add anything however presented, is for the District Court in the first instance to decide.

The complaint, in addition to the claims under the Federal Constitution, also alleges rights, and the General Assembly's duties, under the Tennessee Constitution. Since we hold that appellants have—if it develops at trial that the facts support the allegations—a cognizable federal constitutional cause of action resting in no degree on rights guaranteed or putatively guaranteed by the Tennessee Constitution, we do not consider, let alone enforce, rights under a State Constitution which go further than the protections of the Fourteenth Amendment. Lastly, we need not assess the legal significance, in reaching our conclusion, of the statements of the complaint that the apportionment effected today under the 1901 Act is "contrary to the philosophy of government in the United States and all Anglo-Saxon jurisprudence . . . ."

fication of the issues presently confronting us demands clear exposition of the grounds upon which the District Court rested in dismissing the case. The dismissal order recited that the court sustained the appellees' grounds "(1) that the Court lacks jurisdiction of the subject matter, and (2) that the complaint fails to state a claim upon which relief can be granted . . . ."

In the setting of a case such as this, the recited grounds embrace two possible reasons for dismissal:

*First:* That the facts and injury alleged, the legal bases invoked as creating the rights and duties relied upon, and the relief sought, fail to come within that language of Article III of the Constitution and of the jurisdictional statutes which define those matters concerning which United States District Courts are empowered to act;

*Second:* That, although the matter is cognizable and facts are alleged which establish infringement of appellants' rights as a result of state legislative action departing from a federal constitutional standard, the court will not proceed because the matter is considered unsuited to judicial inquiry or adjustment.

We treat the first ground of dismissal as "lack of jurisdiction of the subject matter." The second we consider to result in a failure to state a justiciable cause of action.

The District Court's dismissal order recited that it was issued in conformity with the court's *per curiam* opinion. The opinion reveals that the court rested its dismissal upon lack of subject-matter jurisdiction and lack of a justiciable cause of action without attempting to distinguish between these grounds. After noting that the plaintiffs challenged the existing legislative apportionment in Tennessee under the Due Process and Equal Protection Clauses, and summarizing the supporting allegations and the relief requested, the court stated that

"The action is presently before the Court upon the defendants' motion to dismiss predicated upon three

grounds: first, that the Court lacks jurisdiction of the subject matter; second, that the complaints fail to state a claim upon which relief can be granted; and third, that indispensable party defendants are not before the Court." 179 F. Supp., at 826.

The court proceeded to explain its action as turning on the case's presenting a "question of the distribution of political strength for legislative purposes." For,

"From a review of [numerous Supreme Court] . . . decisions there can be no doubt that the federal rule, as enunciated and applied by the Supreme Court, is that the federal courts, whether from a lack of jurisdiction or from the inappropriateness of the subject matter for judicial consideration, will not intervene in cases of this type to compel legislative reapportionment." 179 F. Supp., at 826.

The court went on to express doubts as to the feasibility of the various possible remedies sought by the plaintiffs. 179 F. Supp., at 827–828. Then it made clear that its dismissal reflected a view not of doubt that violation of constitutional rights was alleged, but of a court's impotence to correct that violation:

"With the plaintiffs' argument that the legislature of Tennessee is guilty of a clear violation of the state constitution and of the rights of the plaintiffs the Court entirely agrees. It also agrees that the evil is a serious one which should be corrected without further delay. But even so the remedy in this situation clearly does not lie with the courts. It has long been recognized and is accepted doctrine that there are indeed some rights guaranteed by the Constitution for the violation of which the courts cannot give redress." 179 F. Supp., at 828.

In light of the District Court's treatment of the case, we hold today only (a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of

action is stated upon which appellants would be entitled to appropriate relief; and (c) because appellees raise the issue before this Court, that the appellants have standing to challenge the Tennessee apportionment statutes.[16] Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial.

## II.

### JURISDICTION OF THE SUBJECT MATTER.

The District Court was uncertain whether our cases withholding federal judicial relief rested upon a lack of federal jurisdiction or upon the inappropriateness of the subject matter for judicial consideration—what we have designated "nonjusticiability." The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute. Our conclusion, see pp. 208–237, *infra,* that this cause presents no nonjusticiable "political question" settles the only possible doubt that it is a case or controversy. Under the present heading of "Jurisdic-

---

[16] We need not reach the question of indispensable parties because the District Court has not yet decided it.

tion of the Subject Matter" we hold only that the matter set forth in the complaint does arise under the Constitution and is within 28 U. S. C. § 1343.

Article III, § 2, of the Federal Constitution provides that "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ." It is clear that the cause of action is one which "arises under" the Federal Constitution. The complaint alleges that the 1901 statute effects an apportionment that deprives the appellants of the equal protection of the laws in violation of the Fourteenth Amendment. Dismissal of the complaint upon the ground of lack of jurisdiction of the subject matter would, therefore, be justified only if that claim were "so attenuated and unsubstantial as to be absolutely devoid of merit," *Newburyport Water Co.* v. *Newburyport,* 193 U. S. 561, 579, or "frivolous," *Bell* v. *Hood,* 327 U. S. 678, 683.[17] That the claim is unsubstantial must be "very plain." *Hart* v. *Keith Vaudeville Exchange,* 262 U. S. 271, 274. Since the District Court obviously and correctly did not deem the asserted federal constitutional claim unsubstantial and frivolous, it should not have dismissed the complaint for want of jurisdiction of the subject matter. And of course no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter. We said in an earlier voting case from Tennessee: "It is obvious . . . that the court, in dismissing for want of jurisdiction, was controlled by what it deemed to be the want of merit in the averments which were made in the complaint as to the violation of the Federal right. But as the very nature of the controversy was Federal, and, therefore,

---

[17] The accuracy of calling even such dismissals "jurisdictional" was questioned in *Bell* v. *Hood.* See 327 U. S., at 683.

jurisdiction existed, whilst the opinion of the court as to the want of merit in the cause of action might have furnished ground for dismissing for that reason, it afforded no sufficient ground for deciding that the action was not one arising under the Constitution and laws of the United States." *Swafford* v. *Templeton,* 185 U. S. 487, 493. "For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Bell* v. *Hood,* 327 U. S. 678, 682. See also *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 305–308.

Since the complaint plainly sets forth a case arising under the Constitution, the subject matter is within the federal judicial power defined in Art. III, § 2, and so within the power of Congress to assign to the jurisdiction of the District Courts. Congress has exercised that power in 28 U. S. C. § 1343 (3):

> "The district courts shall have original jurisdiction of any civil action authorized by law [18] to be commenced by any person . . . [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States . . . ." [19]

---

[18] 42 U. S. C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[19] This Court has frequently sustained District Court jurisdiction under 28 U. S. C. § 1343 (3) or its predecessors to entertain suits to redress deprivations of rights secured against state infringement by the Equal Protection and Due Process Clauses of the Fourteenth

An unbroken line of our precedents sustains the federal courts' jurisdiction of the subject matter of federal constitutional claims of this nature. The first cases involved the redistricting of States for the purpose of electing Representatives to the Federal Congress. When the Ohio Supreme Court sustained Ohio legislation against an attack for repugnancy to Art. I, § 4, of the Federal Constitution, we affirmed on the merits and expressly refused to dismiss for want of jurisdiction "In view . . . of the subject-matter of the controversy and the Federal characteristics which inhere in it . . . ." *Ohio ex rel. Davis* v. *Hildebrant,* 241 U. S. 565, 570. When the Minnesota Supreme Court affirmed the dismissal of a suit to enjoin the Secretary of State of Minnesota from acting under Minnesota redistricting legislation, we reviewed the constitutional merits of the legislation and reversed the State Supreme Court. *Smiley* v. *Holm,* 285 U. S. 355. And see companion cases from the New York Court of Appeals and the Missouri Supreme Court, *Koenig* v. *Flynn,* 285 U. S. 375; *Carroll* v. *Becker,* 285 U. S. 380. When a three-judge District Court, exercising jurisdiction under the predecessor of 28 U. S. C. § 1343 (3), permanently enjoined officers of the State of Mississippi from conducting an election of Representatives under a Mississippi redistricting act, we reviewed the federal questions on the merits and reversed the District Court. *Wood* v. *Broom,* 287 U. S. 1, reversing 1 F. Supp. 134. A similar decree of a District Court, exercising jurisdiction under the same statute, concerning a Kentucky redistricting act, was

Amendment. *Douglas* v. *Jeannette,* 319 U. S. 157; *Stefanelli* v. *Minard,* 342 U. S. 117; cf. *Nixon* v. *Herndon,* 273 U. S. 536; *Nixon* v. *Condon,* 286 U. S. 73; *Snowden* v. *Hughes,* 321 U. S. 1; *Smith* v. *Allwright,* 321 U. S. 649; *Monroe* v. *Pape,* 365 U. S. 167; *Egan* v. *Aurora,* 365 U. S. 514.

reviewed and the decree reversed. *Mahan* v. *Hume*, 287 U. S. 575, reversing 1 F. Supp. 142.[20]

The appellees refer to *Colegrove* v. *Green*, 328 U. S. 549, as authority that the District Court lacked jurisdiction of the subject matter. Appellees misconceive the holding of that case. The holding was precisely contrary to their reading of it. Seven members of the Court participated in the decision. Unlike many other cases in this field which have assumed without discussion that there was jurisdiction, all three opinions filed in *Colegrove* discussed the question. Two of the opinions expressing the views of four of the Justices, a majority, flatly held that there was jurisdiction of the subject matter. MR. JUSTICE BLACK joined by MR. JUSTICE DOUGLAS and Mr. Justice Murphy stated: "It is my judgment that the District Court had jurisdiction . . . ," citing the predecessor of 28 U. S. C. § 1343 (3), and *Bell* v. *Hood, supra.* 328 U. S., at 568. Mr. Justice Rutledge, writing separately, expressed agreement with this conclusion. 328 U. S., at 564, 565, n. 2. Indeed, it is even questionable that the opinion of MR. JUSTICE FRANKFURTER, joined by Justices Reed and Burton, doubted jurisdiction of the subject matter. Such doubt would have been inconsistent with the professed willingness to turn the decision on either the majority or concurring views in *Wood* v. *Broom, supra.* 328 U. S., at 551.

Several subsequent cases similar to *Colegrove* have been decided by the Court in summary *per curiam* statements. None was dismissed for want of jurisdiction of the subject matter. *Cook* v. *Fortson,* 329 U. S. 675; *Turman* v.

---

[20] Since that case was not brought to the Court until after the election had been held, the Court cited not only *Wood* v. *Broom,* but also directed dismissal for mootness, citing *Brownlow* v. *Schwartz,* 261 U. S. 216.

*Duckworth, ibid.; Colegrove* v. *Barrett,* 330 U. S. 804; [21]
*Tedesco* v. *Board of Supervisors,* 339 U. S. 940; *Remmey*
v. *Smith,* 342 U. S. 916; *Cox* v. *Peters,* 342 U. S. 936;
*Anderson* v. *Jordan,* 343 U. S. 912; *Kidd* v. *McCanless,*
352 U. S. 920; *Radford* v. *Gary,* 352 U. S. 991; *Hartsfield*
v. *Sloan,* 357 U. S. 916; *Matthews* v. *Handley,* 361 U. S.
127.[22]

Two cases decided with opinions after *Colegrove* like-
wise plainly imply that the subject matter of this suit is
within District Court jurisdiction. In *MacDougall* v.
*Green,* 335 U. S. 281, the District Court dismissed for
want of jurisdiction, which had been invoked under 28
U. S. C. § 1343 (3), a suit to enjoin enforcement of the
requirement that nominees for state-wide elections be
supported by a petition signed by a minimum number of
persons from at least 50 of the State's 102 counties.
This Court's disagreement with that action is clear since
the Court affirmed the judgment after a review of the
merits and concluded that the particular claim there was
without merit. In *South* v. *Peters,* 339 U. S. 276, we
affirmed the dismissal of an attack on the Georgia "county
unit" system but founded our action on a ground that
plainly would not have been reached if the lower court
lacked jurisdiction of the subject matter, which allegedy
existed under 28 U. S. C. § 1343 (3). The express words
of our holding were that "Federal courts consistently
refuse to exercise their equity powers in cases posing

[21] Compare *Boeing Aircraft Co.* v. *King County,* 330 U. S. 803
("the appeal is dismissed for want of jurisdiction"). See *Coleman* v.
*Miller,* 307 U. S. 433, 440.

[22] *Matthews* did affirm a judgment that may be read as a dis-
missal for want of jurisdiction, 179 F. Supp. 470. However, the
motion to affirm also rested on the ground of failure to state a claim
upon which relief could be granted. Cf. text following, on *MacDougall*
v. *Green.* And see text, *infra,* p. 236.

political issues arising from a state's geographical distribution of electoral strength among its political subdivisions." 339 U. S., at 277.

We hold that the District Court has jurisdiction of the subject matter of the federal constitutional claim asserted in the complaint.

## III.

### STANDING.

A federal court cannot "pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." *Liverpool Steamship Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39. Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing. It is, of course, a question of federal law.

The complaint was filed by residents of Davidson, Hamilton, Knox, Montgomery, and Shelby Counties. Each is a person allegedly qualified to vote for members of the General Assembly representing his county.[23] These appellants sued "on their own behalf and on behalf of all qualified voters of their respective counties, and further, on behalf of all voters of the State of Tennessee who

---

[23] The Mayor of Nashville suing "on behalf of himself and all residents of the City of Nashville, Davidson County, . . ." and the Cities of Chattanooga (Hamilton County) and Knoxville (Knox County), each suing on behalf of its residents, were permitted to intervene as parties plaintiff. Since they press the same claims as do the initial plaintiffs, we find it unnecessary to decide whether the intervenors would have standing to maintain this action in their asserted representative capacities.

are similarly situated . . . ."[24]   The appellees are the Tennessee Secretary of State, Attorney General, Coordinator of Elections, and members of the State Board of Elections; the members of the State Board are sued in their own right and also as representatives of the County Election Commissioners whom they appoint.[25]

[24] The complaint also contains an averment that the appellants sue "on their own behalf and *on behalf of all other voters* in the State of Tennessee." (Emphasis added.)   This may be read to assert a claim that voters in counties allegedly over-represented in the General Assembly also have standing to complain.   But it is not necessary to decide that question in this case.

[25] The duties of the respective appellees are alleged to be as follows:

"Defendant, *Joe C. Carr*, is the duly elected, qualified and acting Secretary of State of the State of Tennessee, with his office in Nashville in said State, and as such he is charged with the duty of furnishing blanks, envelopes and information slips to the County Election Commissioners, certifying the results of elections and maintaining the records thereof; and he is further ex officio charged, together with the Governor and the Attorney General, with the duty of examining the election returns received from the County Election Commissioners and declaring the election results, by the applicable provisions of the Tennessee Code Annotated, and by Chapter 164 of the Acts of 1949, inter alia.

"Defendant, *George F. McCanless*, is the duly appointed and acting Attorney General of the State of Tennessee, with his office in Nashville in said State, and is charged with the duty of advising the officers of the State upon the law, and is made by Section 23–1107 of the Tennessee Code Annotated a necessary party defendant in any declaratory judgment action where the constitutionality of statutes of the State of Tennessee is attacked, and he is ex-officio charged, together with the Governor and the Secretary of State, with the duty of declaring the election results, under Section 2–140 of the Tennessee Code Annotated.

"Defendant, *Jerry McDonald*, is the duly appointed Coordinator of Elections in the State of Tennessee, with his office in Nashville, Tennessee, and as such official, is charged with the duties set forth in the public law enacted by the 1959 General Assembly of Tennessee creating said office.

"Defendants, *Dr. Sam Coward, James Alexander*, and *Hubert Brooks* are the duly appointed and qualified members constituting

We hold that the appellants do have standing to maintain this suit. Our decisions plainly support this conclusion. Many of the cases have assumed rather than articulated the premise in deciding the merits of similar claims.[26]   And *Colegrove* v. *Green, supra,* squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue.[27]   A num-

the State Board of Elections, and as such they are charged with the duty of appointing the Election Commissioners for all the counties of the State of Tennessee, the organization and supervision of the biennial elections as provided by the Statutes of Tennessee, Chapter 9 of Title 2 of the Tennessee Code Annotated, Sections 2–901, et seq.

"That this action is brought against the aforenamed defendants in their representative capacities, and that said Election Commissioners are sued also as representatives of all of the County Election Commissioners in the State of Tennessee, such persons being so numerous as to make it impracticable to bring them all before the court; that there is a common question of law involved, namely, the constitutionality of Tennessee laws set forth in the Tennessee Code Annotated, Section 3–101 through Section 3–109, inclusive; that common relief is sought against all members of said Election Commissions in their official capacities, it being the duties of the aforesaid County Election Commissioners, within their respective jurisdictions, to appoint the judges of elections, to maintain the registry of qualified voters of said County, certify the results of elections held in said County to the defendants State Board of Elections and Secretary of State, and of preparing ballots and taking other steps to prepare for and hold elections in said Counties by virtue of Sections 2–1201, et seq. of Tennessee Code Annotated, and Section 2–301, et seq. of Tennessee Code Annotated, and Chapter 164 of the Acts of 1949, inter alia."

The question whether the named defendants are sufficient parties remains open for consideration on remand.

[26] *Smiley* v. *Holm, supra,* at 361 (" 'citizen, elector and taxpayer' of the State"); *Koenig* v. *Flynn, supra,* at 379 (" 'citizens and voters' of the State") *Wood* v. *Broom, supra,* at 4 ("citizen of Mississippi, a qualified elector under its laws, and also qualified to be a candidate for election as representative in Congress"); cf. *Carroll* v. *Becker, supra* (candidate for office).

[27] Mr. Justice Rutledge was of the view that any question of standing was settled in *Smiley* v. *Holm, supra;* Mr. Justice Black stated "that appellants had standing to sue, since the facts alleged show that

ber of cases decided after *Colegrove* recognized the standing of the voters there involved to bring those actions.[28]

These appellants seek relief in order to protect or vindicate an interest of their own, and of those similarly situated. Their constitutional claim is, in substance, that the 1901 statute constitutes arbitrary and capricious state action, offensive to the Fourteenth Amendment in its irrational disregard of the standard of apportionment prescribed by the State's Constitution or of any standard, effecting a gross disproportion of representation to voting population. The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality *vis-à-vis* voters

they have been injured as individuals." He relied on *Coleman* v. *Miller*, 307 U. S. 433, 438, 467. See 328 U. S. 564, 568.

Commentators have suggested that the following statement in MR. JUSTICE FRANKFURTER's opinion might imply a view that appellants there had no standing: "This is not an action to recover for damage because of the discriminatory exclusion of a plaintiff from rights enjoyed by other citizens. The basis for the suit is not a private wrong, but a wrong suffered by Illinois as a polity." 328 U. S., at 552. See Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv. L. Rev. 1265, 1298 (1961); Lewis, Legislative Apportionment and the Federal Courts, 71 Harv. L. Rev. 1057, 1081–1083 (1958). But since the opinion goes on to consider the merits, it seems that this statement was not intended to intimate any view that the plaintiffs in that action lacked standing. Nor do the cases cited immediately after the above quotation deal with standing. See especially *Lane* v. *Wilson*, 307 U. S. 268, 272–273.

[28] *MacDougall* v. *Green, supra*, at 282 ("the 'Progressive Party,' its nominees for United States Senator, Presidential Electors, and State offices, and several Illinois voters"); *South* v. *Peters, supra*, at 277 ("residents of the most populous county in the State"); *Radford* v. *Gary*, 145 F. Supp. 541, 542 ("citizen of Oklahoma and resident and voter in the most populous county"); *Matthews* v. *Handley, supra* ("citizen of the State"); see also *Hawke* v. *Smith* (*No. 1*), 253 U. S. 221; *Leser* v. *Garnett*, 258 U. S. 130; *Coleman* v. *Miller*, 307 U. S. 433, 437–446.

in irrationally favored counties. A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, cf. *United States* v. *Classic,* 313 U. S. 299; or by a refusal to count votes from arbitrarily selected precincts, cf. *United States* v. *Mosley,* 238 U. S. 383, or by a stuffing of the ballot box, cf. *Ex parte Siebold,* 100 U. S. 371; *United States* v. *Saylor,* 322 U. S. 385.

It would not be necessary to decide whether appellants' allegations of impairment of their votes by the 1901 apportionment will, ultimately, entitle them to any relief, in order to hold that they have standing to seek it. If such impairment does produce a legally cognizable injury, they are among those who have sustained it. They are asserting "a plain, direct and adequate interest in maintaining the effectiveness of their votes," *Coleman* v. *Miller,* 307 U. S., at 438, not merely a claim of "the right, possessed by every citizen, to require that the Government be administered according to law . . . ." *Fairchild* v. *Hughes,* 258 U. S. 126, 129; compare *Leser* v. *Garnett,* 258 U. S. 130. They are entitled to a hearing and to the District Court's decision on their claims. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury* v. *Madison,* 1 Cranch 137, 163.

## IV.

### JUSTICIABILITY.

In holding that the subject matter of this suit was not justiciable, the District Court relied on *Colegrove* v. *Green, supra,* and subsequent *per curiam* cases.[29] The

[29] *Cook* v. *Fortson,* 329 U. S. 675; *Turman* v. *Duckworth, ibid.; Colegrove* v. *Barrett,* 330 U. S. 804; *MacDougall* v. *Green,* 335 U. S. 281; *South* v. *Peters,* 339 U. S. 276; *Remmey* v. *Smith,* 342 U. S. 916;

court stated: "From a review of these decisions there can be no doubt that the federal rule . . . is that the federal courts . . . will not intervene in cases of this type to compel legislative reapportionment." 179 F. Supp., at 826. We understand the District Court to have read the cited cases as compelling the conclusion that since the appellants sought to have a legislative apportionment held unconstitutional, their suit presented a "political question" and was therefore nonjusticiable. We hold that this challenge to an apportionment presents no nonjusticiable "political question." The cited cases do not hold the contrary.

Of course the mere fact that the suit seeks protection of a political right does not mean it presents a political question. Such an objection "is little more than a play upon words." *Nixon* v. *Herndon,* 273 U. S. 536, 540. Rather, it is argued that apportionment cases, whatever the actual wording of the complaint, can involve no federal constitutional right except one resting on the guaranty of a republican form of government,[30] and that complaints based on that clause have been held to present political questions which are nonjusticiable.

We hold that the claim pleaded here neither rests upon nor implicates the Guaranty Clause and that its justiciability is therefore not foreclosed by our decisions of cases involving that clause. The District Court misinterpreted *Colegrove* v. *Green* and other decisions of this Court on which it relied. Appellants' claim that they are being denied equal protection is justiciable, and if

---

*Anderson* v. *Jordan,* 343 U. S. 912; *Kidd* v. *McCanless,* 352 U. S. 920; *Radford* v. *Gary,* 352 U. S. 991.

[30] "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U. S. Const., Art. IV, § 4.

"discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights." *Snowden* v. *Hughes,* 321 U. S. 1, 11. To show why we reject the argument based on the Guaranty Clause, we must examine the authorities under it. But because there appears to be some uncertainty as to why those cases did present political questions, and specifically as to whether this apportionment case is like those cases, we deem it necessary first to consider the contours of the "political question" doctrine.

Our discussion, even at the price of extending this opinion, requires review of a number of political question cases, in order to expose the attributes of the doctrine— attributes which, in various settings, diverge, combine, appear, and disappear in seeming disorderliness. Since that review is undertaken solely to demonstrate that neither singly nor collectively do these cases support a conclusion that this apportionment case is nonjusticiable, we of course do not explore their implications in other contexts. That review reveals that in the Guaranty Clause cases and in the other "political question" cases, it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the "political question."

We have said that "In determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." *Coleman* v. *Miller,* 307 U. S. 433, 454–455. The nonjusticiability of a political question is primarily a function of the separation of powers. Much confusion results from the capacity of the "political question" label to obscure the need for

case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. To demonstrate this requires no less than to analyze representative cases and to infer from them the analytical threads that make up the political question doctrine. We shall then show that none of those threads catches this case.

*Foreign relations:* There are sweeping statements to the effect that all questions touching foreign relations are political questions.[31] Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature;[32] but many such questions uniquely demand single-voiced statement of the Government's views.[33] Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible conse-

---

[31] *E. g.*, "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen* v. *Central Leather Co.*, 246 U. S. 297, 302.

[32] See *Doe* v. *Braden*, 16 How. 635, 657; *Taylor* v. *Morton*, 23 Fed. Cas., No. 13,799 (C. C. D. Mass.) (Mr. Justice Curtis), affirmed, 2 Black 481.

[33] See *Doe* v. *Braden*, 16 How. 635, 657.

quences of judicial action. For example, though a court will not ordinarily inquire whether a treaty has been terminated, since on that question "governmental action . . . must be regarded as of controlling importance," if there has been no conclusive "governmental action" then a court can construe a treaty and may find it provides the answer. Compare *Terlinden* v. *Ames,* 184 U. S. 270, 285, with *Society for the Propagation of the Gospel in Foreign Parts* v. *New Haven,* 8 Wheat. 464, 492–495.[34] Though a court will not undertake to construe a treaty in a manner inconsistent with a subsequent federal statute, no similar hesitancy obtains if the asserted clash is with state law. Compare *Whitney* v. *Robertson,* 124 U. S. 190, with *Kolovrat* v. *Oregon,* 366 U. S. 187.

While recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called "a republic of whose existence we know nothing,"[35] and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory,[36] once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area.[37] Similarly, recognition of belligerency abroad is an executive responsibility, but if the executive proclamations fall short of an explicit answer, a court may construe them seeking, for example, to determine whether the situation is such that statutes designed to assure American neutrality have

[34] And see *Clark* v. *Allen,* 331 U. S. 503.

[35] *United States* v. *Klintock,* 5 Wheat. 144, 149; see also *United States* v. *Palmer,* 3 Wheat. 610, 634–635.

[36] *Foster & Elam* v. *Neilson,* 2 Pet. 253, 307; and see *Williams* v. *Suffolk Insurance Co.,* 13 Pet. 415, 420.

[37] *Vermilya-Brown Co.* v. *Connell,* 335 U. S. 377, 380; *De Lima* v. *Bidwell,* 182 U. S. 1, 180–200.

become operative. *The Three Friends,* 166 U. S. 1, 63, 66. Still again, though it is the executive that determines a person's status as representative of a foreign government, *Ex parte Hitz,* 111 U. S. 766, the executive's statements will be construed where necessary to determine the court's jurisdiction, *In re Baiz,* 135 U. S. 403. Similar judicial action in the absence of a recognizedly authoritative executive declaration occurs in cases involving the immunity from seizure of vessels owned by friendly foreign governments. Compare *Ex parte Peru,* 318 U. S. 578, with *Mexico v. Hoffman,* 324 U. S. 30, 34–35.

*Dates of duration of hostilities:* Though it has been stated broadly that "the power which declared the necessity is the power to declare its cessation, and what the cessation requires," *Commercial Trust Co.* v. *Miller,* 262 U. S. 51, 57, here too analysis reveals isolable reasons for the presence of political questions, underlying this Court's refusal to review the political departments' determination of when or whether a war has ended. Dominant is the need for finality in the political determination, for emergency's nature demands "A prompt and unhesitating obedience," *Martin* v. *Mott,* 12 Wheat. 19, 30 (calling up of militia). Moreover, "the cessation of hostilities does not necessarily end the war power. It was stated in *Hamilton* v. *Kentucky Distilleries & W. Co.,* 251 U. S. 146, 161, that the war power includes the power 'to remedy the evils which have arisen from its rise and progress' and continues during that emergency. *Stewart* v. *Kahn,* 11 Wall. 493, 507." *Fleming* v. *Mohawk Wrecking Co.,* 331 U. S. 111, 116. But deference rests on reason, not habit.[38] The question in a particular case may not seriously implicate considerations of finality—*e. g.,* a public program of importance

---

[38] See, *e. g., Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426.

(rent control) yet not central to the emergency effort.[39] Further, clearly definable criteria for decision may be available. In such case the political question barrier falls away: "[A] Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared. . . . [It can] inquire whether the exigency still existed upon which the continued operation of the law depended." *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543, 547–548.[40] Compare *Woods* v. *Miller Co.,* 333 U. S. 138. On the other hand, even in private litigation which directly implicates no feature of separation of powers, lack of judicially discoverable standards and the drive for even-handed application may impel reference to the political departments' determination of dates of hostilities' beginning and ending. *The Protector,* 12 Wall. 700.

*Validity of enactments:* In *Coleman* v. *Miller, supra,* this Court held that the questions of how long a proposed amendment to the Federal Constitution remained open to ratification, and what effect a prior rejection had on a subsequent ratification, were committed to congressional resolution and involved criteria of decision that necessarily escaped the judicial grasp.[41] Similar considerations apply to the enacting process: "The respect due to coequal and independent departments," and the need for finality and certainty about the status of a statute contribute to judicial reluctance to inquire whether, as passed, it complied with all requisite formalities. *Field* v. *Clark,* 143 U. S. 649, 672, 676–677; see *Leser* v. *Garnett,* 258 U. S. 130, 137. But it is not true that courts will never delve

---

[39] Contrast *Martin* v. *Mott, supra.*

[40] But cf. *Dakota Central Tel. Co.* v. *South Dakota,* 250 U. S. 163, 184, 187.

[41] Cf. *Dillon* v. *Gloss,* 256 U. S. 368. See also *United States* v. *Sprague,* 282 U. S. 716, 732.

into a legislature's records upon such a quest: If the enrolled statute lacks an effective date, a court will not hesitate to seek it in the legislative journals in order to preserve the enactment. *Gardner* v. *The Collector*, 6 Wall. 499. The political question doctrine, a tool for maintenance of governmental order, will not be so applied as to promote only disorder.

*The status of Indian tribes:* This Court's deference to the political departments in determining whether Indians are recognized as a tribe, while it reflects familiar attributes of political questions,[42] *United States* v. *Holliday*, 3 Wall. 407, 419, also has a unique element in that "the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else. . . . [The Indians are] domestic dependent nations . . . in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian." *The Cherokee Nation* v. *Georgia*, 5 Pet. 1, 16, 17.[43] Yet, here too, there is no blanket rule. While

---

[42] See also *Fellows* v. *Blacksmith*, 19 How. 366, 372; *United States* v. *Old Settlers*, 148 U. S. 427, 466; and compare *Doe* v. *Braden*, 16 How. 635, 657.

[43] This case, so frequently cited for the broad proposition that the status of an Indian tribe is a matter for the political departments, is in fact a noteworthy example of the limited and precise impact of a political question. The Cherokees brought an original suit in this Court to enjoin Georgia's assertion of jurisdiction over Cherokee territory and abolition of Cherokee government and laws. Unquestionably the case lay at the vortex of most fiery political embroilment. See 1 Warren, The Supreme Court in United States History (Rev. ed.), 729–779. But in spite of some broader language in separate opinions, all that the Court held was that it possessed no original jurisdiction over the suit: for the Cherokees could in no view be considered either a State of this Union or a "foreign state." Chief Justice Marshall treated the question as one of *de novo* interpretation of words in the Constitution. The Chief Justice did say that "The acts of our government plainly recognize the Cherokee nation

" 'It is for [Congress] . . . , and not for the courts, to determine when the true interests of the Indian require his release from [the] condition of tutelage' . . . , it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe . . . ." *United States* v. *Sandoval*, 231 U. S. 28, 46. Able to discern what is "distinctly Indian," *ibid.*, the courts will strike down

as a state, and the courts are bound by those acts," but here he referred to their existence "as a state, as a distinct political society, separated from others . . . ." From there he went to "A question of much more difficulty . . . . Do the Cherokees constitute a foreign state in the sense of the constitution?" *Id.*, at 16. Thus, while the Court referred to "the political" for the decision whether the tribe was an entity, a separate polity, it held that whether being an entity the tribe had such status as to be entitled to sue originally was a judicially soluble issue: criteria were discoverable in relevant phrases of the Constitution and in the common understanding of the times. As to this issue, the Court was not hampered by problems of the management of unusual evidence or of possible interference with a congressional program. Moreover, Chief Justice Marshall's dictum that "It savours too much of the exercise of political power to be within the proper province of the judicial department," *id.*, at 20, was not addressed to the issue of the Cherokees' status to sue, but rather to the breadth of the claim asserted and the impropriety of the relief sought. Compare *Georgia* v. *Stanton*, 6 Wall. 50, 77. The Chief Justice made clear that if the issue of the Cherokees' rights arose in a customary legal context, "a proper case with proper parties," it would be justiciable. Thus, when the same dispute produced a case properly brought, in which the right asserted was one of protection under federal treaties and laws from conflicting state law, and the relief sought was the voiding of a conviction under that state law, the Court did void the conviction. *Worcester* v. *Georgia*, 6 Pet. 515. There, the fact that the tribe was a separate polity served as a datum contributing to the result, and despite the consequences in a heated federal-state controversy and the opposition of the other branches of the National Government, the judicial power acted to reverse the State Supreme Court. An example of similar isolation of a political question in the decision of a case is *Luther* v. *Borden*, 7 How. 1, see *infra*.

any heedless extension of that label. They will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power.

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

But it is argued that this case shares the characteristics of decisions that constitute a category not yet considered, cases concerning the Constitution's guaranty, in Art. IV,

§ 4, of a republican form of government. A conclusion as to whether the case at bar does present a political question cannot be confidently reached until we have considered those cases with special care. We shall discover that Guaranty Clause claims involve those elements which define a "political question," and for that reason and no other, they are nonjusticiable. In particular, we shall discover that the nonjusticiability of such claims has nothing to do with their touching upon matters of state governmental organization.

*Republican form of government: Luther v. Borden,* 7 How. 1, though in form simply an action for damages for trespass was, as Daniel Webster said in opening the argument for the defense, "an unusual case." [44] The defendants, admitting an otherwise tortious breaking and entering, sought to justify their action on the ground that they were agents of the established lawful government of Rhode Island, which State was then under martial law to defend itself from active insurrection; that the plaintiff was engaged in that insurrection; and that they entered under orders to arrest the plaintiff. The case arose "out of the unfortunate political differences which agitated the people of Rhode Island in 1841 and 1842," 7 How., at 34, and which had resulted in a situation wherein two groups laid competing claims to recognition as the lawful government. [45] The plaintiff's right to

---

[44] 7 How., at 29. And see 11 The Writings and Speeches of Daniel Webster 217 (1903).

[45] See Mowry, The Dorr War (1901), and its exhaustive bibliography. And for an account of circumstances surrounding the decision here, see 2 Warren, The Supreme Court in United States History (Rev. ed.), 185-195.

Dorr himself, head of one of the two groups and held in a Rhode Island jail under a conviction for treason, had earlier sought a decision from the Supreme Court that his was the lawful government. His application for original habeas corpus in the Supreme Court was

recover depended upon which of the two groups was entitled to such recognition; but the lower court's refusal to receive evidence or hear argument on that issue, its charge to the jury that the earlier established or "charter" government was lawful, and the verdict for the defendants, were affirmed upon appeal to this Court.

Chief Justice Taney's opinion for the Court reasoned as follows: (1) If a court were to hold the defendants' acts unjustified because the charter government had no legal existence during the period in question, it would follow that all of that government's actions—laws enacted, taxes collected, salaries paid, accounts settled, sentences passed—were of no effect; and that "the officers who carried their decisions into operation [were] answerable as trespassers, if not in some cases as criminals." [46] There was, of course, no room for application of any doctrine of *de facto* status to uphold prior acts of an officer not authorized *de jure,* for such would have defeated the plaintiff's very action. A decision for the plaintiff would inevitably have produced some significant measure of chaos, a consequence to be avoided if it could be done without abnegation of the judicial duty to uphold the Constitution.

(2) No state court had recognized as a judicial responsibility settlement of the issue of the locus of state governmental authority. Indeed, the courts of Rhode Island had in several cases held that "it rested with the political power to decide whether the charter government had been displaced or not," and that that department had acknowledged no change.

---

denied because the federal courts then lacked authority to issue habeas for a prisoner held under a state court sentence. *Ex parte Dorr,* 3 How. 103.

[46] 7 How., at 39.

(3) Since "[t]he question relates, altogether, to the constitution and laws of [the] . . . State," the courts of the United States had to follow the state courts' decisions unless there was a federal constitutional ground for overturning them.[47]

(4) No provision of the Constitution could be or had been invoked for this purpose except Art. IV, § 4, the Guaranty Clause. Having already noted the absence of standards whereby the choice between governments could be made by a court acting independently, Chief Justice Taney now found further textual and practical reasons for concluding that, if any department of the United States was empowered by the Guaranty Clause to resolve the issue, it was not the judiciary:

> "Under this article of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue; and . . . Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in the courts.

---

[47] *Id.*, at 39, 40.

"So, too, as relates to the clause in the above-mentioned article of the Constitution, providing for cases of domestic violence. It rested with Congress, too, to determine upon the means proper to be adopted to fulfill this guarantee. . . . [B]y the act of February 28, 1795, [Congress] provided, that, 'in case of an insurrection in any State against the government thereof, it shall be lawful for the President of the United States, on application of the legislature of such State or of the executive (when the legislature cannot be convened), to call forth such number of the militia of any other State or States, as may be applied for, as he may judge sufficient to suppress such insurrection.'

"By this act, the power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the President. . . .

"After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right? . . . If the judicial power extends so far, the guarantee contained in the Constitution of the United States is a guarantee of anarchy, and not of order. . . .

"It is true that in this case the militia were not called out by the President. But upon the application of the governor under the charter government, the President recognized him as the executive power of the State, and took measures to call out the militia to support his authority if it should be found necessary for the general government to interfere . . . . [C]ertainly no court of the United States, with a knowledge of this decision, would have been justified in recognizing the opposing party as the lawful gov-

ernment . . . . In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice. . . ." 7 How., at 42–44.

Clearly, several factors were thought by the Court in *Luther* to make the question there "political": the commitment to the other branches of the decision as to which is the lawful state government; the unambiguous action by the President, in recognizing the charter government as the lawful authority; the need for finality in the executive's decision; and the lack of criteria by which a court could determine which form of government was republican.[48]

---

[48] Even though the Court wrote of unrestrained legislative and executive authority under this Guaranty, thus making its enforcement a political question, the Court plainly implied that the political question barrier was no absolute: "Unquestionably a military government, established as the permanent government of the State, would not be a republican government, and it would be the duty of Congress to overthrow it." 7 How., at 45. Of course, it does not necessarily follow that if Congress did not act, the Court would. For while the judiciary might be able to decide the limits of the meaning of "republican form," and thus the factor of lack of criteria might fall away, there would remain other possible barriers to decision because of primary commitment to another branch, which would have to be considered in the particular fact setting presented.

That was not the only occasion on which this Court indicated that lack of criteria does not obliterate the Guaranty's extreme limits: "The guaranty is of a republican form of government. No particular government is designated as republican, neither is the exact form to be guaranteed, in any manner especially designated. Here, as in other parts of the instrument, we are compelled to resort elsewhere to ascertain what was intended.

"The guaranty necessarily implies a duty on the part of the States themselves to provide such a government. All the States had governments when the Constitution was adopted. In all the people participated to some extent, through their representatives elected in the manner specially provided. These governments the Constitution did not change. They were accepted precisely as they were, and it

But the only significance that *Luther* could have for our immediate purposes is in its holding that the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government. The Court has since refused to resort to the Guaranty Clause—which alone had been invoked for the purpose—as the source of a constitutional standard for invalidating state action. See *Taylor & Marshall* v. *Beckham (No. 1)*, 178 U. S. 548 (claim that Kentucky's resolution of contested gubernatorial election deprived voters of republican government held nonjusticiable); *Pacific States Tel. Co.* v. *Oregon*, 223 U. S. 118 (claim that initiative and referendum negated republican government held nonjusticiable); *Kiernan* v. *Portland*, 223 U. S. 151 (claim that municipal charter amendment *per* municipal initiative and referendum negated republican government held non-

is, therefore, to be presumed that they were such as it was the duty of the States to provide. Thus we have unmistakable evidence of what was republican in form, within the meaning of that term as employed in the Constitution." *Minor* v. *Happersett,* 21 Wall. 162, 175–176. There, the question was whether a government republican in form could deny the vote to women.

*In re Duncan,* 139 U. S. 449, upheld a murder conviction against a claim that the relevant codes had been invalidly enacted. The Court there said:

"By the Constitution, a republican form of government is guaranteed to every State in the Union, and the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves; but, while the people are thus the source of political power, their governments, National and State, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities." 139 U. S., at 461. But the Court did not find any of these fundamental principles violated.

justiciable); *Marshall* v. *Dye,* 231 U. S. 250 (claim that Indiana's constitutional amendment procedure negated republican government held nonjusticiable); *O'Neill* v. *Leamer,* 239 U. S. 244 (claim that delegation to court of power to form drainage districts negated republican government held "futile"); *Ohio ex rel. Davis* v. *Hildebrant,* 241 U. S. 565 (claim that invalidation of state reapportionment statute *per* referendum negates republican government held nonjusticiable); [49] *Mountain Timber Co.* v. *Washington,* 243 U. S. 219 (claim that workmen's compensation violates republican government held nonjusticiable); *Ohio ex rel. Bryant* v. *Akron Metropolitan Park District,* 281 U. S. 74 (claim that rule requiring invalidation of statute by all but one justice of state court negated republican government held nonjusticiable); *Highland Farms Dairy* v. *Agnew,* 300 U. S. 608 (claim that delegation to agency of power to control milk prices violated republican government, rejected).

Just as the Court has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question so has it held, and for the same reasons, that challenges to congressional action on the ground of inconsistency with that clause present no justiciable question. In *Georgia* v. *Stanton,* 6 Wall. 50, the State sought by an original bill to enjoin execution of the Reconstruction Acts, claiming that it already possessed "A republican State, in every political, legal, constitutional, and juridical sense," and that enforcement of the new Acts "Instead of keeping the guaranty against a forcible overthrow of its government by foreign invaders or domestic insurgents, . . . is destroying that very government by force." [50] Congress had clearly refused to

---

[49] But cf. *Hawke* v. *Smith (No. 1),* 253 U. S. 221; *National Prohibition Cases,* 253 U. S. 350.

[50] 6 Wall., at 65, 66.

recognize the republican character of the government of the suing State.[51]  It seemed to the Court that the only constitutional claim that could be presented was under the Guaranty Clause, and Congress having determined that the effects of the recent hostilities required extraordinary measures to restore governments of a republican form, this Court refused to interfere with Congress' action at the behest of a claimant relying on that very guaranty.[52]

In only a few other cases has the Court considered Art. IV, § 4, in relation to congressional action.  It has refused to pass on a claim relying on the Guaranty Clause to establish that Congress lacked power to allow the States to employ the referendum in passing on legislation redistricting for congressional seats.  *Ohio ex rel. Davis* v. *Hildebrant, supra.*  And it has pointed out that Congress is not required to establish republican government in the territories before they become States, and before they have attained a sufficient population to warrant a

---

[51] The First Reconstruction Act opened: "Whereas no legal State governments . . . now exists [*sic*] in the rebel States of . . . Georgia [and] Mississippi . . . ; and whereas it is necessary that peace and good order should be enforced in said States until loyal and republican State governments can be legally established: . . ."  14 Stat. 428.  And see 15 Stat. 2, 14.

[52] In *Mississippi* v. *Johnson,* 4 Wall. 475, the State sought to enjoin the President from executing the Acts, alleging that his role was purely ministerial.  The Court held that the duties were in no sense ministerial, and that although the State sought to compel inaction rather than action, the absolute lack of precedent for any such distinction left the case one in which "general principles . . . forbid judicial interference with the exercise of Executive discretion."  4 Wall., at 499.  See also *Mississippi* v. *Stanton,* 154 U. S. 554; and see 2 Warren, The Supreme Court in United States History (Rev. ed.), 463.

For another instance of congressional action challenged as transgressing the Guaranty Clause, see *The Collector* v. *Day,* 11 Wall. 113, 125–126, overruled, *Graves* v. *O'Keefe,* 306 U. S. 466.

popularly elected legislature. *Downes* v. *Bidwell*, 182 U. S. 244, 278–279 (dictum).[53]

We come, finally, to the ultimate inquiry whether our precedents as to what constitutes a nonjusticiable "political question" bring the case before us under the umbrella of that doctrine. A natural beginning is to note whether any of the common characteristics which we have been able to identify and label descriptively are present. We find none: The question here is the consistency of state action with the Federal Constitution. We have no question decided, or to be decided, by a political branch of government coequal with this Court. Nor do we risk embarrassment of our government abroad, or grave disturbance at home[54] if we take issue with Tennessee as to the constitutionality of her action here challenged. Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action.

This case does, in one sense, involve the allocation of political power within a State, and the appellants

---

[53] On the other hand, the implication of the Guaranty Clause in a case concerning congressional action does not always preclude judicial action. It has been held that the clause gives Congress no power to impose restrictions upon a State's admission which would undercut the constitutional mandate that the States be on an equal footing. *Coyle* v. *Smith*, 221 U. S. 559. And in *Texas* v. *White*, 7 Wall. 700, although Congress had determined that the State's government was not republican in form, the State's standing to bring an original action in this Court was sustained.

[54] See, *infra*, p. 235, considering *Kidd* v. *McCanless*, 352 U. S. 920.

might conceivably have added a claim under the Guaranty Clause. Of course, as we have seen, any reliance on that clause would be futile. But because any reliance on the Guaranty Clause could not have succeeded it does not follow that appellants may not be heard on the equal protection claim which in fact they tender. True, it must be clear that the Fourteenth Amendment claim is not so enmeshed with those political question elements which render Guaranty Clause claims nonjusticiable as actually to present a political question itself. But we have found that not to be the case here.

In this connection special attention is due *Pacific States Tel. Co.* v. *Oregon,* 223 U. S. 118. In that case a corporation tax statute enacted by the initiative was attacked ostensibly on three grounds: (1) due process; (2) equal protection; and (3) the Guaranty Clause. But it was clear that the first two grounds were invoked solely in aid of the contention that the tax was invalid by reason of its passage:

> "The defendant company does not contend here that it could not have been required to pay a license tax. It does not assert that it was denied an opportunity to be heard as to the amount for which it was taxed, or that there was anything inhering in the tax or involved intrinsically in the law which violated any of its constitutional rights. If such questions had been raised they would have been justiciable, and therefore would have required the calling into operation of judicial power. Instead, however, of doing any of these things, the attack on the statute here made is of a wholly different character. Its essentially political nature is at once made manifest by understanding that the assault which the contention here advanced makes it [*sic*] not on the tax as a tax, but on the State as a State. It is addressed to the

framework and political character of the government by which the statute levying the tax was passed. It is the government, the political entity, which (reducing the case to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power assailed, on the ground that its exertion has injuriously affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the State that it establish its right to exist as a State, republican in form." 223 U. S., at 150–151.

The due process and equal protection claims were held nonjusticiable in *Pacific States* not because they happened to be joined with a Guaranty Clause claim, or because they sought to place before the Court a subject matter which might conceivably have been dealt with through the Guaranty Clause, but because the Court believed that they were invoked merely in verbal aid of the resolution of issues which, in its view, entailed political questions. *Pacific States* may be compared with cases such as *Mountain Timber Co.* v. *Washington*, 243 U. S. 219, wherein the Court refused to consider whether a workmen's compensation act violated the Guaranty Clause but considered at length, and rejected, due process and equal protection arguments advanced against it; and *O'Neill* v. *Leamer*, 239 U. S. 244, wherein the Court refused to consider whether Nebraska's delegation of power to form drainage districts violated the Guaranty Clause, but went on to consider and reject the contention that the action against which an injunction was sought was not a taking for a public purpose.

We conclude then that the nonjusticiability of claims resting on the Guaranty Clause which arises from their embodiment of questions that were thought "political," can have no bearing upon the justiciability of the equal protection claim presented in this case. Finally, we

emphasize that it is the involvement in Guaranty Clause claims of the elements thought to define "political questions," and no other feature, which could render them nonjusticiable. Specifically, we have said that such claims are not held nonjusticiable because they touch matters of state governmental organization. Brief examination of a few cases demonstrates this.

When challenges to state action respecting matters of "the administration of the affairs of the State and the officers through whom they are conducted" [55] have rested on claims of constitutional deprivation which are amenable to judicial correction, this Court has acted upon its view of the merits of the claim. For example, in *Boyd* v. *Nebraska ex rel. Thayer,* 143 U. S. 135, we reversed the Nebraska Supreme Court's decision that Nebraska's Governor was not a citizen of the United States or of the State and therefore could not continue in office. In *Kennard* v. *Louisiana ex rel. Morgan,* 92 U. S. 480, and *Foster* v. *Kansas ex rel. Johnston,* 112 U. S. 201, we considered whether persons had been removed from public office by procedures consistent with the Fourteenth Amendment's due process guaranty, and held on the merits that they had. And only last Term, in *Gomillion* v. *Lightfoot,* 364 U. S. 339, we applied the Fifteenth Amendment to strike down a redrafting of municipal boundaries which effected a discriminatory impairment of voting rights, in the face of what a majority of the Court of Appeals thought to be a sweeping commitment to state legislatures of the power to draw and redraw such boundaries.[56]

*Gomillion* was brought by a Negro who had been a resident of the City of Tuskegee, Alabama, until the municipal boundaries were so recast by the State Legis-

---

[55] *Boyd* v. *Nebraska ex rel. Thayer,* 143 U. S. 135, 183 (Field, J., dissenting).

[56] *Gomillion* v. *Lightfoot,* 270 F. 2d 594, relying upon, *inter alia, Hunter* v. *Pittsburgh,* 207 U. S. 161.

lature as to exclude practically all Negroes. The plaintiff claimed deprivation of the right to vote in municipal elections. The District Court's dismissal for want of jurisdiction and failure to state a claim upon which relief could be granted was affirmed by the Court of Appeals. This Court unanimously reversed. This Court's answer to the argument that States enjoyed unrestricted control over municipal boundaries was:

> "Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution. . . . The opposite conclusion, urged upon us by respondents, would sanction the achievement by a State of any impairment of voting rights whatever so long as it was cloaked in the garb of the realignment of political subdivisions. 'It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.' " 364 U. S., at 344–345.

To a second argument, that *Colegrove* v. *Green, supra,* was a barrier to hearing the merits of the case, the Court responded that *Gomillion* was lifted "out of the so-called 'political' arena and into the conventional sphere of constitutional litigation" because here was discriminatory treatment of a racial minority violating the Fifteenth Amendment.

> "A statute which is alleged to have worked unconstitutional deprivations of petitioners' rights is not immune to attack simply because the mechanism employed by the legislature is a redefinition of municipal boundaries. . . . While in form this is merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of

their theretofore enjoyed voting rights. That was not *Colegrove* v. *Green*.

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." 364 U. S., at 347.[57]

We have not overlooked such cases as *In re Sawyer,* 124 U. S. 200, and *Walton* v. *House of Representatives,* 265 U. S. 487, which held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer. But these decisions explicitly reflect only a traditional limit upon equity jurisdiction, and not upon federal courts' power to inquire into matters of state governmental organization. This is clear not only from the opinions in those cases, but also from *White* v. *Berry,* 171 U. S. 366, which, relying on *Sawyer,* withheld federal equity from staying removal of a *federal* officer. *Wilson* v. *North Carolina,* 169 U. S. 586, simply dismissed an appeal from an unsuccessful suit to upset a State's removal procedure, on the ground that the constitutional claim presented—that a jury trial was necessary if the removal procedure was to comport with due process requirements—was frivolous. Finally, in *Taylor and Marshall* v. *Beckham (No. 1),* 178 U. S. 548, where losing candidates attacked the constitutionality of Kentucky's resolution of a contested gubernatorial election, the Court refused to consider the merits of a claim posited upon

---

[57] The Court's opinion was joined by MR. JUSTICE DOUGLAS, noting his adherence to the dissents in *Colegrove* and *South* v. *Peters, supra;* and the judgment was concurred in by MR. JUSTICE WHITTAKER, who wrote that the decision should rest on the Equal Protection Clause rather than on the Fifteenth Amendment, since there had been not solely a denial of the vote (if there had been that at all) but also a "fencing out" of a racial group.

the Guaranty Clause, holding it presented a political question, but also held on the merits that the ousted candidates had suffered no deprivation of property without due process of law.[58]

Since, as has been established, the equal protection claim tendered in this case does not require decision of any political question, and since the presence of a matter affecting state government does not render the case nonjusticiable, it seems appropriate to examine again the reasoning by which the District Court reached its conclusion that the case was nonjusticiable.

We have already noted that the District Court's holding that the subject matter of this complaint was nonjusticiable relied upon *Colegrove* v. *Green, supra,* and later cases. Some of those concerned the choice of members of a state legislature, as in this case; others, like *Colegrove* itself and earlier precedents, *Smiley* v. *Holm,* 285 U. S. 355, *Koenig* v. *Flynn,* 285 U. S. 375, and *Carroll* v. *Becker,* 285 U. S. 380, concerned the choice of Representatives in the Federal Congress. *Smiley, Koenig* and *Carroll* settled the issue in favor of justiciability of questions of congressional redistricting. The Court followed these precedents in *Colegrove* although over the dissent of three of the seven Justices who participated in that decision. On the issue of justiciability, all four Justices comprising a majority relied upon *Smiley* v. *Holm,* but in two opinions, one for three Justices, 328 U. S., at 566, 568, and a separate one by Mr. Justice Rutledge, 328 U. S., at 564. The argument that congressional redistricting problems presented a "political question" the resolution of which was confided to Congress might have been rested upon Art. I, § 4, Art. I, § 5, Art. I, § 2, and Amendment

---

[58] No holding to the contrary is to be found in *Cave* v. *Newell,* 246 U. S. 650, dismissing a writ of error to the Supreme Court of Missouri, 272 Mo. 653, 199 S. W. 1014; or in *Snowden* v. *Hughes,* 321 U. S. 1.

XIV, § 2.   Mr. Justice Rutledge said: "But for the ruling in *Smiley* v. *Holm*, 285 U. S. 355, I should have supposed that the provisions of the Constitution, Art. I, § 4, that 'The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . .'; Art. I, § 2 [but see Amendment XIV, § 2], vesting in Congress the duty of apportionment of representatives among the several states 'according to their respective Numbers'; and Art. I, § 5, making each House the sole judge of the qualifications of its own members, would remove the issues in this case from justiciable cognizance.   But, in my judgment, the *Smiley* case rules squarely to the contrary, save only in the matter of degree.   . . . Assuming that that decision is to stand, I think . . . that its effect is to rule that this Court has power to afford relief in a case of this type as against the objection that the issues are not justiciable."   328 U. S., at 564–565.   Accordingly, Mr. Justice Rutledge joined in the conclusion that the case was justiciable, although he held that the dismissal of the complaint should be affirmed.   His view was that "The shortness of the time remaining [before forthcoming elections] makes it doubtful whether action could, or would, be taken in time to secure for petitioners the effective relief they seek. . . .   I think, therefore, the case is one in which the Court may properly, and should, decline to exercise its jurisdiction.   Accordingly, the judgment should be affirmed and I join in that disposition of the cause."   328 U. S., at 565–566.[59]

[59] The ground of Mr. Justice Rutledge's vote to affirm is further explained in his footnote 3, 328 U. S., at 566: " 'The power of a court of equity to act is a discretionary one. . . . Where a federal court of equity is asked to interfere with the enforcement of state laws, it should do so only "to prevent irreparable injury which is clear and

Article I, §§ 2, 4, and 5, and Amendment XIV, § 2, relate only to congressional elections and obviously do not govern apportionment of state legislatures. However, our decisions in favor of justiciability even in light of those provisions plainly afford no support for the District Court's conclusion that the subject matter of this controversy presents a political question. Indeed, the refusal to award relief in *Colegrove* resulted only from the controlling view of a want of equity. Nor is anything contrary to be found in those *per curiams* that came after *Colegrove.* This Court dismissed the appeals in *Cook* v. *Fortson* and *Turman* v. *Duckworth,* 329 U. S. 675, as moot. *MacDougall* v. *Green,* 335 U. S. 281, held only that in that case equity would not act to void the State's requirement that there be at least a minimum of support for nom-

imminent." ' *American Federation of Labor* v. *Watson,* 327 U. S. 582, 593 and cases cited."

No constitutional questions, including the question whether voters have a judicially enforceable constitutional right to vote at elections of congressmen from districts of equal population, were decided in *Colegrove.* Six of the participating Justices reached the questions but divided three to three on their merits. Mr. Justice Rutledge believed that it was not necessary to decide them. He said: "There is [an alternative to constitutional decision] in this case. And I think the gravity of the constitutional questions raised so great, together with the possibilities for collision [with the political departments of the Government], that the admonition [against avoidable constitutional decision] is appropriate to be followed here. Other reasons support this view, including the fact that, in my opinion, the basic ruling and less important ones in *Smiley* v. *Holm, supra,* would otherwise be brought into question." 328 U. S., at 564–565. He also joined with his brethren who shared his view that the issues were justiciable in considering that *Wood* v. *Broom,* 287 U. S. 1, decided no constitutional questions but "the Court disposed of the cause on the ground that the 1929 Reapportionment Act, 46 Stat. 21, did not carry forward the requirements of the 1911 Act, 37 Stat. 13, and declined to decide whether there was equity in the bill." 328 U. S., at 565; see also, *id.,* at 573. We agree with this view of *Wood* v. *Broom.*

inees for state-wide office, over at least a minimal area of the State. Problems of timing were critical in *Remmey* v. *Smith*, 342 U. S. 916, dismissing for want of a substantial federal question a three-judge court's dismissal of the suit as prematurely brought, 102 F. Supp. 708; and in *Hartsfield* v. *Sloan*, 357 U. S. 916, denying mandamus sought to compel the convening of a three-judge court—movants urged the Court to advance consideration of their case, "Inasmuch as the mere lapse of time before this case can be reached in the normal course of . . . business may defeat the cause, and inasmuch as the time problem is due to the inherent nature of the case . . . ." *South* v. *Peters*, 339 U. S. 276, like *Colegrove* appears to be a refusal to exercise equity's powers; see the statement of the holding, quoted, *supra*, p. 203. And *Cox* v. *Peters*, 342 U. S. 936, dismissed for want of a substantial federal question the appeal from the state court's holding that their primary elections implicated no "state action." See 208 Ga. 498, 67 S. E. 2d 579. But compare *Terry* v. *Adams*, 345 U. S. 461.

*Tedesco* v. *Board of Supervisors*, 339 U. S. 940, indicates solely that no substantial federal question was raised by a state court's refusal to upset the districting of city council seats, especially as it was urged that there was a rational justification for the challenged districting. See 43 So. 2d 514. Similarly, in *Anderson* v. *Jordan*, 343 U. S. 912, it was certain only that the state court had refused to issue a discretionary writ, original mandamus in the Supreme Court. That had been denied without opinion, and of course it was urged here that an adequate state ground barred this Court's review. And in *Kidd* v. *McCanless*, 200 Tenn. 273, 292 S. W. 2d 40, the Supreme Court of Tennessee held that it could not invalidate the very statute at issue in the case at bar, but its holding rested on its state law of remedies, *i. e.*, the state view of

*de facto* officers,[60] and not on any view that the norm for legislative apportionment in Tennessee is not numbers of qualified voters resident in the several counties. Of course this Court was there precluded by the adequate state ground, and in dismissing the appeal, 352 U. S. 920, we cited *Anderson, supra,* as well as *Colegrove.* Nor does the Tennessee court's decision in that case bear upon this, for just as in *Smith* v. *Holm,* 220 Minn. 486, 19 N. W. 2d 914, and *Magraw* v. *Donovan,* 163 F. Supp. 184, 177 F. Supp. 803, a state court's inability to grant relief does not bar a federal court's assuming jurisdiction to inquire into alleged deprivation of federal constitutional rights. Problems of relief also controlled in *Radford* v. *Gary,* 352 U. S. 991, affirming the District Court's refusal to mandamus the Governor to call a session of the legislature, to mandamus the legislature then to apportion, and if they did not comply, to mandamus the State Supreme Court to do so. And *Matthews* v. *Handley,* 361 U. S. 127, affirmed a refusal to strike down the State's gross income tax statute—urged on the ground that the legislature was malapportioned—that had rested on the adequacy of available state legal remedies for suits involving that tax, including challenges to its constitutionality. Lastly, *Colegrove* v. *Barrett,* 330 U. S. 804, in which Mr. Justice Rutledge concurred in this Court's refusal to note the appeal from a dismissal for want of equity, is sufficiently explained by his statement in *Cook* v. *Fortson, supra:* "The discretionary exercise or non-exercise of equitable or declaratory judgment jurisdiction . . . in one case is not precedent in another case

---

[60] See also *Buford* v. *State Board of Elections,* 206 Tenn. 480, 334 S. W. 2d 726; *State ex rel. Sanborn* v. *Davidson County Board of Election Comm'rs,* No. 36,391 Tenn. Sup. Ct., Oct. 29, 1954 (unreported); 8 Vand. L. Rev. 501 (1955).

where the facts differ." 329 U. S., at 678, n. 8. (Citations omitted.)

We conclude that the complaint's allegations of a denial of equal protection present a justiciable constitutional cause of action upon which appellants are entitled to a trial and a decision. The right asserted is within the reach of judicial protection under the Fourteenth Amendment.

The judgment of the District Court is reversed and the cause is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

Mr. Justice Whittaker did not participate in the decision of this case.

## APPENDIX TO OPINION OF THE COURT.

The Tennessee Code Annotated provides for representation in the General Assembly as follows:

"3-101. *Composition—Counties electing one representative each.*—The general assembly of the state of Tennessee shall be composed of thirty-three (33) senators and ninety-nine (99) representatives, to be apportioned among the qualified voters of the state as follows: Until the next enumeration and apportionment of voters each of the following counties shall elect one (1) representative, to wit: Bedford, Blount, Cannon, Carroll, Chester, Cocke, Claiborne, Coffee, Crockett, DeKalb, Dickson, Dyer, Fayette, Franklin, Giles, Greene, Hardeman, Hardin, Henry, Hickman, Hawkins, Haywood, Jackson, Lake, Lauderdale, Lawrence, Lincoln, Marion, Marshall, Maury, Monroe, Montgomery, Moore, McMinn, McNairy, Obion, Overton, Putnam, Roane, Robertson, Rutherford, Sevier, Smith, Stewart, Sullivan, Sumner, Tipton, Warren, Washington, White, Weakley, William-

son and Wilson. [Acts 1881 (E. S.), ch. 5, § 1; 1881 (E. S.), ch. 6, § 1; 1901, ch. 122, § 2; 1907, ch. 178, §§ 1, 2; 1915, ch. 145; Shan., § 123; Acts 1919, ch. 147, §§ 1, 2; 1925 Private, ch. 472, § 1; Code 1932, § 140; Acts 1935, ch. 150, § 1; 1941, ch. 58, § 1; 1945, ch. 68, § 1; C. Supp. 1950, § 140.]

"3–102. *Counties electing two representatives each.*— The following counties shall elect two (2) representatives each, to wit: Gibson and Madison. [Acts 1901, ch. 122, § 3; Shan., § 124; mod. Code 1932, § 141.]

"3–103. *Counties electing three representatives each.*— The following counties shall elect three (3) representatives each, to wit: Knox and Hamilton. [Acts 1901, ch. 122, § 4; Shan., § 125; Code 1932, § 142.]

"3–104. *Davidson County.*—Davidson county shall elect six (6) representatives. [Acts 1901, ch. 122, § 5; Shan., § 126; Code 1932, § 143.]

"3–105. *Shelby county.*—Shelby county shall elect eight (8) representatives. Said county shall consist of eight (8) representative districts, numbered one (1) through eight (8), each district co-extensive with the county, with one (1) representative to be elected from each district. [Acts 1901, ch. 122, § 6; Shan., § 126a1; Code 1932, § 144; Acts 1957, ch. 220, § 1; 1959, ch. 213, § 1.]

"3–106. *Joint representatives.*—The following counties jointly, shall elect one representative, as follows, to wit:

"First district—Johnson and Carter.

"Second district—Sullivan and Hawkins.

"Third district—Washington, Greene and Unicoi.

"Fourth district—Jefferson and Hamblen.

"Fifth district—Hancock and Grainger.

"Sixth district—Scott, Campbell, and Union.

"Seventh district—Anderson and Morgan.

"Eighth district—Knox and Loudon.

"Ninth district—Polk and Bradley.

"Tenth district—Meigs and Rhea.

"Eleventh district—Cumberland, Bledsoe, Sequatchie, Van Buren and Grundy.

"Twelfth district—Fentress, Pickett, Overton, Clay and Putnam.

"Fourteenth district—Sumner, Trousdale and Macon.

"Fifteenth district—Davidson and Wilson.

"Seventeenth district — Giles, Lewis, Maury and Wayne.

"Eighteenth district—Williamson, Cheatham and Robertson.

"Nineteenth district—Montgomery and Houston.

"Twentieth district—Humphreys and Perry.

"Twenty-first district—Benton and Decatur.

"Twenty-second district—Henry, Weakley and Carroll.

"Twenty-third district—Madison and Henderson.

"Twenty-sixth district—Tipton and Lauderdale. [Acts 1901, ch. 122, § 7; 1907, ch. 178, §§ 1, 2; 1915, ch. 145, §§ 1, 2; Shan., § 127; Acts 1919, ch. 147, § 1; 1925 Private, ch. 472, § 2; Code 1932, § 145; Acts 1933, ch. 167, § 1; 1935, ch. 150, § 2; 1941, ch. 58, § 2; 1945, ch. 68, § 2; C. Supp. 1950, § 145; Acts 1957, ch. 220, § 2.]

"3–107. *State senatorial districts.*—Until the next enumeration and apportionment of voters, the following counties shall comprise the senatorial districts, to wit:

"First district—Johnson, Carter, Unicoi, Greene, and Washington.

"Second district—Sullivan and Hawkins.

"Third district—Hancock, Morgan, Grainger, Claiborne, Union, Campbell, and Scott.

"Fourth district—Cocke, Hamblen, Jefferson, Sevier, and Blount.

"Fifth district—Knox.

"Sixth district—Knox, Loudon, Anderson, and Roane.

"Seventh district—McMinn, Bradley, Monroe, and Polk.

"Eighth district—Hamilton.

"Ninth district—Rhea, Meigs, Bledsoe, Sequatchie, Van Buren, White, and Cumberland.

"Tenth district—Fentress, Pickett, Clay, Overton, Putnam, and Jackson.

"Eleventh district—Marion, Franklin, Grundy and Warren.

"Twelfth district—Rutherford, Cannon, and DeKalb.

"Thirteenth district—Wilson and Smith.

"Fourteenth district—Sumner, Trousdale and Macon.

"Fifteenth district—Montgomery and Robertson.

"Sixteenth district—Davidson.

"Seventeenth district—Davidson.

"Eighteenth district—Bedford, Coffee and Moore.

"Nineteenth district—Lincoln and Marshall.

"Twentieth district—Maury, Perry and Lewis.

"Twenty-first district—Hickman, Williamson and Cheatham.

"Twenty-second district—Giles, Lawrence and Wayne.

"Twenty-third district—Dickson, Humphreys, Houston and Stewart.

"Twenty-fourth district—Henry and Carroll.

"Twenty-fifth district—Madison, Henderson and Chester.

"Twenty-sixth district—Hardeman, McNairy, Hardin, Decatur and Benton.

"Twenty-seventh district—Gibson.

"Twenty-eighth district—Lake, Obion and Weakley.

"Twenty-ninth district — Dyer, Lauderdale and Crockett.

"Thirtieth district—Tipton and Shelby.

"Thirty-first district—Haywood and Fayette.

"Thirty-second district—Shelby.

"Thirty-third district—Shelby. [Acts 1901, ch. 122, § 1; 1907, ch. 3, § 1; Shan., § 128; Code 1932, § 146; Acts 1945, ch. 11, § 1; C. Supp. 1950, § 146.]"

Today's apportionment statute is as enacted in 1901, with minor changes. For example:

(1) In 1957, Shelby County was raised from 7½ to 8 representatives. Acts of 1957, c. 220. See also Acts of 1959, c. 213. The 1957 Act, § 2, abolished the Twenty-seventh Joint Representative District, which had included Shelby and Fayette Counties.

(2) In 1907, Marion County was given a whole House seat instead of sharing a joint seat with Franklin County. Acts of 1907, c. 178. Acts of 1915, c. 145, repealed that change, restoring the *status quo ante*. And that reversal was itself reversed, Acts of 1919, c. 147.

(3) James County was in 1901 one of five counties in the Seventh State Senate District and one of the three in the Ninth House District. It appears that James County no longer exists but we are not advised when or how it was dissolved.

(4) In 1945, Anderson and Roane Counties were shifted to the Sixth State Senate District from the Seventh, and Monroe and Polk Counties were shifted to the Seventh from the Sixth. Acts of 1945, c. 11.

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court and, like the Court, do not reach the merits, a word of explanation is necessary.[1]  I put to one side the problems of "politi-

[1] I feel strongly that many of the cases cited by the Court and involving so-called "political" questions were wrongly decided.

In joining the opinion, I do not approve those decisions but only construe the Court's opinion in this case as stating an accurate historical account of what the prior cases have held.

cal" questions involving the distribution of power between this Court, the Congress, and the Chief Executive. We have here a phase of the recurring problem of the relation of the federal courts to state agencies. More particularly, the question is the extent to which a State may weight one person's vote more heavily than it does another's.

So far as voting rights are concerned, there are large gaps in the Constitution. Yet the right to vote is inherent in the republican form of government envisaged by Article IV, Section 4 of the Constitution. The House—and now the Senate—are chosen by the people. The time, manner, and place of elections of Senators and Representatives are left to the States (Article I, Section 4, Clause 1; Amendment XVII) subject to the regulatory power of Congress. A "republican form" of government is guaranteed each State by Article IV, Section 4, and each is likewise promised protection against invasion.[2] *Ibid.*

---

[2] The statements in *Luther* v. *Borden,* 7 How. 1, 42, that this guaranty is enforceable only by Congress or the Chief Executive is not maintainable. Of course the Chief Executive, not the Court, determines how a State will be protected against invasion. Of course each House of Congress, not the Court, is "the Judge of the Elections, Returns, and Qualifications of its own Members." Article I, Section 5, Clause 1. But the abdication of all judicial functions respecting voting rights (7 How., at 41), however justified by the peculiarities of the charter form of government in Rhode Island at the time of Dorr's Rebellion, states no general principle. It indeed is contrary to the cases discussed in the body of this opinion—the modern decisions of the Court that give the full panoply of judicial protection to voting rights. Today we would not say with Chief Justice Taney that it is no part of the judicial function to protect the right to vote of those "to whom it is denied by the written and established constitution and laws of the State." *Ibid.*

Moreover, the Court's refusal to examine the legality of the regime of martial law which had been laid upon Rhode Island (*id.,* at 45–46) is indefensible, as Mr. Justice Woodbury maintained in his dissent. *Id.,* at 59 *et seq.* Today we would ask with him: ". . . who

That the States may specify the qualifications for voters is implicit in Article I, Section 2, Clause 1, which provides that the House of Representatives shall be chosen by the

could hold for a moment, when the writ of habeas corpus cannot be suspended by the legislature itself, either in the general government or most of the States, without an express constitutional permission, that all other writs and laws could be suspended, and martial law substituted for them over the whole State or country, without any express constitutional license to that effect, in any emergency?" *Id.*, at 67.

Justice Woodbury went on to say:

"It would be alarming enough to sanction here an unlimited power, exercised either by legislatures, or the executive, or courts, when all our governments are themselves governments of limitations and checks, and of fixed and known laws, and the people a race above all others jealous of encroachments by those in power. And it is far better that those persons should be without the protection of the ordinary laws of the land who disregard them in an emergency, and should look to a grateful country for indemnity and pardon, than to allow, beforehand, the whole frame of jurisprudence to be overturned, and every thing placed at the mercy of the bayonet.

"No tribunal or department in our system of governments ever can be lawfully authorized to dispense with the laws, like some of the tyrannical Stuarts, or to repeal, or abolish, or suspend the whole body of them; or, in other words, appoint an unrestrained military dictator at the head of armed men.

"Whatever stretches of such power may be ventured on in great crises, they cannot be upheld by the laws, as they prostrate the laws and ride triumphant over and beyond them, however the Assembly of Rhode Island, under the exigency, may have hastily supposed that such a measure in this instance was constitutional. It is but a branch of the omnipotence claimed by Parliament to pass bills of attainder, belonging to the same dangerous and arbitrary family with martial law." *Id.*, at 69–70.

What he wrote was later to become the tradition, as expressed by Chief Justice Hughes in *Sterling* v. *Constantin*, 287 U. S. 378, 401: "What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."

people and that "the Electors (voters) in each State shall have the Qualifications requisite for Electors (voters) of the most numerous Branch of the State Legislature." The same provision, contained in the Seventeenth Amendment, governs the election of Senators. Within limits those qualifications may be fixed by state law. See *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, 50–51. Yet, as stated in *Ex parte Yarbrough,* 110 U. S. 651, 663–664, those who vote for members of Congress do not "owe their right to vote to the State law in any sense which makes the exercise of the right to depend exclusively on the law of the State." The power of Congress to prescribe the qualifications for voters and thus override state law is not in issue here. It is, however, clear that by reason of the commands of the Constitution there are several qualifications that a State may not require.

Race, color, or previous condition of servitude is an impermissible standard by reason of the Fifteenth Amendment, and that alone is sufficient to explain *Gomillion* v. *Lightfoot,* 364 U. S. 339. See Taper, Gomillion versus Lightfoot (1962), pp. 12–17.

Sex is another impermissible standard by reason of the Nineteenth Amendment.

There is a third barrier to a State's freedom in prescribing qualifications of voters and that is the Equal Protection Clause of the Fourteenth Amendment, the provision invoked here. And so the question is, may a State weight the vote of one county or one district more heavily than it weights the vote in another?

The traditional test under the Equal Protection Clause has been whether a State has made "an invidious discrimination," as it does when it selects "a particular race or nationality for oppressive treatment." See *Skinner* v. *Oklahoma,* 316 U. S. 535, 541. Universal equality is not

the test; there is room for weighting. As we stated in *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489, "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination."

I agree with my Brother CLARK that if the allegations in the complaint can be sustained a case for relief is established. We are told that a single vote in Moore County, Tennessee, is worth 19 votes in Hamilton County, that one vote in Stewart or in Chester County is worth nearly eight times a single vote in Shelby or Knox County. The opportunity to prove that an "invidious discrimination" exists should therefore be given the appellants.

It is said that any decision in cases of this kind is beyond the competence of courts. Some make the same point as regards the problem of equal protection in cases involving racial segregation. Yet the legality of claims and conduct is a traditional subject for judicial determination. Adjudication is often perplexing and complicated. An example of the extreme complexity of the task can be seen in a decree apportioning water among the several States. *Nebraska* v. *Wyoming,* 325 U. S. 589, 665. The constitutional guide is often vague, as the decisions under the Due Process and Commerce Clauses show. The problem under the Equal Protection Clause is no more intricate. See Lewis, Legislative Apportionment and the Federal Courts, 71 Harv. L. Rev. 1057, 1083–1084.

There are, of course, some questions beyond judicial competence. Where the performance of a "duty" is left to the discretion and good judgment of an executive officer, the judiciary will not compel the exercise of his discretion one way or the other (*Kentucky* v. *Dennison,* 24 How. 66, 109), for to do so would be to take over the office. Cf. *Federal Communications Comm'n* v. *Broadcasting Co.,* 309 U. S. 134, 145.

246

Where the Constitution assigns a particular function wholly and indivisibly [3] to another department, the federal judiciary does not intervene. *Oetjen* v. *Central Leather Co.*, 246 U. S. 297, 302. None of those cases is relevant here.

---

[3] The category of the "political" question is, in my view, narrower than the decided cases indicate. "Even the English courts have held that a resolution of one House of Parliament does not change the law (*Stockdale* v. *Hansard* (1839), 9 A. & E. 1; and *Bowles* v. *Bank of England* (*No. 2*) [1913] 1 Ch. 57), and these decisions imply that the House of Commons acting alone does not constitute the 'Parliament' recognised by the English courts." 103 Sol. Jour. 995, 996. The Court in *Bowles* v. *Bank of England,* [1913] 1 Ch. 57, 84–85, stated: "By the statute 1. W. & M., usually known as the Bill of Rights, it was finally settled that there could be no taxation in this country except under authority of an Act of Parliament. The Bill of Rights still remains unrepealed, and no practice or custom, however prolonged, or however acquiesced in on the part of the subject, can be relied on by the Crown as justifying any infringement of its provisions. It follows that, with regard to the powers of the Crown to levy taxation, no resolution, either of the Committee for Ways and Means or of the House itself, has any legal effect whatever. Such resolutions are necessitated by a parliamentary procedure adopted with a view to the protection of the subject against the hasty imposition of taxes, and it would be strange to find them relied on as justifying the Crown in levying a tax before such tax is actually imposed by Act of Parliament."

In *The Pocket Veto Case,* 279 U. S. 655, the Court undertook a review of the veto provisions of the Constitution and concluded that the measure in litigation had not become a law. Cf. *Coleman* v. *Miller,* 307 U. S. 433.

*Georgia* v. *Stanton,* 6 Wall. 50, involved the application of the Reconstruction Acts to Georgia—laws which destroyed by force the internal regime of that State. Yet the Court refused to take jurisdiction. That question was no more "political" than a host of others we have entertained. See, *e. g., Pennsylvania* v. *West Virginia,* 262 U. S. 553; *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579; *Alabama* v. *Texas,* 347 U. S. 272.

There is no doubt that the federal courts have jurisdiction of controversies concerning voting rights. The Civil Rights Act gives them authority to redress the deprivation "under color of any State law" of any "right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens . . . ." 28 U. S. C. § 1343 (3). And 28 U. S. C. § 1343 (4) gives the federal courts authority to award damages or issue an injunction to redress the violation of "any Act of Congress providing for the protection of civil rights, including the *right to vote.*" (Italics added.) The element of state action covers a wide range. For as stated in *United States* v. *Classic,* 313 U. S. 299, 326:

> "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." And see *Monroe* v. *Pape,* 365 U. S. 167.

The right to vote in both federal and state elections was protected by the judiciary long before that right received the explicit protection it is now accorded by § 1343 (4). Discrimination against a voter on account of race has been penalized (*Ex parte Yarbrough,* 110 U. S. 651) or struck down. *Nixon* v. *Herndon,* 273 U. S. 536; *Smith* v. *Allwright,* 321 U. S. 649; *Terry* v. *Adams,* 345 U. S. 461. Fraudulent acts that dilute the votes of some

---

Today would this Court hold nonjusticiable or "political" a suit to enjoin a Governor who, like Fidel Castro, takes everything into his own hands and suspends all election laws?

*Georgia* v. *Stanton, supra,* expresses a philosophy at war with *Ex parte Milligan,* 4 Wall. 2, and *Duncan* v. *Kahanamoku,* 327 U. S. 304. The dominance of the civilian authority has been expressed from the beginning. See *Wise* v. *Withers,* 3 Cranch 331, 337; *Sterling* v. *Constantin, supra,* note 2.

have long been held to be within judicial cognizance. *Ex parte Siebold,* 100 U. S. 371. The "right to have one's vote counted" whatever his race or nationality or creed was held in *United States* v. *Mosley,* 238 U. S. 383, 386, to be "as open to protection by Congress as the right to put a ballot in a box." See also *United States* v. *Classic, supra,* 324–325; *United States* v. *Saylor,* 322 U. S. 385.

Chief Justice Holt stated in *Ashby* v. *White,* 2 Ld. Raym. 938, 956 (a suit in which damages were awarded against election officials for not accepting the plaintiff's vote, 3 Ld. Raym. 320) that:

> "To allow this action will make publick officers more careful to observe the constitution of cities and boroughs, and not to be so partial as they commonly are in all elections, which is indeed a great and growing mischief, and tends to the prejudice of the peace of the nation."

The same prophylactic effect will be produced here, as entrenched political regimes make other relief as illusory in this case as a petition to Parliament in *Ashby* v. *White* would have been.[4]

---

[4] We are told by the National Institute of Municipal Law Officers in an *amicus* brief:

"Regardless of the fact that in the last two decades the United States has become a predominantly urban country where well over two-thirds of the population now lives in cities or suburbs, political representation in the majority of state legislatures is 50 or more years behind the times. Apportionments made when the greater part of the population was located in rural communities are still determining and undermining our elections.

"As a consequence, the municipality of 1960 is forced to function in a horse and buggy environment where there is little political recognition of the heavy demands of an urban population. These demands will become even greater by 1970 when some 150 million people will be living in urban areas.

"The National Institute of Municipal Law Officers has for many years recognized the wide-spread complaint that by far the greatest

Intrusion of the Federal Government into the election machinery of the States has taken numerous forms—investigations (*Hannah* v. *Larche,* 363 U. S. 420); criminal proceedings (*Ex parte Siebold, supra; Ex parte Yarbrough, supra; United States* v. *Mosley, supra; United States* v. *Classic, supra*); collection of penalties (*Smith* v. *Allwright, supra*); suits for declaratory relief and for an injunction (*Terry* v. *Adams, supra*); suits by the United States under the Civil Rights Act to enjoin discriminatory practices. *United States* v. *Raines,* 362 U. S. 17.

As stated by Judge McLaughlin in *Dyer* v. *Kazuhisa Abe,* 138 F. Supp. 220, 236 (an apportionment case in Hawaii which was reversed and dismissed as moot, 256 F. 2d 728):

> "The whole thrust of today's legal climate is to end unconstitutional discrimination. It is ludicrous to preclude judicial relief when a mainspring of representative government is impaired. Legislators have no immunity from the Constitution. The legislatures of our land should be made as responsive to the Constitution of the United States as are the citizens who elect the legislators."

With the exceptions of *Colegrove* v. *Green,* 328 U. S. 549; *MacDougall* v. *Green,* 335 U. S. 281; *South* v. *Peters,* 339 U. S. 276, and the decisions they spawned, the Court has never thought that protection of voting rights

---

preponderance of state representatives and senators are from rural areas which, in the main, fail to become vitally interested in the increasing difficulties now facing urban administrators.

"Since World War II, the explosion in city and suburban population has created intense local problems in education, transportation, and housing. Adequate handling of these problems has not been possible to a large extent, due chiefly to the political weakness of municipalities. This situation is directly attributable to considerable under-representation of cities in the legislatures of most states." *Amicus* brief, pp. 2–3.

was beyond judicial cognizance. Today's treatment of those cases removes the only impediment to judicial cognizance of the claims stated in the present complaint.

The justiciability of the present claims being established, any relief accorded can be fashioned in the light of well-known principles of equity.[5]

---

[5] The recent ruling by the Iowa Supreme Court that a legislature, though elected under an unfair apportionment scheme, is nonetheless a legislature empowered to act (*Cedar Rapids* v. *Cox*, 252 Iowa 948, 964, 108 N. W. 2d 253, 262–263; cf. *Kidd* v. *McCanless*, 200 Tenn. 273, 292 S. W. 2d 40) is plainly correct.

There need be no fear of a more disastrous collision between federal and state agencies here than where a federal court enjoins gerrymandering based on racial lines. See *Gomillion* v. *Lightfoot, supra.*

The District Court need not undertake a complete reapportionment. It might possibly achieve the goal of substantial equality merely by directing respondent to eliminate the egregious injustices. Or its conclusion that reapportionment should be made may in itself stimulate legislative action. That was the result in *Asbury Park Press* v. *Woolley*, 33 N. J. 1, 161 A. 2d 705, where the state court ruled it had jurisdiction:

"If by reason of passage of time and changing conditions the reapportionment statute no longer serves its original purpose of securing to the voter the full constitutional value of his franchise, and the legislative branch fails to take appropriate restorative action, the doors of the courts must be open to him. The law-making body cannot by inaction alter the constitutional system under which it has its own existence." 33 N. J., at 14, 161 A. 2d, at 711. The court withheld its decision on the merits in order that the legislature might have an opportunity to consider adoption of a reapportionment act. For the sequel see *Application of Lamb*, 67 N. J. Super. 39, 46–47, 169 A. 2d 822, 825–826.

Reapportionment was also the result in *Magraw* v. *Donovan*, 159 F. Supp. 901, where a federal three-judge District Court took jurisdiction, saying, 163 F. Supp. 184, 187:

"Here it is the unmistakable duty of the State Legislature to reapportion itself periodically in accordance with recent population changes. . . . Early in January 1959 the 61st Session of the Minnesota Legislature will convene, all of the members of which will be newly elected on November 4th of this year. The facts which have

Mr. Justice Clark, concurring.

One emerging from the rash of opinions with their accompanying clashing of views may well find himself suffering a mental blindness. The Court holds that the appellants have alleged a cause of action. However, it refuses to award relief here—although the facts are undisputed—and fails to give the District Court any guidance whatever. One dissenting opinion, bursting with words that go through so much and conclude with so little, contemns the majority action as "a massive repudiation of the experience of our whole past." Another describes the complaint as merely asserting conclusory allegations that Tennessee's apportionment is "incorrect," "arbitrary," "obsolete," and "unconstitutional." I believe it can be shown that this case is distinguishable from earlier cases dealing with the distribution of political power by a State, that a patent violation of the Equal-Protection Clause of the United States Constitution has been shown, and that an appropriate remedy may be formulated.

## I.

I take the law of the case from *MacDougall* v. *Green,* 335 U. S. 281 (1948), which involved an attack under the Equal Protection Clause upon an Illinois election statute. The Court decided that case on its merits without hindrance from the "political question" doctrine. Although the statute under attack was upheld, it is clear

_____

been presented to us will be available to them. It is not to be presumed that the Legislature will refuse to take such action as is necessary to comply with its duty under the State Constitution. We defer decision on all the issues presented (including that of the power of this Court to grant relief), in order to afford the Legislature full opportunity to 'heed the constitutional mandate to redistrict.' "

See 177 F. Supp. 803, where the case was dismissed as moot, the State Legislature having acted.

that the Court based its decision upon the determination that the statute represented a rational state policy. It stated:

> "It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a *proper* diffusion of political initiative as between its thinly populated counties and those having concentrated masses, *in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former." Id.,* at 284. (Emphasis supplied.)

The other cases upon which my Brethren dwell are all distinguishable or inapposite. The widely heralded case of *Colegrove* v. *Green,* 328 U. S. 549 (1946), was one not only in which the Court was bobtailed but in which there was no majority opinion. Indeed, even the "political question" point in MR. JUSTICE FRANKFURTER's opinion was no more than an alternative ground.[1] Moreover, the appellants did not present an equal protection argument.[2] While it has served as a Mother Hubbard to most of the subsequent cases, I feel it was in that respect ill-cast and for all of these reasons put it to one side.[3] Like-

---

[1] The opinion stated at 551 that the Court "could also dispose of this case on the authority of *Wood* v. *Broom* [287 U. S. 1 (1932)]." *Wood* v. *Broom* involved only the interpretation of a congressional reapportionment Act.

[2] Similarly, the Equal Protection Clause was not invoked in *Tedesco* v. *Board of Supervisors,* 339 U. S. 940 (1950).

[3] I do not read the later case of *Colegrove* v. *Barrett,* 330 U. S. 804 (1947), as having rejected the equal protection argument adopted here. That was merely a dismissal of an appeal where the equal protection point was mentioned along with attacks under three other constitutional provisions, two congressional Acts, and three state constitutional provisions.

wise, I do not consider the Guaranty Clause cases based on Art. I, § 4, of the Constitution, because it is not invoked here and it involves different criteria, as the Court's opinion indicates. Cases resting on various other considerations not present here, such as *Radford* v. *Gary,* 352 U. S. 991 (1957) (lack of equity); *Kidd* v. *McCanless,* 352 U. S. 920 (1956) (adequate state grounds supporting the state judgment); *Anderson* v. *Jordan,* 343 U. S. 912 (1952) (adequate state grounds); *Remmey* v. *Smith,* 342 U. S. 916 (1952) (failure to exhaust state procedures), are of course not controlling. Finally, the Georgia county-unit-system cases, such as *South* v. *Peters,* 339 U. S. 276 (1950), reflect the viewpoint of *MacDougall, i. e.,* to refrain from intervening where there is some rational policy behind the State's system.[4]

## II.

The controlling facts cannot be disputed. It appears from the record that 37% of the voters of Tennessee elect 20 of the 33 Senators while 40% of the voters elect 63 of the 99 members of the House. But this might not on its face be an "invidious discrimination," *Williamson* v. *Lee Optical of Oklahoma,* 348 U. S. 483, 489 (1955), for a "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland,* 366 U. S. 420, 426 (1961).

It is true that the apportionment policy incorporated in Tennessee's Constitution, *i. e.,* state-wide numerical equality of representation with certain minor qualifications,[5] is a rational one. On a county-by-county compari-

---

[4] Georgia based its election system on a consistent combination of political units and population, giving six unit votes to the eight most populous counties, four unit votes to the 30 counties next in population, and two unit votes to each of the remaining counties.

[5] See Part I of the Appendix to MR. JUSTICE HARLAN's dissent, *post,* p. 341.

son a districting plan based thereon naturally will have disparities in representation due to the qualifications. But this to my mind does not raise constitutional problems, for the overall policy is reasonable. However, the root of the trouble is not in Tennessee's Constitution, for admittedly its policy has not been followed. The discrimination lies in the action of Tennessee's Assembly in allocating legislative seats to counties or districts created by it. Try as one may, Tennessee's apportionment just cannot be made to fit the pattern cut by its Constitution. This was the finding of the District Court. The policy of the Constitution referred to by the dissenters, therefore, is of no relevance here. We must examine what the Assembly has done.[6] The frequency and magnitude of the inequalities in the present districting admit of no policy whatever. An examination of Table I accompanying this opinion, *post,* p. 262, conclusively reveals that the apportionment picture in Tennessee is a topsy-turvical of gigantic proportions. This is not to say that some of the disparity cannot be explained, but when the entire table is examined—comparing the voting strength of counties of like population as well as contrasting that of the smaller with the larger counties—it leaves but one conclusion, namely that Tennessee's apportionment is a crazy quilt without rational basis. At the risk of being accused of picking out a few of the horribles I shall allude to a series of examples that are taken from Table I.

As is admitted, there is a wide disparity of voting strength between the large and small counties. Some

------

[6] It is suggested that the districting is not unconstitutional since it was established by a statute that was constitutional when passed some 60 years ago. But many Assembly Sessions since that time have deliberately refused to change the original act, and in any event "[a] statute [constitutionally] valid when enacted may become invalid by change in the conditions to which it is applied." *Nashville, C. & St. L. R. Co.* v. *Walters,* 294 U. S. 405, 415 (1935).

samples are: Moore County has a total representation of two [7] with a population (2,340) of only one-eleventh of Rutherford County (25,316) with the same representation; Decatur County (5,563) has the same representation as Carter (23,303) though the latter has four times the population; likewise, Loudon County (13,264), Houston (3,084), and Anderson County (33,990) have the same representation, i. e., 1.25 each. But it is said that in this illustration all of the under-represented counties contain municipalities of over 10,000 population and they therefore should be included under the "urban" classification, rationalizing this disparity as an attempt to effect a rural-urban political balance. But in so doing one is caught up in the backlash of his own bull whip, for many counties have municipalities with a population exceeding 10,000, yet the same invidious discrimination is present. For example:

| County | Population | Representation |
|--------|-----------|----------------|
| Carter | 23,303 | 1.10 |
| Maury | 24,556 | 2.25 |
| Washington | 36,967 | 1.93 |
| Madison | 37,245 | 3.50 |

[7] "Total representation" indicates the combined representation in the State Senate (33 members) and the State House of Representatives (99 members) in the Assembly of Tennessee. Assuming a county has one representative, it is credited in this calculation with 1/99. Likewise, if the same county has one-third of a senate seat, it is credited with another 1/99, and thus such a county, in our calculation, would have a "total representation" of two; if a county has one representative and one-sixth of a senate seat, it is credited with 1.5/99, or 1.50. It is this last figure that I use here in an effort to make the comparisons clear. The 1950 rather than the 1960 census of voting population is used to avoid the charge that use of 1960 tabulations might not have allowed sufficient time for the State to act. However, the 1960 picture is even more irrational than the 1950 one.

Likewise, counties with no municipality of over 10,000 suffer a similar discrimination:

| County | Population | Representation |
|---|---|---|
| Grundy | 6,540 | 0.95 |
| Chester | 6,391 | 2.00 |
| Cumberland | 9,593 | 0.63 |
| Crockett | 9,676 | 2.00 |
| Loudon | 13,264 | 1.25 |
| Fayette | 13,577 | 2.50 |

This could not be an effort to attain political balance between rural and urban populations. Since discrimination is present among counties of like population, the plan is neither consistent nor rational. It discriminates horizontally creating gross disparities between rural areas themselves as well as between urban areas themselves,[8] still maintaining the wide vertical disparity already pointed out between rural and urban.

It is also insisted that the representation formula used above (see n. 7) is "patently deficient" because "it eliminates from consideration the relative voting power of the counties that are joined together in a single election district." This is a strange claim coming from those who rely on the proposition that "the voice of every voter" need not have "approximate equality." Indeed, representative government, as they say, is not necessarily one of "bare numbers." The use of floterial districts in our political system is not ordinarily based on the theory that the floterial representative is splintered among the counties of his district per relative population. His function is to represent the whole district. However, I shall meet the charge on its own ground and by use of its "adjusted

---

[8] Of course this was not the case in the Georgia county unit system, *South* v. *Peters, supra,* or the Illinois initiative plan, *MacDougall* v. *Green, supra,* where recognized political units having independent significance were given minimum political weight.

'total representation' " formula show that the present apportionment is loco. For example, compare some "urban" areas of like population, using the HARLAN formula:

| County | Population | Representation |
|---|---|---|
| Washington | 36,967 | 2.65 |
| Madison | 37,245 | 4.87 |
| Carter | 23,303 | 1.48 |
| Greene | 23,649 | 2.05 |
| Maury | 24,556 | 3.81 |
| Coffee | 13,406 | 2.32 |
| Hamblen | 14,090 | 1.07 |

And now, using the same formula, compare some so-called "rural" areas of like population:

| County | Population | Representation |
|---|---|---|
| Moore | 2,340 | 1.23 |
| Pickett | 2,565 | .22 |
| Stewart | 5,238 | 1.60 |
| Cheatham | 5,263 | .74 |
| Chester | 6,391 | 1.36 |
| Grundy | 6,540 | .69 |
| Smith | 8,731 | 2.04 |
| Unicoi | 8,787 | 0.40 |

And for counties with similar representation but with gross differences in population, take:

| County | Population | Representation |
|---|---|---|
| Sullivan | 55,712 | 4.07 |
| Maury | 24,556 | 3.81 |
| Blount | 30,353 | 2.12 |
| Coffee | 13,406 | 2.32 |

These cannot be "distorted effects," for here the same formula proposed by the dissenters is used and the result is even "a crazier" quilt.

The truth is that—although this case has been here for two years and has had over six hours' argument (three times the ordinary case) and has been most carefully considered over and over again by us in Conference and individually—no one, not even the State nor the dissenters, has come up with any rational basis for Tennessee's apportionment statute.

No one—except the dissenters advocating the HARLAN "adjusted 'total representation' " formula—contends that mathematical equality among voters is required by the Equal Protection Clause. But certainly there must be some rational design to a State's districting. The discrimination here does not fit any pattern—as I have said, it is but a crazy quilt. My Brother HARLAN contends that other proposed apportionment plans contain disparities. Instead of chasing those rabbits he should first pause long enough to meet appellants' proof of discrimination by showing that in fact the present plan follows a rational policy. Not being able to do this, he merely counters with such generalities as "classic legislative judgment," no "significant discrepancy," and "de minimis departures." I submit that even a casual glance at the present apportionment picture shows these conclusions to be entirely fanciful. If present representation has a policy at all, it is to maintain the *status quo* of invidious discrimination at any cost. Like the District Court, I conclude that appellants have met the burden of showing "Tennessee is guilty of a clear violation of the state constitution and of the [federal] rights of the plaintiffs. . . ."

### III.

Although I find the Tennessee apportionment statute offends the Equal Protection Clause, I would not consider intervention by this Court into so delicate a field if there were any other relief available to the people of Tennessee. But the majority of the people of Tennessee have no

"practical opportunities for exerting their political weight at the polls" to correct the existing "invidious discrimination." Tennessee has no initiative and referendum. I have searched diligently for other "practical opportunities" present under the law. I find none other than through the federal courts. The majority of the voters have been caught up in a legislative strait jacket. Tennessee has an "informed, civically militant electorate" and "an aroused popular conscience," but it does not sear "the conscience of the people's representatives." This is because the legislative policy has riveted the present seats in the Assembly to their respective constituencies, and by the votes of their incumbents a reapportionment of any kind is prevented. The people have been rebuffed at the hands of the Assembly; they have tried the constitutional convention route, but since the call must originate in the Assembly it, too, has been fruitless. They have tried Tennessee courts with the same result,[9] and Governors have fought the tide only to flounder. It is said that there is recourse in Congress and perhaps that may be, but from a practical standpoint this is without substance. To date Congress has never undertaken such a task in any State. We therefore must conclude that the people of Tennessee are stymied and without judicial intervention will be saddled with the present discrimination in the affairs of their state government.

## IV.

Finally, we must consider if there are any appropriate modes of effective judicial relief. The federal courts are of course not forums for political debate, nor should they

---

[9] It is interesting to note that state judges often rest their decisions on the ground that this Court has precluded adjudication of the federal claim. See, e. g., *Scholle* v. *Secretary of State*, 360 Mich. 1, 104 N. W. 2d 63 (1960).

resolve themselves into state constitutional conventions or legislative assemblies. Nor should their jurisdiction be exercised in the hope that such a declaration as is made today may have the direct effect of bringing on legislative action and relieving the courts of the problem of fashioning relief. To my mind this would be nothing less than blackjacking the Assembly into reapportioning the State. If judicial competence were lacking to fashion an effective decree, I would dismiss this appeal. However, like the Solicitor General of the United States, I see no such difficulty in the position of this case. One plan might be to start with the existing assembly districts, consolidate some of them, and award the seats thus released to those counties suffering the most egregious discrimination. Other possibilities are present and might be more effective. But the plan here suggested would at least release the strangle hold now on the Assembly and permit it to redistrict itself.

In this regard the appellants have proposed a plan based on the rationale of state-wide equal representation. Not believing that numerical equality of representation throughout a State is constitutionally required, I would not apply such a standard albeit a permissive one. Nevertheless, the dissenters attack it by the application of the HARLAN "adjusted 'total representation'" formula. The result is that some isolated inequalities are shown, but this in itself does not make the proposed plan irrational or place it in the "crazy quilt" category. Such inequalities, as the dissenters point out in attempting to support the present apportionment as rational, are explainable. Moreover, there is no requirement that any plan have mathematical exactness in its application. Only where, as here, the total picture reveals incommensurables of both magnitude and frequency can it be said that there is present an invidious discrimination.

In view of the detailed study that the Court has given this problem, it is unfortunate that a decision is not reached on the merits. The majority appears to hold, at least *sub silentio*, that an invidious discrimination is present, but it remands to the three-judge court for it to make what is certain to be that formal determination. It is true that Tennessee has not filed a formal answer. However, it has filed voluminous papers and made extended arguments supporting its position. At no time has it been able to contradict the appellants' factual claims; it has offered no rational explanation for the present apportionment; indeed, it has indicated that there are none known to it. As I have emphasized, the case proceeded to the point before the three-judge court that it was able to find an invidious discrimination factually present, and the State has not contested that holding here. In view of all this background I doubt if anything more can be offered or will be gained by the State on remand, other than time. Nevertheless, not being able to muster a court to dispose of the case on the merits, I concur in the opinion of the majority and acquiesce in the decision to remand. However, in fairness I do think that Tennessee is entitled to have my idea of what it faces on the record before us and the trial court some light as to how it might proceed.

As John Rutledge (later Chief Justice) said 175 years ago in the course of the Constitutional Convention, a chief function of the Court is to secure the national rights.[10] Its decision today supports the proposition for which our forebears fought and many died, namely, that to be fully conformable to the principle of right, the form of government must be representative.[11] That is the keystone upon which our government was founded

---

[10] 1 Farrand, The Records of the Federal Convention of 1787, 124.

[11] Kant, Perpetual Peace.

and lacking which no republic can survive.   It is well for this Court to practice self-restraint and discipline in constitutional adjudication, but never in its history have those principles received sanction where the national rights of so many have been so clearly infringed for so long a time.   National respect for the courts is more enhanced through the forthright enforcement of those rights rather than by rendering them nugatory through the interposition of subterfuges.   In my view the ultimate decision today is in the greatest tradition of this Court.

TABLE I.

| County | 1950 voting population | Present total representation using J. Clark's formula | Present total representation using J. Harlan's formula | Proposed total representation (appellants' plan), using J. Harlan's formula |
|---|---|---|---|---|
| Van Buren | 2,039 | .63 | .23 | .11 |
| Moore | 2,340 | 2.00 | 1.23 | .18 |
| Pickett | 2,565 | .70 | .22 | .24 |
| Sequatchie | 2,904 | .63 | .33 | .19 |
| Meigs | 3,039 | .93 | .48 | .17 |
| Houston | 3,084 | 1.25 | .46 | .24 |
| Trousdale | 3,351 | 1.33 | .43 | .12 |
| Lewis | 3,413 | 1.25 | .39 | .25 |
| Perry | 3,711 | 1.50 | .71 | .40 |
| Bledsoe | 4,198 | .63 | .49 | .24 |
| Clay | 4,528 | .70 | .40 | .42 |
| Union | 4,600 | .76 | .37 | .45 |
| Hancock | 4,710 | .93 | .62 | .49 |
| Stewart | 5,238 | 1.75 | 1.60 | .41 |
| Cheatham | 5,263 | 1.33 | .72 | .20 |
| Cannon | 5,341 | 2.00 | 1.43 | .52 |
| Decatur | 5,563 | 1.10 | .79 | .52 |
| Lake | 6,252 | 2.00 | 1.44 | .41 |
| Chester | 6,391 | 2.00 | 1.36 | .19 |
| Grundy | 6,540 | .95 | .69 | .43 |
| Humphreys | 6,588 | 1.25 | 1.39 | .72 |
| Johnson | 6,649 | 1.10 | .42 | .43 |

| County | 1950 voting population | Present total representation using J. Clark's formula | Present total representation using J. Harlan's formula | Proposed total representation (appellants' plan), using J. Harlan's formula |
|---|---|---|---|---|
| Jackson | 6,719 | 1.50 | 1.43 | .63 |
| De Kalb | 6,984 | 2.00 | 1.56 | .68 |
| Benton | 7,023 | 1.10 | 1.01 | .66 |
| Fentress | 7,057 | .70 | .62 | .64 |
| Grainger | 7,125 | .93 | .94 | .65 |
| Wayne | 7,176 | 1.25 | .69 | .76 |
| Polk | 7,330 | 1.25 | .68 | .73 |
| Hickman | 7,598 | 2.00 | 1.85 | .80 |
| Macon | 7,974 | 1.33 | 1.01 | .61 |
| Morgan | 8,308 | .93 | .59 | .75 |
| Scott | 8,417 | .76 | .68 | .62 |
| Smith | 8,731 | 2.50 | 2.04 | .67 |
| Unicoi | 8,787 | .93 | .40 | .63 |
| Rhea | 8,937 | .93 | 1.42 | .21 |
| White | 9,244 | 1.43 | 1.69 | .90 |
| Overton | 9,474 | 1.70 | 1.83 | .89 |
| Hardin | 9,577 | 1.60 | 1.61 | .93 |
| Cumberland | 9,593 | .63 | 1.10 | .87 |
| Crockett | 9,676 | 2.00 | 1.66 | .63 |
| Henderson | 10,199 | 1.50 | .78 | .96 |
| Marion | 10,998 | 1.75 | 1.73 | .72 |
| Marshall | 11,288 | 2.50 | 2.28 | .84 |
| Dickson | 11,294 | 1.75 | 2.29 | 1.23 |
| Jefferson | 11,359 | 1.10 | .87 | 1.03 |
| McNairy | 11,601 | 1.60 | 1.74 | 1.13 |
| Cocke | 12,572 | 1.60 | 1.46 | .89 |
| Sevier | 12,793 | 1.60 | 1.47 | .69 |
| Claiborne | 12,799 | 1.43 | 1.61 | 1.34 |
| Monroe | 12,884 | 1.75 | 1.68 | 1.30 |
| Loudon | 13,264 | 1.25 | .28 | .52 |
| Warren | 13,337 | 1.75 | 1.89 | 1.68 |
| Coffee | 13,406 | 2.00 | 2.32 | 1.68 |
| Hardeman | 13,565 | 1.60 | 1.86 | 1.11 |
| Fayette | 13,577 | 2.50 | 2.48 | 1.11 |
| Haywood | 13,934 | 2.50 | 2.52 | 1.69 |
| Williamson | 14,064 | 2.33 | 2.96 | 1.71 |

| County | 1950 voting population | Present total representation using J. Clark's formula | Present total representation using J. Harlan's formula | Proposed total representation (appellants' plan), using J. Harlan's formula |
|---|---|---|---|---|
| Hamblen | 14,090 | 1.10 | 1.07 | 1.67 |
| Franklin | 14,297 | 1.75 | 1.95 | 1.73 |
| Lauderdale | 14,413 | 2.50 | 2.45 | 1.73 |
| Bedford | 14,732 | 2.00 | 1.45 | 1.74 |
| Lincoln | 15,092 | 2.50 | 2.72 | 1.77 |
| Henry | 15,465 | 2.83 | 2.76 | 1.73 |
| Lawrence | 15,847 | 2.00 | 2.22 | 1.81 |
| Giles | 15,935 | 2.25 | 2.54 | 1.81 |
| Tipton | 15,944 | ·3.00 | 1.68 | 1.13 |
| Robertson | 16,456 | 2.83 | 2.62 | 1.85 |
| Wilson | 16,459 | 3.00 | 3.03 | 1.21 |
| Carroll | 16,472 | 2.83 | 2.88 | 1.82 |
| Hawkins | 16,900 | 3.00 | 1.93 | 1.82 |
| Putnam | 17,071 | 1.70 | 2.50 | 1.86 |
| Campbell | 17,477 | .76 | 1.40 | 1.94 |
| Roane | 17,639 | 1.75 | 1.26 | 1.30 |
| Weakley | 18,007 | 2.33 | 2.63 | 1.85 |
| Bradley | 18,273 | 1.25 | 1.67 | 1.92 |
| McMinn | 18,347 | 1.75 | 1.97 | 1.92 |
| Obion | 18,434 | 2.00 | 2.30 | 1.94 |
| Dyer | 20,062 | 2.00 | 2.36 | 2.32 |
| Sumner | 20,143 | 2.33 | 3.56 | 2.54 |
| Carter | 23,303 | 1.10 | 1.48 | 2.55 |
| Greene | 23,649 | 1.93 | 2.05 | 2.68 |
| Maury | 24,556 | 2.25 | 3.81 | 2.85 |
| Rutherford | 25,316 | 2.00 | 3.02 | 2.39 |
| Montgomery | 26,284 | 3.00 | 3.73 | 3.06 |
| Gibson | 29,832 | 5.00 | 5.00 | 2.86 |
| Blount | 30,353 | 1.60 | 2.12 | 2.19 |
| Anderson | 33,990 | 1.25 | 1.30 | 3.62 |
| Washington | 36,967 | 1.93 | 2.65 | 3.45 |
| Madison | 37,245 | 3.50 | 4.87 | 3.69 |
| Sullivan | 55,712 | 3.00 | 4.07 | 5.57 |
| Hamilton | 131,971 | 6.00 | 6.00 | 15.09 |
| Knox | 140,559 | 7.25 | 8.96 | 15.21 |
| Davidson | 211,930 | 12.50 | 12.93 | 21.57 |
| Shelby | 312,345 | 15.50 | 16.85 | 31.59 |

Mr. Justice Stewart, concurring.

The separate writings of my dissenting and concurring Brothers stray so far from the subject of today's decision as to convey, I think, a distressingly inaccurate impression of what the Court decides. For that reason, I think it appropriate, in joining the opinion of the Court, to emphasize in a few words what the opinion does and does not say.

The Court today decides three things and no more: "(a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) . . . that the appellants have standing to challenge the Tennessee apportionment statutes." *Ante,* pp. 197–198.

The complaint in this case asserts that Tennessee's system of apportionment is utterly arbitrary—without any possible justification in rationality. The District Court did not reach the merits of that claim, and this Court quite properly expresses no view on the subject. Contrary to the suggestion of my Brother HARLAN, the Court does not say or imply that "state legislatures must be so structured as to reflect with approximate equality the voice of every voter." *Post,* p. 332. The Court does not say or imply that there is anything in the Federal Constitution "to prevent a State, acting not irrationally, from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people." *Post,* p. 334. And contrary to the suggestion of my Brother DOUGLAS, the Court most assuredly does not decide the question, "may a State weight the vote of one county or one district more heavily than it weights the vote in another?" *Ante,* p. 244.

In *MacDougall* v. *Green,* 335 U. S. 281, the Court held that the Equal Protection Clause does not "deny a State the power to assure a proper diffusion of political initia-

tive as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former." 335 U. S., at 284. In case after case arising under the Equal Protection Clause the Court has said what it said again only last Term—that "the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others." *McGowan* v. *Maryland,* 366 U. S. 420, 425. In case after case arising under that Clause we have also said that "the burden of establishing the unconstitutionality of a statute rests on him who assails it." *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 U. S. 580, 584.

Today's decision does not turn its back on these settled precedents. I repeat, the Court today decides only: (1) that the District Court possessed jurisdiction of the subject matter; (2) that the complaint presents a justiciable controversy; (3) that the appellants have standing. My Brother CLARK has made a convincing prima facie showing that Tennessee's system of apportionment is in fact utterly arbitrary—without any possible justification in rationality. My Brother HARLAN has, with imagination and ingenuity, hypothesized possibly rational bases for Tennessee's system. But the merits of this case are not before us now. The defendants have not yet had an opportunity to be heard in defense of the State's system of apportionment; indeed, they have not yet even filed an answer to the complaint. As in other cases, the proper place for the trial is in the trial court, not here.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins, dissenting.

The Court today reverses a uniform course of decision established by a dozen cases, including one by which the very claim now sustained was unanimously rejected

only five years ago. The impressive body of rulings thus cast aside reflected the equally uniform course of our political history regarding the relationship between population and legislative representation—a wholly different matter from denial of the franchise to individuals because of race, color, religion or sex. Such a massive repudiation of the experience of our whole past in asserting destructively novel judicial power demands a detailed analysis of the role of this Court in our constitutional scheme. Disregard of inherent limits in the effective exercise of the Court's "judicial Power" not only presages the futility of judicial intervention in the essentially political conflict of forces by which the relation between population and representation has time out of mind been and now is determined. It may well impair the Court's position as the ultimate organ of "the supreme Law of the Land" in that vast range of legal problems, often strongly entangled in popular feeling, on which this Court must pronounce. The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements.

A hypothetical claim resting on abstract assumptions is now for the first time made the basis for affording illusory relief for a particular evil even though it foreshadows deeper and more pervasive difficulties in consequence. The claim is hypothetical and the assumptions are abstract because the Court does not vouchsafe the lower courts—state and federal—guidelines for formulating specific, definite, wholly unprecedented remedies for the inevitable litigations that today's umbrageous disposition is bound to stimulate in connection with politically motivated reapportionments in so many States. In

such a setting, to promulgate jurisdiction in the abstract is meaningless. It is as devoid of reality as "a brooding omnipresence in the sky," for it conveys no intimation what relief, if any, a District Court is capable of affording that would not invite legislatures to play ducks and drakes with the judiciary. For this Court to direct the District Court to enforce a claim to which the Court has over the years consistently found itself required to deny legal enforcement and at the same time to find it necessary to withhold any guidance to the lower court how to enforce this turnabout, new legal claim, manifests an odd— indeed an esoteric—conception of judicial propriety. One of the Court's supporting opinions, as elucidated by commentary, unwittingly affords a disheartening pre- view of the mathematical quagmire (apart from divers judicially inappropriate and elusive determinants) into which this Court today catapults the lower courts of the country without so much as adumbrating the basis for a legal calculus as a means of extrication. Even assuming the indispensable intellectual disinterestedness on the part of judges in such matters, they do not have accepted legal standards or criteria or even reliable analogies to draw upon for making judicial judgments. To charge courts with the task of accommodating the incommensurable fac- tors of policy that underlie these mathematical puzzles is to attribute, however flatteringly, omnicompetence to judges. The Framers of the Constitution persistently rejected a proposal that embodied this assumption and Thomas Jefferson never entertained it.

Recent legislation, creating a district appropriately described as "an atrocity of ingenuity," is not unique. Considering the gross inequality among legislative elec- toral units within almost every State, the Court naturally shrinks from asserting that in districting at least substan- tial equality is a constitutional requirement enforceable

by courts.* Room continues to be allowed for weighting. This of course implies that geography, economics, urban-rural conflict, and all the other non-legal factors which have throughout our history entered into political districting are to some extent not to be ruled out in the undefined vista now opened up by review in the federal courts of state reapportionments. To some extent—aye, there's the rub. In effect, today's decision empowers the courts of the country to devise what should constitute the proper composition of the legislatures of the fifty States. If state courts should for one reason or another find themselves unable to discharge this task, the duty of doing so is put on the federal courts or on this Court, if State views do not satisfy this Court's notion of what is proper districting.

We were soothingly told at the bar of this Court that we need not worry about the kind of remedy a court could effectively fashion once the abstract constitutional right to have courts pass on a state-wide system of electoral districting is recognized as a matter of judicial rhetoric, because legislatures would heed the Court's admonition. This is not only a euphoric hope. It implies a sorry

---

*It is worth reminding that the problem of legislative apportionment is not one dividing North and South. Indeed, in the present House of Representatives, for example, Michigan's congressional districts are far less representative of the numbers of inhabitants, according to the 1960 census, than are Louisiana's. Michigan's Sixteenth District, which is 93.1% urban, contains 802,994 persons and its Twelfth, which is 47.6% urban, contains 177,431—one-fifth as many persons. Louisiana's most populous district, the Sixth, is 53.6% urban and contains 536,029 persons, and its least populous, the Eighth, 36.7% urban, contains 263,850—nearly half. Gross disregard of any assumption that our political system implies even approximation to the notion that individual votes in the various districts within a State should have equal weight is as true, e. g., of California, Illinois, and Ohio as it is of Georgia. See United States Department of Commerce, Census Release, February 24, 1962, CB62–23.

confession of judicial impotence in place of a frank acknowledgment that there is not under our Constitution a judicial remedy for every political mischief, for every undesirable exercise of legislative power. The Framers carefully and with deliberate forethought refused so to enthrone the judiciary. In this situation, as in others of like nature, appeal for relief does not belong here. Appeal must be to an informed, civically militant electorate. In a democratic society like ours, relief must come through an aroused popular conscience that sears the conscience of the people's representatives. In any event there is nothing judicially more unseemly nor more self-defeating than for this Court to make *in terrorem* pronouncements, to indulge in merely empty rhetoric, sounding a word of promise to the ear, sure to be disappointing to the hope.

This is the latest in the series of cases in which the Equal Protection and Due Process Clauses of the Fourteenth Amendment have been invoked in federal courts as restrictions upon the power of the States to allocate electoral weight among the voting populations of their various geographical subdivisions.[1] The present action, which

---

[1] See *Wood* v. *Broom,* 287 U. S. 1; *Colegrove* v. *Green,* 328 U. S. 549, rehearing denied, 329 U. S. 825, motion for reargument before the full bench denied, 329 U. S. 828; *Cook* v. *Fortson,* 329 U. S. 675, rehearing denied, 329 U. S. 829; *Turman* v. *Duckworth,* 329 U. S. 675, rehearing denied, 329 U. S. 829; *Colegrove* v. *Barrett,* 330 U. S. 804; *MacDougall* v. *Green,* 335 U. S. 281; *South* v. *Peters,* 339 U. S. 276; *Tedesco* v. *Board of Supervisors,* 339 U. S. 940; *Remmey* v. *Smith,* 342 U. S. 916; *Cox* v. *Peters,* 342 U. S. 936, rehearing denied, 343 U. S. 921; *Anderson* v. *Jordan,* 343 U. S. 912; *Kidd* v. *McCanless,* 352 U. S. 920; *Radford* v. *Gary,* 352 U. S. 991; *Hartsfield* v. *Sloan,* 357 U. S. 916; *Matthews* v. *Handley,* 361 U. S. 127; *Perry* v. *Folsom,* 144 F. Supp. 874 (D. C. N. D. Ala.); *Magraw* v. *Donovan,* 163 F. Supp. 184 (D. C. D. Minn.); cf. *Dyer* v. *Kazuhisa Abe,* 138 F. Supp. 220 (D. C. D. Hawaii). And see *Keogh* v. *Neely,* 50 F. 2d 685 (C. A. 7th Cir.).

comes here on appeal from an order of a statutory three-judge District Court dismissing amended complaints seeking declaratory and injunctive relief, challenges the provisions of Tenn. Code Ann., 1955, §§ 3-101 to 3-109, which apportion state representative and senatorial seats among Tennessee's ninety-five counties.

The original plaintiffs, citizens and qualified voters entitled to vote for members of the Tennessee Legislature in the several counties in which they respectively reside, bring this action in their own behalf and "on behalf of all other voters in the State of Tennessee," or, as they alternatively assert, "on behalf of all qualified voters of their respective counties, and further, on behalf of all voters of the State of Tennessee who are similarly situated." The cities of Knoxville and Chattanooga, and the Mayor of Nashville—on his own behalf as a qualified voter and, pursuant to an authorizing resolution by the Nashville City Council, as a representative of all the city's residents—were permitted to intervene as parties plaintiff.[2] The defendants are executive officials charged with statutory duties in connection with state elections.[3]

---

[2] Although the motion to intervene by the Mayor of Nashville asserted an interest in the litigation in only a representative capacity, the complaint which he subsequently filed set forth that he was a qualified voter who also sued in his own behalf. The municipalities of Knoxville and Chattanooga purport to represent their residents. Since the claims of the municipal intervenors do not differ materially from those of the parties who sue as individual voters, the Court need not now determine whether the municipalities are proper parties to this proceeding. See, e. g., Stewart v. Kansas City, 239 U. S. 14.

[3] The original complaint named as defendants Tennessee's Secretary of State, Attorney General, Coordinator of Elections, and the three members of the State Board of Elections, seeking to make the Board members representatives of all the State's County Election Commissioners. The prayer in an intervening complaint by the City of Knoxville, that the Commissioners of Elections of Knox County be added as parties defendant seems not to have been acted on by the court below. Defendants moved to dismiss, inter alia, on the ground

The original plaintiffs' amended complaint avers, in substance, the following.[4]   The Constitution of the State of Tennessee declares that "elections shall be free and equal," provides that no qualifications other than age, citizenship and specified residence requirements shall be attached to the right of suffrage, and prohibits denying to any person the suffrage to which he is entitled except upon conviction of an infamous crime.   Art. I, § 5; Art. IV, § 1.   It requires an enumeration of qualified voters within every term of ten years after 1871 and an apportionment of representatives and senators among the several counties or districts according to the number of qualified voters in each [5] at the time of each decennial

---

of failure to join indispensable parties, and they argue in this Court that only the County Election Commissioners of the ninety-five counties are the effective administrators of Tennessee's elections laws, and that none of the defendants have substantial duties in connection therewith.   The District Court deferred ruling on this ground of the motion.   Inasmuch as it involves questions of local law more appropriately decided by judges sitting in Tennessee than by this Court, and since in any event the failure to join County Election Commissioners in this action looking to prospective relief could be corrected, if necessary, by amendment of the complaints, the issue does not concern the Court on this appeal.

[4] Jurisdiction is predicated upon R. S. § 1979, 42 U. S. C. § 1983, and 28 U. S. C. § 1343 (3).

[5] However, counties having two-thirds of the ratio required for a Representative are entitled to seat one member in the House, and there are certain geographical restrictions upon the formation of Senate districts.   The applicable provisions of Article II of the Tennessee Constitution are:

"*Sec. 4. Census.*—An enumeration of the qualified voters, and an apportionment of the Representatives in the General Assembly, shall be made in the year one thousand eight hundred and seventy-one, and within every subsequent term of ten years."

"*Sec. 5. Apportionment of representatives.*—The number of Representatives shall, at the several periods of making the enumeration, be apportioned among the several counties or districts, according to the number of qualified voters in each; and shall not exceed seventy-

enumeration. Art. II, §§ 4, 5, 6. Notwithstanding these provisions, the State Legislature has not reapportioned itself since 1901. The Reapportionment Act of that year, Tenn. Acts 1901, c. 122, now Tenn. Code Ann., 1955, §§ 3–101 to 3–109,[6] was unconstitutional when enacted, because not preceded by the required enumeration of qualified voters and because it allocated legislative seats arbitrarily, unequally and discriminatorily, as measured by the 1900 federal census. Moreover, irrespective of the question of its validity in 1901, it is asserted that the Act became "unconstitutional and obsolete" in 1911 by virtue of the decennial reapportionment requirement of the Tennessee Constitution. Continuing a "purposeful and systematic plan to discriminate against a geographical class of persons," recent Tennessee Legislatures have failed, as did their predecessors, to enact reapportionment legislation, although a number of bills providing for reapportionment have been introduced. Because of population shifts since 1901, the apportionment fixed by the Act of that year and still in effect is not proportionate to population, denies to the counties in which the plaintiffs

five, until the population of the State shall be one million and a half, and shall never exceed ninety-nine; Provided that any county having two-thirds of the ratio shall be entitled to one member."

"*Sec. 6. Apportionment of senators.*—The number of Senators shall, at the several periods of making the enumeration, be apportioned among the several counties or districts according to the number of qualified electors in each, and shall not exceed one-third the number of representatives. In apportioning the Senators among the different counties, the fraction that may be lost by any county or counties, in the apportionment of members to the House of Representatives, shall be made up to such county or counties in the Senate, as near as may be practicable. When a district is composed of two or more counties, they shall be adjoining; and no county shall be divided in forming a district."

[6] It is alleged that certain amendments to the Act of 1901 made only minor modifications of that Act, adjusting the boundaries of individual districts in a manner not material to plaintiffs' claims.

live an additional number of representatives to which they are entitled, and renders plaintiffs' votes "not as effective as the votes of the voters residing in other senatorial and representative districts . . . ." Plaintiffs "suffer a debasement of their votes by virtue of the incorrect, arbitrary, obsolete and unconstitutional apportionment of the General Assembly . . . ," and the totality of the malapportionment's effect—which permits a minority of about thirty-seven percent of the voting population of the State to control twenty of the thirty-three members of Tennessee's Senate, and a minority of forty percent of the voting population to control sixty-three of the ninety-nine members of the House—results in "a distortion of the constitutional system" established by the Federal and State Constitutions, prevents the General Assembly "from being a body representative of the people of the State of Tennessee, . . ." and is "contrary to the basic principle of representative government . . . ," and "contrary to the philosophy of government in the United States and all Anglo-Saxon jurisprudence . . . ."

Exhibits appended to the complaint purport to demonstrate the extent of the inequalities of which plaintiffs complain. Based upon "approximate voting population,"[7] these set forth figures showing that the State

---

[7] The exhibits do not reveal the source of the population figures which they set forth, but it appears that the figures were taken from the United States Census of Population, 1950, Volume II, Part 42 (Tennessee), Table 41, at 76–91. These census figures represent the total population over twenty-one years of age in each Tennessee county; they do not purport to enumerate "qualified voters" or "qualified electors," the measure of apportionment prescribed by the Tennessee Constitution. See note 5, *supra*. To qualify to vote in Tennessee, in addition to fulfilling the age requirement, an individual must be a citizen of the United States, a resident of the State for twelve months and of the county where he offers his vote for six months next preceding the election, and must not be under the dis-

Senator from Tennessee's most populous senatorial district represents five and two-tenths times the number of voters represented by the Senator from the least populous district, while the corresponding ratio for most and least populous House districts is more than eighteen to one. The General Assembly thus apportioned has discriminated against the underrepresented counties and in favor of the overrepresented counties in the collection and distribution of various taxes and tax revenues, notably in the distribution of school and highway-improvement funds,[8] this discrimination being "made possible and effective" by the Legislature's failure to reapportion itself. Plaintiffs conclude that election of the State Legislature pursuant to the apportionment fixed by the 1901 Act violates the Tennessee Constitution and deprives them of due process of law and of the equal protection of the laws guaranteed by the Fourteenth Amendment. Their prayer below was for a declaratory judgment striking down the Act, an injunction restraining defendants from any acts necessary to the holding of elections in the districts prescribed by Tenn. Code Ann., 1955, §§ 3–101 to 3–109, until such time as the legislature is reapportioned "according to the

qualification attaching to conviction for certain offenses. Tenn. Code Ann., 1955, §§ 2–201, 2–205. The statistics found in the United States Census of Population, 1950, Volume II, Part 42 (Tennessee), Table 42, at 92–97, suggest that the residence requirement, in particular, may be an unknown variable of considerable significance. Appellants do not suggest a means by which a court, on the basis of the federal census figures, can determine the number of qualified voters in the various Tennessee counties.

[8] The "county aid funds" derived from a portion of a state gasoline privilege tax, for example, are distributed among the counties as follows: one-half equally among the ninety-five counties, one-quarter on the basis of area, one-quarter on the basis of population, to be used by county authorities in the building, repairing and improving of county roads and bridges. Tenn. Code Ann., 1955, § 54–403. Appellants urge that this distribution is discriminatory.

Constitution of the State of Tennessee," and an order directing defendants to declare the next primary and general elections for members of the Tennessee Legislature on an at-large basis—the thirty-three senatorial candidates and the ninety-nine representative candidates receiving the highest number of votes to be declared elected.[9]

Motions to dismiss for want of jurisdiction of the subject matter and for failure to state a claim were made and granted, 179 F. Supp. 824, the District Court relying upon this Court's series of decisions beginning with *Colegrove* v. *Green,* 328 U. S. 549, rehearing denied, 329 U. S. 825, motion for reargument before the full bench denied, 329 U. S. 828. The original and intervening plaintiffs bring the case here on appeal. 364 U. S. 898. In this Court they have altered their request for relief, suggesting a "step-by-step approach." The first step is a remand to the District Court with directions to vacate the order dismissing the complaint and to enter an order retaining jurisdiction, providing "the necessary spur to legislative action . . . ." If this proves insufficient, appellants will ask the "additional spur" of an injunction prohibiting elections under the 1901 Act, or a declaration of the Act's unconstitutionality, or both. Finally, all other means failing, the District Court is invited by the plaintiffs, greatly daring, to order an election at large or redistrict the State itself or through a master. The Solicitor General of the United States, who has filed a brief *amicus* and argued in favor of reversal, asks the Court on this appeal to hold only that the District Court has "jurisdiction" and may properly exercise it to entertain the plaintiffs' claims on the merits. This would leave to that court after remand the questions of the challenged stat-

---

[9] Plaintiffs also suggested, as an alternative to at-large elections, that the District Court might itself redistrict the State. They did not, however, expressly pray such relief.

ute's constitutionality and of some undefined, unadumbrated relief in the event a constitutional violation is found. After an argument at the last Term, the case was set down for reargument, 366 U. S. 907, and heard this Term.

## I.

In sustaining appellants' claim, based on the Fourteenth Amendment, that the District Court may entertain this suit, this Court's uniform course of decision over the years is overruled or disregarded. Explicitly it begins with *Colegrove* v. *Green, supra,* decided in 1946, but its roots run deep in the Court's historic adjudicatory process.

*Colegrove* held that a federal court should not entertain an action for declaratory and injunctive relief to adjudicate the constitutionality, under the Equal Protection Clause and other federal constitutional and statutory provisions, of a state statute establishing the respective districts for the State's election of Representatives to the Congress. Two opinions were written by the four Justices who composed the majority of the seven sitting members of the Court. Both opinions joining in the result in *Colegrove* v. *Green* agreed that considerations were controlling which dictated denial of jurisdiction though not in the strict sense of want of power. While the two opinions show a divergence of view regarding some of these considerations, there are important points of concurrence. Both opinions demonstrate a predominant concern, first, with avoiding federal judicial involvement in matters traditionally left to legislative policy making; second, with respect to the difficulty—in view of the nature of the problems of apportionment and its history in this country—of drawing on or devising judicial standards for judgment, as opposed to legislative determinations, of the part which mere numerical equality among voters should play as a criterion for the allocation of

political power; and, third, with problems of finding appropriate modes of relief—particularly, the problem of resolving the essentially political issue of the relative merits of at-large elections and elections held in districts of unequal population.

The broad applicability of these considerations—summarized in the loose shorthand phrase, "political question"—in cases involving a State's apportionment of voting power among its numerous localities has led the Court, since 1946, to recognize their controlling effect in a variety of situations. (In all these cases decision was by a full Court.) The "political question" principle as applied in *Colegrove* has found wide application commensurate with its function as "one of the rules basic to the federal system and this Court's appropriate place within that structure." *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 570. In *Colegrove* v. *Barrett,* 330 U. S. 804, litigants brought suit in a Federal District Court challenging as offensive to the Equal Protection Clause Illinois' state legislative-apportionment laws. They pointed to state constitutional provisions requiring decennial reapportionment and allocation of seats in proportion to population, alleged a failure to reapportion for more than forty-five years—during which time extensive population shifts had rendered the legislative districts grossly unequal—and sought declaratory and injunctive relief with respect to all elections to be held thereafter. After the complaint was dismissed by the District Court, this Court dismissed an appeal for want of a substantial federal question. A similar District Court decision was affirmed here in *Radford* v. *Gary,* 352 U. S. 991. And cf. *Remmey* v. *Smith,* 342 U. S. 916. In *Tedesco* v. *Board of Supervisors,* 339 U. S. 940, the Court declined to hear, for want of a substantial federal question, the claim that the division of a municipality into voting districts of unequal population for the selection for councilmen fell

afoul of the Fourteenth Amendment, and in *Cox* v. *Peters,* 342 U. S. 936, rehearing denied, 343 U. S. 921, it found no substantial federal question raised by a state court's dismissal of a claim for damages for "devaluation" of plaintiff's vote by application of Georgia's county-unit system in a primary election for the Democratic gubernatorial candidate. The same Georgia system was subsequently attacked in a complaint for declaratory judgment and an injunction; the federal district judge declined to take the requisite steps for the convening of a statutory three-judge court; and this Court, in *Hartsfield* v. *Sloan,* 357 U. S. 916, denied a motion for leave to file a petition for a writ of mandamus to compel the district judge to act. In *MacDougall* v. *Green,* 335 U. S. 281, 283, the Court noted that "To assume that political power is a function exclusively of numbers is to disregard the practicalities of government," and, citing the *Colegrove* cases, declined to find in "such broad constitutional concepts as due process and equal protection of the laws," *id.,* at 284, a warrant for federal judicial invalidation of an Illinois statute requiring as a condition for the formation of a new political party the securing of at least two hundred signatures from each of fifty counties. And in *South* v. *Peters,* 339 U. S. 276, another suit attacking Georgia's county-unit law, it affirmed a District Court dismissal, saying

> "Federal courts consistently refuse to exercise their equity powers in cases posing political issues arising from a state's geographical distribution of electoral strength among its political subdivisions." *Id.,* at 277.

Of course it is important to recognize particular, relevant diversities among comprehensively similar situations. Appellants seek to distinguish several of this Court's prior decisions on one or another ground—*Colegrove* v.

*Green* on the ground that federal, not state, legislative apportionment was involved; *Remmey* v. *Smith* on the ground that state judicial remedies had not been tried; *Radford* v. *Gary* on the ground that Oklahoma has the initiative, whereas Tennessee does not. It would only darken counsel to discuss the relevance and significance of each of these assertedly distinguishing factors here and in the context of this entire line of cases. Suffice it that they do not serve to distinguish *Colegrove* v. *Barrett, supra,* which is on all fours with the present case, or to distinguish *Kidd* v. *McCanless,* 352 U. S. 920, in which the full Court without dissent, only five years ago, dismissed on authority of *Colegrove* v. *Green* and *Anderson* v. *Jordan,* 343 U. S. 912, an appeal from the Supreme Court of Tennessee in which a precisely similar attack was made upon the very statute now challenged. If the weight and momentum of an unvarying course of carefully considered decisions are to be respected, appellants' claims are foreclosed not only by precedents governing the exact facts of the present case but are themselves supported by authority the more persuasive in that it gives effect to the *Colegrove* principle in distinctly varying circumstances in which state arrangements allocating relative degrees of political influence among geographic groups of voters were challenged under the Fourteenth Amendment.

## II.

The *Colegrove* doctrine, in the form in which repeated decisions have settled it, was not an innovation. It represents long judicial thought and experience. From its earliest opinions this Court has consistently recognized a class of controversies which do not lend themselves to judicial standards and judicial remedies. To classify the various instances as "political questions" is rather a form

of stating this conclusion than revealing of analysis.[10] Some of the cases so labelled have no relevance here. But from others emerge unifying considerations that are compelling.

1. The cases concerning war or foreign affairs, for example, are usually explained by the necessity of the country's speaking with one voice in such matters. While this concern alone undoubtedly accounts for many of the decisions,[11] others do not fit the pattern. It would hardly embarrass the conduct of war were this Court to determine, in connection with private transactions between litigants, the date upon which war is to be deemed terminated. But the Court has refused to do so. See, *e. g., The Protector,* 12 Wall. 700; *Brown* v. *Hiatts,* 15 Wall. 177; *Adger* v. *Alston,* 15 Wall. 555; *Williams* v. *Bruffy,* 96 U. S. 176, 192–193. It does not suffice to explain such cases as *Ludecke* v. *Watkins,* 335 U. S. 160—deferring to political determination the question of the duration of war for purposes of the Presidential power to deport alien enemies—that judicial intrusion would seriously

---

[10] See Bickel, Foreword: The Passive Virtues, 75 Harv. L. Rev. 40, 45 *et seq.* (1961).

[11] See, *e. g., United States* v. *Palmer,* 3 Wheat. 610, 634, 635; *The Divina Pastora,* 4 Wheat. 52; *Williams* v. *Suffolk Ins. Co.,* 13 Pet. 415; *Kennett* v. *Chambers,* 14 How. 38; *Doe* v. *Braden,* 16 How. 635; *Jones* v. *United States,* 137 U. S. 202; *Terlinden* v. *Ames,* 184 U. S. 270; *Charlton* v. *Kelly,* 229 U. S. 447; *Oetjen* v. *Central Leather Co.,* 246 U. S. 297; *Ex parte Peru,* 318 U. S. 578; *Clark* v. *Allen,* 331 U. S. 503. Compare *Foster and Elam* v. *Neilson,* 2 Pet. 253, with *United States* v. *Arredondo,* 6 Pet. 691. Of course, judgment concerning the "political" nature of even a controversy affecting the Nation's foreign affairs is not a simple mechanical matter, and certain of the Court's decisions have accorded scant weight to the consideration of unity of action in the conduct of external relations. Compare *Vermilya-Brown Co.* v. *Connell,* 335 U. S. 377, with *United States* v. *Pink,* 315 U. S. 203.

impede the President's power effectively to protect the country's interests in time of war. Of course, this is true; but the precise issue presented is the duration of the time of war which demands the power. Cf. *Martin* v. *Mott,* 12 Wheat. 19; *Lamar* v. *Browne,* 92 U. S. 187, 193; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146; *Kahn* v. *Anderson,* 255 U. S. 1. And even for the purpose of determining the extent of congressional regulatory power over the tribes and dependent communities of Indians, it is ordinarily for Congress, not the Court, to determine whether or not a particular Indian group retains the characteristics constitutionally requisite to confer the power.[12] *E. g., United States* v. *Holliday,* 3 Wall. 407; *Tiger* v. *Western Investment Co.,* 221 U. S. 286; *United States* v. *Sandoval,* 231 U. S. 28. A controlling factor in such cases is that, decision respecting these kinds of complex matters of policy being traditionally committed not to courts but to the politicial agencies of government for determination by criteria of political expediency, there exists no standard ascertainable by settled judicial experience or process by reference to which a political decision affecting the question at issue between the parties can be judged. Where the question arises in the course of a litigation involving primarily the adjudication of other issues between the litigants, the Court accepts as a basis for adjudication the political departments' decision of it. But where its determination is the sole function to be served by the exercise of the judicial power, the Court will not entertain the action. See *Chicago & Southern Air Lines, Inc.,* v. *Waterman S. S. Corp.,*

---

[12] Obviously, this is the equivalent of saying that the characteristics are not "constitutionally requisite" in a judicially enforceable sense. The recognition of their necessity as a condition of legislation is left, as is observance of certain other constitutional commands, to the conscience of the non-judicial organs. Cf. *Kentucky* v. *Dennison,* 24 How. 66.

333 U. S. 103. The dominant consideration is "the lack of satisfactory criteria for a judicial determination . . . ." Mr. Chief Jusice Hughes, for the Court, in *Coleman v. Miller,* 307 U. S. 433, 454–455. Compare *United States* v. *Rogers,* 4 How. 567, 572, with *Worcester* v. *Georgia,* 6 Pet. 515.[13]

This may be, like so many questions of law, a matter of degree. Questions have arisen under the Constitution to which adjudication gives answer although the criteria for decision are less than unwavering bright lines. Often in these cases illumination was found in the federal structures established by, or the underlying presuppositions of, the Constitution. With respect to such questions, the Court has recognized that, concerning a particular power of Congress put in issue, ". . . effective restraints on its exercise must proceed from political rather than from judicial processes." *Wickard* v. *Filburn,* 317 U. S. 111, 120. It is also true that even regarding the duration of war and the status of Indian tribes, referred to above as subjects ordinarily committed exclusively to the non-judicial branches, the Court has suggested that some limitations exist upon the range within which the decisions of those branches will be permitted to go unreviewed. See *United States* v. *Sandoval, supra,* at 46; cf. *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543. But this is merely to acknowledge that particular circumstances may differ so greatly in degree as to differ thereby in kind, and that, although within a certain range of cases on a continuum, no standard of distinction can be found to tell between them, other cases will fall above or below the range. The doctrine of political questions, like any other, is not to

---

[13] Also compare the *Coleman* case and *United States* v. *Sprague,* 282 U. S. 716, with *Hawke* v. *Smith (No. 1),* 253 U. S. 221. See the *National Prohibition Cases,* 253 U. S. 350; and consider the Court's treatment of the several contentions in *Leser* v. *Garnett,* 258 U. S. 130.

be applied beyond the limits of its own logic, with all the quiddities and abstract disharmonies it may manifest. See the disposition of contentions based on logically distorting views of *Colegrove* v. *Green* and *Hunter* v. *Pittsburgh,* 207 U. S. 161, in *Gomillion* v. *Lightfoot,* 364 U. S. 339.

2. The Court has been particularly unwilling to intervene in matters concerning the structure and organization of the political institutions of the States. The abstention from judicial entry into such areas has been greater even than that which marks the Court's ordinary approach to issues of state power challenged under broad federal guarantees. "We should be very reluctant to decide that we had jurisdiction in such a case, and thus in an action of this nature to supervise and review the political administration of a state government by its own officials and through its own courts. The jurisdiction of this court would only exist in case there had been . . . such a plain and substantial departure from the fundamental principles upon which our government is based that it could with truth and propriety be said that if the judgment were suffered to remain, the party aggrieved would be deprived of his life, liberty or property in violation of the provisions of the Federal Constitution." *Wilson* v. *North Carolina,* 169 U. S. 586, 596. See *Taylor and Marshall* v. *Beckham* (No. 1), 178 U. S. 548; *Walton* v. *House of Representatives,* 265 U. S. 487; *Snowden* v. *Hughes,* 321 U. S. 1. Cf. *In re Sawyer,* 124 U. S. 200, 220–221.

Where, however, state law has made particular federal questions determinative of relations within the structure of state government, not in challenge of it, the Court has resolved such narrow, legally defined questions in proper proceedings. See *Boyd* v. *Nebraska ex rel. Thayer,* 143 U. S. 135. In such instances there is no conflict between state policy and the exercise of federal judicial

power. This distinction explains the decisions in *Smiley* v. *Holm,* 285 U. S. 355; *Koenig* v. *Flynn,* 285 U. S. 375; and *Carroll* v. *Becker,* 285 U. S. 380, in which the Court released state constitutional provisions prescribing local lawmaking procedures from misconceived restriction of superior federal requirements. Adjudication of the federal claim involved in those cases was not one demanding the accommodation of conflicting interests for which no readily accessible judicial standards could be found. See *McPherson* v. *Blacker,* 146 U. S. 1, in which, in a case coming here on writ of error from the judgment of a state court which had entertained it on the merits, the Court treated as justiciable the claim that a State could not constitutionally select its presidential electors by districts, but held that Art. II, § 1, cl. 2, of the Constitution left the mode of choosing electors in the absolute discretion of the States. Cf. *Pope* v. *Williams,* 193 U. S. 621; *Breedlove* v. *Suttles,* 302 U. S. 277. To read with literalness the abstracted jurisdictional discussion in the *McPherson* opinion reveals the danger of conceptions of "justiciability" derived from talk and not from the effective decision in a case. In probing beneath the surface of cases in which the Court has declined to interfere with the actions of political organs of government, of decisive significance is whether in each situation the ultimate decision has been to intervene or not to intervene. Compare the reliance in *South* v. *Peters,* 339 U. S. 276, on *MacDougall* v. *Green,* 335 U. S. 281, and the "jurisdictional" form of the opinion in *Wilson* v. *North Carolina,* 169 U. S. 586, 596, *supra.*

3. The cases involving Negro disfranchisement are no exception to the principle of avoiding federal judicial intervention into matters of state government in the absence of an explicit and clear constitutional imperative. For here the controlling command of Supreme Law is plain and unequivocal. An end of discrimination against

the Negro was the compelling motive of the Civil War Amendments. The Fifteenth expresses this in terms, and it is no less true of the Equal Protection Clause of the Fourteenth. *Slaughter-House Cases,* 16 Wall. 36, 67–72; *Strauder* v. *West Virginia,* 100 U. S. 303, 306–307; *Nixon* v. *Herndon,* 273 U. S. 536, 541. Thus the Court, in cases involving discrimination against the Negro's right to vote, has recognized not only the action at law for damages,[14] but, in appropriate circumstances, the extraordinary remedy of declaratory or injunctive relief.[15] *Schnell* v. *Davis,* 336 U. S. 933; *Terry* v. *Adams,* 345 U. S. 461.[16] Injunctions in these cases, it should be noted, would not have restrained state-wide general elections. Compare *Giles* v. *Harris,* 189 U. S. 475.

4. The Court has refused to exercise its jurisdiction to pass on "abstract questions of political power, of sovereignty, of government." *Massachusetts* v. *Mellon,* 262 U. S. 447, 485. See *Texas* v. *Interstate Commerce Commission,* 258 U. S. 158, 162; *New Jersey* v. *Sargent,* 269 U. S. 328, 337. The "political question" doctrine, in this aspect, reflects the policies underlying the requirement of "standing": that the litigant who would challenge offi-

---

[14] *E. g., Myers* v. *Anderson,* 238 U. S. 368; *Nixon* v. *Condon,* 286 U. S. 73; *Lane* v. *Wilson,* 307 U. S. 268; *Smith* v. *Allwright,* 321 U. S. 649. The action for damages for improperly rejecting an elector's vote had been given by the English law since the time of *Ashby* v. *White,* 1 Brown's Cases in Parliament 62; 2 Ld. Raym. 938; 3 Ld. Raym. 320, a case which in its own day precipitated an intraparliamentary war of major dimensions. See 6 Hansard, Parliamentary History of England (1810), 225–324, 376–436. Prior to the racial-discrimination cases, this Court had recognized the action, by implication, in dictum in *Swafford* v. *Templeton,* 185 U. S. 487, and *Wiley* v. *Sinkler,* 179 U. S. 58, both respecting federal elections.

[15] Cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339.

[16] By statute an action for preventive relief is now given the United States in certain voting cases. 71 Stat. 637, 42 U. S. C. § 1971 (c), amending R. S. § 2004. See *United States* v. *Raines,* 362 U. S. 17; *United States* v. *Thomas,* 362 U. S. 58.

cial action must claim infringement of an interest particular and personal to himself, as distinguished from a cause of dissatisfaction with the general frame and functioning of government—a complaint that the political institutions are awry. ⟩ See *Stearns* v. *Wood,* 236 U. S. 75; *Fairchild* v. *Hughes,* 258 U. S. 126; *United Public Workers* v. *Mitchell,* 330 U. S. 75, 89–91. What renders cases of this kind non-justiciable is not necessarily the nature of the parties to them, for the Court has resolved other issues between similar parties; [17] nor is it the nature of the legal question involved, for the same type of question has been adjudicated when presented in other forms of controversy.[18] The crux of the matter is that courts are not fit instruments of decision where what is essentially at stake is the composition of those large contests of policy traditionally fought out in non-judicial forums, by which governments and the actions of governments are made and unmade. \See *Texas* v. *White,* 7 Wall. 700; *White* v. *Hart,* 13 Wall. 646; *Phillips* v. *Payne,* 92 U. S. 130; *Marsh* v. *Burroughs,* 1 Woods 463, 471–472 (Bradley, Circuit Justice); cf. *Wilson* v. *Shaw,* 204 U. S. 24; but see *Coyle* v. *Smith,* 221 U. S. 559. /Thus, where the Cherokee Nation sought by an original motion to restrain the State of Georgia from the enforcement of laws which assimilated Cherokee territory to the State's counties, abrogated Cherokee law, and abolished Cherokee government, the Court held that such a claim was not judicially cognizable. *Cherokee Nation* v. *Georgia,* 5 Pet. 1.[19] And in *Georgia*

---

[17] Compare *Rhode Island* v. *Massachusetts,* 12 Pet. 657, and cases following, with *Georgia* v. *Stanton,* 6 Wall. 50.

[18] Compare *Worcester* v. *Georgia,* 6 Pet. 515, with *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 20, 28 (Mr. Justice Johnson, concurring), 51 and 75 (Mr. Justice Thompson, dissenting).

[19] This was an alternative ground of Chief Justice Marshall's opinion for the Court. *Id.,* at 20. The question which Marshall reserved as "unnecessary to decide," *ibid.,* was not the justiciability of the bill

v. *Stanton*, 6 Wall. 50, the Court dismissed for want of jurisdiction a bill by the State of Georgia seeking to enjoin enforcement of the Reconstruction Acts on the ground that the command by military districts which they established extinguished existing state government and replaced it with a form of government unauthorized by the Constitution: [20]

> "That these matters, both as stated in the body of the bill; and, in the prayers for relief, call for the judgment of the court upon political questions, and, upon rights, not of persons or property, but of a political character, will hardly be denied. For the rights for the protection of which our authority is invoked, are the rights of sovereignty, of political jurisdiction, of government, of corporate existence as a State, with all its constitutional powers and privileges. No case of private rights or private property infringed, or in danger of actual or threatened infringement, is presented by the bill, in a judicial form, for the judgment of the court." *Id.*, at 77.[21]

in this aspect, but the "more doubtful" question whether that "part of the bill which respects the land occupied by the Indians, and prays the aid of the court to protect their possession," might be entertained. *Ibid.* Mr. Justice Johnson, concurring, found the controversy nonjusticiable and would have put the ruling solely on this ground, *id.*, at 28, and Mr. Justice Thompson, in dissent, agreed that much of the matter in the bill was not fit for judicial determination. *Id.*, at 51, 75.

[20] Cf. *Mississippi v. Johnson*, 4 Wall. 475.

[21] Considerations similar to those which determined the *Cherokee Nation* case and *Georgia v. Stanton* no doubt explain the celebrated decision in *Nabob of the Carnatic v. East India Co.*, 1 Ves. jun. *371; 2 Ves. jun. *56, rather than any attribution of a portion of British sovereignty, in respect of Indian affairs, to the company. The reluctance of the English Judges to involve themselves in contests of factional political power is of ancient standing. In *The Duke*

5. The influence of these converging considerations—the caution not to undertake decision where standards meet for judicial judgment are lacking, the reluctance to interfere with matters of state government in the absence of an unquestionable and effectively enforceable mandate, the unwillingness to make courts arbiters of the broad issues of political organization historically committed to other institutions and for whose adjustment the judicial process is ill-adapted—has been decisive of the settled line of cases, reaching back more than a century, which holds that Art. IV, § 4, of the Constitution, guaranteeing to the States "a Republican Form of Government," [22] is not enforceable through the courts. *E. g., O'Neill* v. *Leamer,* 239 U. S. 244; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Cochran* v. *Board of Education,* 281 U. S. 370; *Highland Farms Dairy, Inc.,* v. *Agnew,* 300 U. S. 608.[23] Claims resting on this specific

*of York's Claim to the Crown,* 5 Rotuli Parl. 375, printed in Wambaugh, Cases on Constitutional Law (1915), 1, the role which the Judges were asked to play appears to have been rather that of advocates than of judges, but the answer which they returned to the Lords relied on reasons equally applicable to either role.

[22] "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."

[23] Cf. the cases holding that the Fourteenth Amendment imposes no such restriction upon the form of a State's governmental organization as will permit persons affected by government action to complain that in its organization principles of separation of powers have been violated. *E. g., Dreyer* v. *Illinois,* 187 U. S. 71; *Soliah* v. *Heskin,* 222 U. S. 522; *Houck* v. *Little River Drainage District,* 239 U. S. 254. The same consistent refusal of this Court to find that the Federal Constitution restricts state power to design the structure of state political institutions is reflected in the cases rejecting claims arising out of the States' creation, alteration, or destruction of local

guarantee of the Constitution have been held nonjusticiable which challenged state distribution of powers between the legislative and judicial branches, *Ohio ex rel. Bryant* v. *Akron Metropolitan Park District*, 281 U. S. 74, state delegation of power to municipalities, *Kiernan* v. *Portland, Oregon,* 223 U. S. 151, state adoption of the referendum as a legislative institution, *Ohio ex rel. Davis* v. *Hildebrant,* 241 U. S. 565, 569, and state restriction upon the power of state constitutional amendment, *Marshall* v. *Dye,* 231 U. S. 250, 256–257. The subject was fully considered in *Pacific States Telephone & Telegraph Co.* v. *Oregon,* 223 U. S. 118, in which the Court dismissed for want of jurisdiction a writ of error attacking a state license-tax statute enacted by the initiative, on the claim that this mode of legislation was inconsistent with a Republican Form of Government and violated the Equal Protection Clause and other federal guarantees. After noting ". . . the ruinous destruction of legislative authority in matters purely political which would necessarily be occasioned by giving sanction

---

subdivisions or their powers, insofar as these claims are made by the subdivisions themselves, see *Laramie County* v. *Albany County,* 92 U. S. 307; *Pawhuska* v. *Pawhuska Oil & Gas Co.,* 250 U. S. 394; *Trenton* v. *New Jersey,* 262 U. S. 182; *Risty* v. *Chicago, R. I. & P. R. Co.,* 270 U. S. 378, 389–390; *Williams* v. *Mayor and City Council of Baltimore,* 289 U. S. 36, or by the whole body of their residents who share only a general, undifferentiated interest in their preservation. See *Hunter* v. *Pittsburgh,* 207 U. S. 161. The policy is also given effect by the denial of "standing" to persons seeking to challenge state action as infringing the interest of some separate unit within the State's administrative structure—a denial which precludes the arbitrament by federal courts of what are only disputes over the local allocation of government functions and powers. See, *e. g.,* *Smith* v. *Indiana,* 191 U. S. 138; *Braxton County Court* v. *West Virginia,* 208 U. S. 192; *Marshall* v. *Dye,* 231 U. S. 250; *Stewart* v. *Kansas City,* 239 U. S. 14.

to the doctrine which underlies and would be necessarily involved in sustaining the propositions contended for," [24] the Court said:

". . . [The] essentially political nature [of this claim] is at once made manifest by understanding that the assault which the contention here advanced makes it [sic] not on the tax as a tax, but on the State as a State. It is addressed to the framework and political character of the government by which the statute levying the tax was passed. It is the government, the political entity, which (reducing the case to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power assailed, on the ground that its exertion

[24] 223 U. S., at 141. ". . . [T]he contention, if held to be sound, would necessarily affect the validity, not only of the particular statute which is before us, but of every other statute passed in Oregon since the adoption of the initiative and referendum. And indeed the propositions go further than this, since in their essence they assert that there is no governmental function, legislative or judicial, in Oregon, because it cannot be assumed, if the proposition be well founded, that there is at one and the same time one and the same government which is republican in form and not of that character." Compare *Luther v. Borden*, 7 How. 1, 38–39:

". . . For, if this court is authorized to enter upon this inquiry as proposed by the plaintiff, and it should be decided that the charter government had no legal existence during the period of time above mentioned,—if it had been annulled by the adoption of the opposing government,—then the laws passed by its legislature during that time were nullities; its taxes wrongfully collected; its salaries and compensation to its officers illegally paid; its public accounts improperly settled; and the judgments and sentences of its courts in civil and criminal cases null and void, and the officers who carried their decisions into operation answerable as trespassers, if not in some cases as criminals.

"When the decision of this court might lead to such results, it becomes its duty to examine very carefully its own powers before it undertakes to exercise jurisdiction."

has injuriously affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the State that it establish its right to exist as a State, republican in form." *Id.*, at 150–151.

The starting point of the doctrine applied in these cases is, of course, *Luther* v. *Borden,* 7 How. 1. The case arose out of the Dorr Rebellion in Rhode Island in 1841–1842. Rhode Island, at the time of the separation from England, had not adopted a new constitution but had continued, in its existence as an independent State, under its original royal Charter, with certain statutory alterations. This frame of government provided no means for amendment of the fundamental law; the right of suffrage was to be prescribed by legislation, which limited it to freeholders. In the 1830's, largely because of the growth of towns in which there developed a propertied class whose means were not represented by freehold estates, dissatisfaction arose with the suffrage qualifications of the charter government. In addition, population shifts had caused a dated apportionment of seats in the lower house to yield substantial numerical inequality of political influence, even among qualified voters. The towns felt themselves underrepresented, and agitation began for electoral reform. When the charter government failed to respond, popular meetings of those who favored the broader suffrage were held and delegates elected to a convention which met and drafted a state constitution. This constitution provided for universal manhood suffrage (with certain qualifications); and it was to be adopted by vote of the people at elections at which a similarly expansive franchise obtained. This new scheme of government was ratified at the polls and declared effective by the convention, but the government elected and organized under it, with Dorr at its head, never came to power. The

charter government denied the validity of the convention, the constitution and its government and, after an insignificant skirmish, routed Dorr and his followers. It meanwhile provided for the calling of its own convention, which drafted a constitution that went peacefully into effect in 1843.[25]

*Luther* v. *Borden* was a trespass action brought by one of Dorr's supporters in a United States Circuit Court to recover damages for the breaking and entering of his house. The defendants justified under military orders pursuant to martial law declared by the charter government, and plaintiff, by his reply, joined issue on the legality of the charter government subsequent to the adoption of the Dorr constitution. Evidence offered by the plaintiff tending to establish that the Dorr government was the rightful government of Rhode Island was rejected by the Circuit Court; the court charged the jury that the charter government was lawful; and on a verdict for defendants, plaintiff brought a writ of error to this Court.

The Court, through Mr. Chief Justice Taney, affirmed. After noting that the issue of the charter government's legality had been resolved in that government's favor by the state courts of Rhode Island—that the state courts, deeming the matter a political one unfit for judicial determination, had declined to entertain attacks upon the existence and authority of the charter government—the Chief Justice held that the courts of the United States must follow those of the State in this regard. *Id.*, at 39–40. It was recognized that the compulsion to follow

---

[25] See Bowen, The Recent Contest in Rhode Island (1844); Frieze, A Concise History of the Efforts to Obtain an Extension of Suffrage in Rhode Island; From the Year 1811 to 1842 (2d ed. 1842); Mowry, The Dorr War (1901); Wayland, The Affairs of Rhode Island (2d ed. 1842).

state law would not apply in a federal court in the face of a superior command found in the Federal Constitution, *ibid.,* but no such command was found. The Constitution, the Court said—referring to the Guarantee Clause of the Fourth Article—". . . as far as it has provided for an emergency of this kind, and authorized the general government to interfere in the domestic concerns of a State, has treated the subject as political in its nature, and placed the power in the hands of that department." *Id.,* at 42.

"Under this article of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue; and as no senators or representatives were elected under the authority of the government of which Mr. Dorr was the head, Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in the courts." *Ibid.*[26]

---

[26] The Court reasoned, with respect to the guarantee against domestic violence also contained in Art. IV, § 4, that this, too, was an authority committed solely to Congress; that Congress had empowered the President, not the courts, to enforce it; and that it

In determining this issue non-justiciable, the Court was sensitive to the same considerations to which its later decisions have given the varied applications already discussed. It adverted to the delicacy of judicial intervention into the very structure of government.[27] It acknowledged that tradition had long entrusted questions of this nature to non-judicial processes,[28] and that judicial processes were unsuited to their decision.[29] The absence of guiding standards for judgment was critical, for the question whether the Dorr constitution had been rightfully adopted depended, in part, upon the extent of the franchise to be recognized—the very point of contention over which rebellion had been fought.

". . . [I]f the Circuit Court had entered upon this inquiry, by what rule could it have determined the qualification of voters upon the adoption or rejection of the proposed constitution, unless there was some previous law of the State to guide it? It is the province of a court to expound the law, not to make it. And certainly it is no part of the judicial functions of any court of the United States to prescribe the qualification of voters in a State, giving the right to those to whom it is denied by the written and established constitution and laws of the State, or taking it away from those to whom it is given; nor has it the right to determine what political privileges

was inconceivable that the courts should assume a power to make determinations in the premises which might conflict with those of the Executive. It noted further that, in fact, the President had recognized the governor of the charter government as the lawful authority in Rhode Island, although it had been unnecessary to call out the militia in his support.

[27] See note 24, *supra*.

[28] *Id.*, at 39, 46–47.

[29] *Id.*, at 41–42.

the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision." *Id.*, at 41.

Mr. Justice Woodbury (who dissented with respect to the effect of martial law) agreed with the Court regarding the inappropriateness of judicial inquiry into the issues:

"But, fortunately for our freedom from political excitements in judicial duties, this court can never with propriety be called on officially to be the umpire in questions merely political. The adjustment of these questions belongs to the people and their political representatives, either in the State or general government. These questions relate to matters not to be settled on strict legal principles. They are adjusted rather by inclination,—or prejudice or compromise, often. Some of them succeed or are defeated even by public policy alone, or mere naked power, rather than intrinsic right. . . .

"Another evil, alarming and little foreseen, involved in regarding these as questions for the final arbitrament of judges would be, that in such an event all political privileges and rights would, in a dispute among the people, depend on our decision finally. . . . [D]isputed points in making constitutions, depending often, as before shown, on policy, inclination, popular resolves, and popular will, . . . if the people, in the distribution of powers under the constitution, should ever think of making judges supreme arbiters in political controversies, when not selected by nor, frequently, amenable to them, nor at liberty to follow such various considerations in their judgments as belong to mere political questions, they will dethrone themselves and lose one of their own invaluable birthrights; building up in this way—slowly, but surely—a new sovereign power in the

republic, in most respects irresponsible and unchange-
able for life, and one more dangerous, in theory at
least, than the worst elective oligarchy in the worst
of times. . . ." *Id.*, at 51–53.[30]

## III.

The present case involves all of the elements that have
made the Guarantee Clause cases non-justiciable. It is,
in effect, a Guarantee Clause claim masquerading under
a different label. But it cannot make the case more fit
for judicial action that appellants invoke the Fourteenth
Amendment rather than Art. IV, § 4, where, in fact, the
gist of their complaint is the same—unless it can be found
that the Fourteenth Amendment speaks with greater par-
ticularity to their situation. We have been admonished
to avoid "the tyranny of labels." *Snyder* v. *Massachu-
setts*, 291 U. S. 97, 114. Art. IV, § 4, is not committed by
express constitutional terms to Congress. It is the nature
of the controversies arising under it, nothing else, which
has made it judicially unenforceable. Of course, if a con-
troversy falls within judicial power, it depends "on how
he [the plaintiff] casts his action," *Pan American Petro-
leum Corp.* v. *Superior Court*, 366 U. S. 656, 662, whether
he brings himself within a jurisdictional statute. But
where judicial competence is wanting, it cannot be created
by invoking one clause of the Constitution rather than
another. When what was essentially a Guarantee Clause
claim was sought to be laid, as well, under the Equal Pro-
tection Clause in *Pacific States Telephone & Telegraph
Co.* v. *Oregon, supra*, the Court had no difficulty in "dis-

---

[30] In evaluating the Court's determination not to inquire into the
authority of the charter government, it must be remembered that,
throughout the country, Dorr "had received the sympathy of the
Democratic press. His cause, therefore, became distinctly a party
issue." 2 Warren, The Supreme Court in United States History
(Rev. ed. 1937), 186.

pelling any mere confusion resulting from forms of expression and considering the substance of things . . . ." 223 U. S., at 140.

Here appellants attack "the State as a State," precisely as it was perceived to be attacked in the *Pacific States* case, *id.,* at 150. Their complaint is that the basis of representation of the Tennessee Legislature hurts them. They assert that "a minority now rules in Tennessee," that the apportionment statute results in a "distortion of the constitutional system," that the General Assembly is no longer "a body representative of the people of the State of Tennessee," all "contrary to the basic principle of representative government . . . ." Accepting appellants' own formulation of the issue, one can know this handsaw from a hawk. Such a claim would be non-justiciable not merely under Art. IV, § 4, but under any clause of the Constitution, by virtue of the very fact that a federal court is not a forum for political debate. *Massachusetts* v. *Mellon, supra.*

But appellants, of course, do not rest on this claim *simpliciter.* In invoking the Equal Protection Clause, they assert that the distortion of representative government complained of is produced by systematic discrimination against them, by way of "a debasement of their votes . . . ." Does this characterization, with due regard for the facts from which it is derived, add anything to appellants' case? [31]

At first blush, this charge of discrimination based on legislative underrepresentation is given the appearance of

[31] Appellants also allege discrimination in the legislature's allocation of certain tax burdens and benefits. Whether or not such discrimination would violate the Equal Protection Clause if the tax statutes were challenged in a proper proceeding, see *Dane* v. *Jackson,* 256 U. S. 589; cf. *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249, 268, these recitative allegations do not affect the nature of the controversy which appellants' complaints present.

a more private, less impersonal claim, than the assertion that the frame of government is askew. Appellants appear as representatives of a class that is prejudiced as a class, in contradistinction to the polity in its entirety. However, the discrimination relied on is the deprivation of what appellants conceive to be their proportionate share of political influence. This, of course, is the practical effect of any allocation of power within the institutions of government. Hardly any distribution of political authority that could be assailed as rendering government non-republican would fail similarly to operate to the prejudice of some groups, and to the advantage of others, within the body politic. It would be ingenuous not to see, or consciously blind to deny, that the real battle over the initiative and referendum, or over a delegation of power to local rather than state-wide authority, is the battle between forces whose influence is disparate among the various organs of government to whom power may be given. No shift of power but works a corresponding shift in political influence among the groups composing a society.

What, then, is this question of legislative apportionment? Appellants invoke the right to vote and to have their votes counted.[32] But they are permitted to vote and their votes are counted. They go to the polls, they cast their ballots, they send their representatives to the state

---

[32] Appellants would find a "right" to have one's ballot counted on authority of *United States* v. *Mosley*, 238 U. S. 383; *United States* v. *Classic*, 313 U. S. 299; *United States* v. *Saylor*, 322 U. S. 385. All that these cases hold is that conspiracies to commit certain sharp election practices which, in a federal election, cause ballots not to receive the weight which the law has in fact given them, may amount to deprivations of the constitutionally secured right to vote for federal officers. But see *United States* v. *Bathgate*, 246 U. S. 220. The cases do not so much as suggest that there exists a constitutional limitation upon the relative weight to which the law might properly entitle respective ballots, even in federal elections.

councils. Their complaint is simply that the representatives are not sufficiently numerous or powerful—in short, that Tennessee has adopted a basis of representation with which they are dissatisfied. Talk of "debasement" or "dilution" is circular talk. One cannot speak of "debasement" or "dilution" of the value of a vote until there is first defined a standard of reference as to what a vote should be worth. What is actually asked of the Court in this case is to choose among competing bases of representation—ultimately, really, among competing theories of political philosophy—in order to establish an appropriate frame of government for the State of Tennessee and thereby for all the States of the Union.

In such a matter, abstract analogies which ignore the facts of history deal in unrealities; they betray reason. This is not a case in which a State has, through a device however oblique and sophisticated, denied Negroes or Jews or redheaded persons a vote, or given them only a third or a sixth of a vote. That was *Gomillion* v. *Lightfoot,* 364 U. S. 339. What Tennessee illustrates is an old and still widespread method of representation—representation by local geographical division, only in part respective of population—in preference to others, others, forsooth, more appealing. Appellants contest this choice and seek to make this Court the arbiter of the disagreement. They would make the Equal Protection Clause the charter of adjudication, asserting that the equality which it guarantees comports, if not the assurance of equal weight to every voter's vote, at least the basic conception that representation ought to be proportionate to population, a standard by reference to which the reasonableness of apportionment plans may be judged.

To find such a political conception legally enforceable in the broad and unspecific guarantee of equal protection is to rewrite the Constitution. See *Luther* v. *Borden,* *supra.* Certainly, "equal protection" is no more secure

a foundation for judicial judgment of the permissibility of varying forms of representative government than is "Republican Form." Indeed since "equal protection of the laws" can only mean an equality of persons standing in the same relation to whatever governmental action is challenged, the determination whether treatment is equal presupposes a determination concerning the nature of the relationship. This, with respect to apportionment, means an inquiry into the theoretic base of representation in an acceptably republican state. For a court could not determine the equal-protection issue without in fact first determining the Republican-Form issue, simply because what is reasonable for equal-protection purposes will depend upon what frame of government, basically, is allowed. To divorce "equal protection" from "Republican Form" is to talk about half a question.

The notion that representation proportioned to the geographic spread of population is so universally accepted as a necessary element of equality between man and man that it must be taken to be the standard of a political equality preserved by the Fourteenth Amendment—that it is, in appellants' words "the basic principle of representative government"—is, to put it bluntly, not true. However desirable and however desired by some among the great political thinkers and framers of our government, it has never been generally practiced, today or in the past. It was not the English system, it was not the colonial system, it was not the system chosen for the national government by the Constitution, it was not the system exclusively or even predominantly practiced by the States at the time of adoption of the Fourteenth Amendment, it is not predominantly practiced by the States today. Unless judges, the judges of this Court, are to make their private views of political wisdom the measure of the Constitution—views which in all honesty cannot but give the appearance, if not reflect the reality, of

involvement with the business of partisan politics so inescapably a part of apportionment controversies—the Fourteenth Amendment, "itself a historical product," *Jackman v. Rosenbaum Co.*, 260 U. S. 22, 31, provides no guide for judicial oversight of the representation problem.

1. *Great Britain.* Writing in 1958, Professor W. J. M. Mackenzie aptly summarized the British history of the principle of representation proportioned to population: " 'Equal electoral districts' formed part of the programme of radical reform in England in the 1830s, the only part of that programme which has not been realised." [33] Until the late nineteenth century, the sole base of representation (with certain exceptions not now relevant) was the local geographical unit: each county or borough returned its fixed number of members, usually two for the English units, regardless of population. [34] Prior to the Reform Act of 1832, this system was marked by the almost total disfranchisement of the populous northern industrial centers, which had grown to significant size at the advent of the Industrial Revolution and had not been granted borough representation, and by the existence of the rotten borough, playing its substantial part in the Crown's struggle for continued control of the Commons. [35] In 1831, ten southernmost English counties, numbering three and a quarter million people, had two hundred and thirty-five parliamentary representatives, while the six northernmost counties, with more than three and a half million people, had sixty-eight. [36] It was said that one hundred and eighty persons appointed three hundred and

---

[33] Mackenzie, Free Elections (1958) (hereafter, Mackenzie), 108.

[34] Ogg, English Government and Politics (2d ed. 1936) (hereafter, Ogg), 248–250, 257; Seymour, Electoral Reform in England and Wales (1915) (hereafter, Seymour), 46–47.

[35] Ogg 257–259; Seymour 45–52; Carpenter, The Development of American Political Thought (1930) (hereafter, Carpenter), 45–46.

[36] Ogg 258.

fifty members in the Commons.[37]  Less than a half
century earlier, Madison in the Federalist had remarked
that half the House was returned by less than six thousand
of the eight million people of England and Scotland.[38]

The Act of 1832, the product of a fierce partisan politi-
cal struggle and the occasion of charges of gerrymander-
ing not without foundation,[39] effected eradication of
only the most extreme numerical inequalities of the
unreformed system.  It did not adopt the principle of
representation based on population, but merely disfran-
chised certain among the rotten borough and enfran-
chised most of the urban centers—still quite without
regard to their relative numbers.[40]  In the wake of the
Act there remained substantial electoral inequality: the
boroughs of Cornwall were represented sixteen times as
weightily, judged by population, as the county's eastern
division; the average ratio of seats to population in ten
agricultural counties was four and a half times that in
ten manufacturing divisions; Honiton, with about three
thousand inhabitants, was equally represented with Liver-
pool, which had four hundred thousand.[41]  In 1866
apportionment by population began to be advocated
generally in the House, but was not made the basis of
the redistribution of 1867, although the act of that year
did apportion representation more evenly, gauged by the
population standard.[42]  Population shifts increased the
surviving inequalities; by 1884 the representation ratio

[37] Seymour 51.

[38] The Federalist, No. 56 (Wright ed. 1961), at 382.  Compare
Seymour 49.  This takes account of the restricted franchise as well
as the effect of the local-unit apportionment principle.

[39] Seymour 52–76.

[40] Ogg 264–265; Seymour 318–319.

[41] For these and other instances of gross inequality, see Seymour
320–325.

[42] Seymour 333–346; Ogg 265.

in many small boroughs was more than twenty-two times that of Birmingham or Manchester, forty-to-one disparities could be found elsewhere, and, in sum, in the 1870's and 1880's, a fourth of the electorate returned two-thirds of the members of the House.[43]

The first systematic English attempt to distribute seats by population was the Redistribution Act of 1885.[44] The statute still left ratios of inequality of as much as seven to one,[45] which had increased to fifteen to one by 1912.[46] In 1918 Parliament again responded to "shockingly bad" conditions of inequality,[47] and to partisan political inspiration,[48] by redistribution.[49] In 1944, redistribution was put on a periodic footing by the House of Commons (Redistribution of Seats) Act of that year,[50] which committed a continuing primary responsibility for reapportioning the Commons to administrative agencies (Boundary Commissions for England, Scotland, Wales and Northern Ireland, respectively).[51] The Commissions, having regard to certain rules prescribed for their guidance, are to prepare at designated intervals reports for the Home Secretary's submission to Parliament, along with the draft of an Order in Council to give effect to the

---

[43] Seymour 349, 490–491.

[44] Seymour 489–518.

[45] Mackenzie 108; see also Seymour 513–517.

[46] Ogg 270.

[47] Ogg 253.

[48] Ogg 270–271.

[49] Ogg 273–274.

[50] 7 & 8 Geo. VI, c. 41. The 1944 Act was amended by the House of Commons (Redistribution of Seats) Act, 1947, 10 & 11 Geo. VI, c. 10, and the two, with other provisions, were consolidated in the House of Commons (Redistribution of Seats) Act, 1949, 12 & 13 Geo. VI, c. 66, since amended by the House of Commons (Redistribution of Seats) Act, 1958, 6 & 7 Eliz. II, c. 26.

[51] See generally Butler, The Redistribution of Seats, 33 Public Administration 125 (1955).

Commissions' recommendations. The districting rules adopt the basic principle of representation by population, although the principle is significantly modified by directions to respect local geographic boundaries as far as practicable, and by discretion to take account of special geographical conditions, including the size, shape and accessibility of constituencies. Under the original 1944 Act, the rules provided that (subject to the exercise of the discretion respecting special geographical conditions and to regard for the total size of the House of Commons as prescribed by the Act) so far as practicable, the single-member districts should not deviate more than twenty-five percent from the electoral quota (population divided by number of constituencies). However, apparently at the recommendation of the Boundary Commission for England, the twenty-five percent standard was eliminated as too restrictive in 1947, and replaced by the flexible provision that constituencies are to be as near the electoral quota as practicable, a rule which is expressly subordinated both to the consideration of special geographic conditions and to that of preserving local boundaries.[52] Free of the twenty-five percent rule, the Commissions drew up plans of distribution in which inequalities among the districts run, in ordinary cases, as high as two to one and, in the case of a few extraordinary constituencies, three to one.[53] The action of the Boundary Commission for England was twice challenged in the courts in 1954—the claim being that the Commission had violated statutory rules

---

[52] See note 50, *supra*. However, Commissions are given discretion to depart from the strict application of the local boundary rule to avoid excessive disparities between the electorate of a constituency and the electoral quota, or between the electorate of a constituency and that of neighboring constituencies. For detailed discussion, see Craig, Parliament and Boundary Commissions, [1959] Public Law 23. See also Butler, *supra*, note 51, at 127.

[53] Mackenzie 108, 113.

prescribing the standards for its judgment—and in both cases the Judges declined to intervene. In *Hammersmith Borough Council* v. *Boundary Commission for England*,[54] Harman, J., was of opinion that the nature of the controversy and the scheme of the Acts made the matter inappropriate for judicial interference, and in *Harper* v. *Home Secretary*,[55] the Court of Appeal, per Evershed, M. R., quoting Harman, J., with approval, adverting to the wide range of discretion entrusted to the Commission under the Acts, and remarking the delicate character of the parliamentary issues in which it was sought to engage the court, reached the same conclusion.[56]

The House of Commons (Redistribution of Seats) Act, 1958,[57] made two further amendments to the law. Responsive to the recommendation of the Boundary Commission for England,[58] the interval permitted between Commission reports was more than doubled, to a new maximum of fifteen years.[59] And at the suggestion of the same Commission that "It would ease the future labours of the Commission and remove much local irritation if Rule 5 [requiring that the electorate of each constituency be as near the electoral quota as practicable] were to be so amended as to allow us to make recommendations preserving the status quo in any area where such a course appeared to be desirable and not inconsistent

---

[54] The Times, Dec. 15, 1954, p. 4, cols 3–4.

[55] [1955] 1 Ch. 238.

[56] The court reserved the question whether a judicial remedy might be found in a case in which it appeared that a Commission had manifestly acted in complete disregard of the Acts.

[57] Note 50, *supra*.

[58] First Periodical Report of the Boundary Commission for England [Cmd. 9311] (1954), 4, par. 19.

[59] Under the 1949 Act, see note 50, *supra*, the intervals between reports were to be not less than three nor more than seven years, with certain qualifications. The 1958 Act raised the minimum to ten and the maximum to fifteen years.

with the broad intention of the Rules," [60] the Commissions were directed to consider the inconveniences attendant upon the alteration of constituencies, and the local ties which such alteration might break. The Home Secretary's view of this amendment was that it worked to erect "a presumption against making changes unless there is a very strong case for them." [61]

2. *The Colonies and the Union.* For the guiding political theorists of the Revolutionary generation, the English system of representation, in its most salient aspects of numerical inequality, was a model to be avoided, not followed.[62] Nevertheless, the basic English principle of apportioning representatives among the local governmental entities, towns or counties, rather than among units of approximately equal population, had early taken root in the colonies.[63] In some, as in Massachusetts and Rhode Island, numbers of electors were taken into account, in a rough fashion, by allotting increasing fixed quotas of representatives to several towns or classes of towns graduated by population, but in most of the colonies delegates were allowed to the local units without respect to numbers.[64] This resulted in grossly unequal electoral units.[65] The representation ratio in one North Carolina county was more than eight times that in another.[66] Moreover, American rotten boroughs had appeared,[67] and apportionment was made an instrument first in the politi-

---

[60] First Periodical Report, *supra,* note 58, at 4, par. 20.

[61] 582 H. C. Deb. (5th ser. 1957–1958), 230.

[62] See The Federalist, No. 56, *supra,* note 38; Tudor, Life of James Otis (1823), 188–190.

[63] Griffith, The Rise and Development of the Gerrymander (1907) (hereafter, Griffith), 23–24.

[64] Luce, Legislative Principles (1930) (hereafter, Luce), 336–342.

[65] Griffith 25.

[66] Griffith 15–16, n. 1.

[67] Griffith 28.

cal struggles between the King or the royal governors and the colonial legislatures,[68] and, later, between the older tidewater regions in the colonies and the growing interior.[69]   Madison in the Philadelphia Convention adverted to the "inequality of the Representation in the Legislatures of particular States, . . ." [70] arguing that it was necessary to confer on Congress the power ultimately to regulate the times, places and manner of selecting Representatives,[71] in order to forestall the over-represented counties' securing themselves a similar over-representation in the national councils.   The example of South Carolina, where Charleston's overrepresentation was a continuing bone of contention between the tidewater and the back country, was cited by Madison in the Virginia Convention and by King in the Massachusetts Convention, in support of the same power, and King also spoke of the extreme numerical inequality arising from Connecticut's town-representation system.[72]

Such inequalities survived the constitutional period. The United States Constitution itself did not largely adopt the principle of numbers.   Apportionment of the national legislature among the States was one of the most difficult problems for the Convention; [73] its solution—involving State representation in the Senate [74] and the three-fifths compromise in the House [75]—left neither chamber apportioned proportionately to population.

[68] Carpenter 48–49, 54; Griffith 26, 28–29; Luce 339–340.

[69] Carpenter 87; Griffith 26–29, 31.

[70] II Farrand, Records of the Federal Convention (1911), 241.

[71] The power was provided.   Art. I, § 4, cl. 1.

[72] III Elliot's Debates (2d ed. 1891), 367; II id., at 50–51.

[73] See Madison, in I Farrand, op. cit., supra, note 70, at 321: "The great difficulty lies in the affair of Representation; and if this could be adjusted, all others would be surmountable."

[74] See The Federalist, No. 62 (Wright ed. 1961), at 408–409.

[75] See The Federalist, No. 54, id., at 369–374.

Within the States, electoral power continued to be allotted to favor the tidewater.[76]  Jefferson, in his Notes on Virginia, recorded the "very unequal" representation there: individual counties differing in population by a ratio of more than seventeen to one elected the same number of representatives, and those nineteen thousand of Virginia's fifty thousand men who lived between the falls of the rivers and the seacoast returned half the State's senators and almost half its delegates.[77]  In South Carolina in 1790, the three lower districts, with a white population of less than twenty-nine thousand elected twenty senators and seventy assembly members; while in the uplands more than one hundred and eleven thousand white persons elected seventeen senators and fifty-four assemblymen.[78]

In the early nineteenth century, the demands of the interior became more insistent.  The apportionment quarrel in Virginia was a major factor in precipitating the calling of a constitutional convention in 1829.  Bitter animosities racked the convention, threatening the State with disunion.  At last a compromise which gave the three hundred and twenty thousand people of the west thirteen senators, as against the nineteen senators returned by the three hundred sixty-three thousand people of the east, commanded agreement.  It was adopted at the polls but left the western counties so dissatisfied that there were threats of revolt and realignment with the State of Maryland.[79]

Maryland, however, had her own numerical disproportions.  In 1820, one representative vote in Calvert County

---

[76] Carpenter 130.

[77] Jefferson, Notes on the State of Virginia (Peden ed. 1955), 118–119. See also II Writings of Thomas Jefferson (Memorial ed. 1903), 160–162.

[78] Carpenter 139–140.

[79] Griffith 102–104.

was worth five in Frederick County, and almost two hundred thousand people were represented by eighteen members, while fifty thousand others elected twenty.[80] This was the result of the county-representation system of allotment. And, except for Massachusetts which, after a long struggle, did adopt representation by population at the mid-century, a similar town-representation principle continued to prevail in various forms throughout New England, with all its attendant, often gross inequalities.[81]

3. *The States at the time of ratification of the Fourteenth Amendment, and those later admitted.* The several state conventions throughout the first half of the nineteenth century were the scenes of fierce sectional and party strifes respecting the geographic allocation of representation.[82] Their product was a wide variety of apportionment methods which recognized the element of population in differing ways and degrees. Particularly pertinent to appraisal of the contention that the Fourteenth Amendment embodied a standard limiting the freedom of the States with regard to the principles and bases of local legislative apportionment is an examination of the apportionment provisions of the thirty-three States which ratified the Amendment between 1866 and 1870, at their respective times of ratification. These may be considered in two groups: (A) the ratifying States other than the ten Southern States whose constitutions, at the time of ratification or shortly thereafter, were the work of the Reconstruction Act conventions;[83] and

---

[80] Griffith 104–105.

[81] Luce 343–350. Bowen, *supra*, note 25, at 17–18, records that in 1824 Providence County, having three-fifths of Rhode Island's population, elected only twenty-two of its seventy-two representatives, and that the town of Providence, more than double the size of Newport, had half Newport's number of representatives.

[82] Carpenter 130–137; Luce 364–367; Griffith 116–117.

[83] See 14 Stat. 428; 15 Stat. 2, 14, 41.

(B) the ten Reconstruction-Act States. All thirty-three are significant, because they demonstrate how unfounded is the assumption that the ratifying States could have agreed on a standard apportionment theory or practice, and how baseless the suggestion that by voting for the Equal Protection Clause they sought to establish a test mold for apportionment which—if appellants' argument is sound—struck down *sub silentio* not a few of their own state constitutional provisions. But the constitutions of the ten Reconstruction-Act States have an added importance, for it is scarcely to be thought that the Congress which was so solicitous for the adoption of the Fourteenth Amendment as to make the readmission of the late rebel States to Congress turn on their respective ratifications of it, would have approved constitutions which—again, under appellants' theory—contemporaneously offended the Amendment.

A. Of the twenty-three ratifying States of the first group, seven or eight had constitutions which demanded or allowed apportionment of both houses on the basis of population,[84] unqualifiedly or with only qualifications respecting the preservation of local boundaries.[85] Three

[84] Various indices of population were employed among the States which took account of the factor of numbers. Some counted all inhabitants, *e. g.*, N. J. Const., 1844, Art. IV, § 3; some, only white inhabitants, *e. g.*, Ill. Const., 1848, Art. III, § 8; some, male inhabitants over twenty-one, *e. g.*, Ind. Const., 1851, Art. IV, §§ 4–5; some, qualified voters, *e. g.*, Tenn. Const., 1834, Art. II, §§ 4 to 6; some excluded aliens, *e. g.*, N. Y. Const., 1846, Art. III, §§ 4, 5 (and untaxed persons of color); some excluded untaxed Indians and military personnel, *e. g.*, Neb. Const., 1866–1867, Art. II, § 3. For present purposes these differences, although not unimportant as revealing fundamental divergences in representation theory, will be disregarded.

[85] Ore. Const., 1857, Art. IV, §§ 5, 6, 7; Ill. Const., 1848, Art. III, §§ 8, 9; Ind. Const., 1851, Art. IV, §§ 4, 5, 6; Minn. Const., 1857,

312

more apportioned on what was essentially a population base, but provided that in one house counties having a specified fraction of a ratio—a moiety or two-thirds— should have a representative.[86]  Since each of these three States limited the size of their chambers, the fractional rule could operate—and, at least in Michigan, has in fact operated [87]—to produce substantial numerical inequalities

---

Art. IV, § 2; Wis. Const., 1848, Art. IV, §§ 3 to 5; Mass. Const., 1780, Amends. XXI, XXII; Neb. Const., 1866–1867, Art. II, § 3. All of these but Minnesota made provision for periodic reapportionment.   Nevada's Constitution of 1864, Art. XV, § 13, provided that the federal censuses and interim state decennial enumerations should serve as the bases of representation for both houses, but did not expressly require either numerical equality or reapportionment at fixed intervals.

Several of these constitutions contain provisions which forbid splitting counties or which otherwise require recognition of local boundaries. See, e. g., the severe restriction in Ill. Const., 1848, Art. III, § 9.   Such provisions will almost inevitably produce numerical inequalities.   See, for example, University of Oklahoma, Bureau of Government Research, Legislative Apportionment in Oklahoma (1956), 21–23.   However, because their effect in this regard will turn on idiosyncratic local factors, and because other constitutional provisions are a more significant source of inequality, these provisions are here disregarded.

[86] Tenn. Const., 1834, Art. II, §§ 4 to 6 (two-thirds of a ratio entitles a county to one representative in the House) ; W. Va. Const., 1861–1863, Art. IV, §§ 4, 5, 7, 8, 9 (one-half of a ratio entitles a county to one representative in the House) ; Mich. Const., 1850, Art. IV, §§ 2 to 4 (one-half of a ratio entitles each county thereafter organized to one representative in the House).   In Oregon and Iowa a major-fraction rule applied which gave a House seat not only to counties having a moiety of a single ratio, but to all counties having more than half a ratio in excess of the multiple of a ratio.   Ore. Const., 1857, Art. IV, § 6, note 85, supra; Iowa Const., 1857, Art. III, §§ 33, 34, 35, 37, note 89, infra.

[87] See Bone, States Attempting to Comply with Reapportionment Requirements, 17 Law & Contemp. Prob. 387, 391 (1952).

in favor of the sparsely populated counties.[88]  Iowa favored her small counties by the rule that no more than four counties might be combined in a representative district,[89] and New York and Kansas compromised population and county-representation principles by assuring every county, regardless of the number of its inhabitants, at least one seat in their respective Houses.[90]

Ohio and Maine recognized the factor of numbers by a different device.  The former gave a House representative to each county having half a ratio, two representatives for a ratio and three-quarters, three representatives for three ratios, and a single additional representative for each additional ratio.[91]  The latter, after apportioning among counties on a population base, gave each town of fifteen hundred inhabitants one representative, each town of three thousand, seven hundred and fifty inhabitants two representatives, and so on in increasing intervals to twenty-six thousand, two hundred and fifty inhabitants— towns of that size or larger receiving the maximum permitted number of representatives: seven.[92]  The departure from numerical equality under these systems is apparent: in Maine, assuming the incidence of towns in

---

[88] It also appears, although the section is not altogether clear, that the provisions of West Virginia's Constitution controlling apportionment of senators would operate in favor of the State's less populous regions by limiting any single county to a maximum of two senators. W. Va. Const., 1861–1863, Art. IV, § 4.

[89] Iowa Const., 1857, Art. III, §§ 33, 34, 35, 37.

[90] N. Y. Const., 1846, Art. III, §§ 4, 5 (except Hamilton County); Kan. Const., 1859, Art. 2, § 2; Art. 10.  The Kansas provisions require periodic apportionment based on censuses, but do not in terms demand equal districts.

[91] Ohio Const., 1851, Art. XI, §§ 1 to 5.  See Art. XI, §§ 6 to 9 for Senate apportionment.

[92] Me. Const., 1819, Art. IV, Pt. First, §§ 2, 3.  See Art. IV, Pt. Second, § 2, for Senate apportionment based on numbers.

all categories, representative ratios would differ by factors of two and a half to one, at a minimum. Similarly, Missouri gave each of its counties, however small, one representative, two representatives for three ratios, three representatives for six ratios, and one additional representative for each three ratios above six.[93] New Hampshire allotted a representative to each town of one hundred and fifty ratable male polls of voting age and one more representative for each increment of three hundred above that figure;[94] its Senate was not apportioned by population but among districts based on the proportion of direct taxes paid.[95] In Pennsylvania, the basis of apportionment in both houses was taxable inhabitants; and in the House every county of at least thirty-five hundred taxables had a representative, nor could more than three counties be joined in forming a representative district; while in the Senate no city or county could have more than four of the State's twenty-five to thirty-three senators.[96]

Finally, four States apportioned at least one House with no regard whatever to population. In Connecticut[97] and Vermont[98] representation in the House was on a town basis; Rhode Island gave one senator to each of its towns or cities,[99] and New Jersey, one to each of its counties.[100]

---

[93] Mo. Const., 1865, Art. IV, §§ 2, 7, 8. See Art. IV, §§ 4 to 8, for Senate apportionment based on numbers.

[94] Towns smaller than one hundred and fifty, if so situated that it was "very inconvenient" to join them to other towns for voting purposes, might be permitted by the legislature to send a representative.

[95] N. H. Const., 1792, Pt. Second, §§ IX to XI; Pt. Second, § XXVI.

[96] Pa. Const., 1838, as amended, Art. I, §§ 4, 6, 7.

[97] Conn. Const., 1818, Art. Third, § 3.

[98] Vt. Const., 1793, c. II, § 7.

[99] R. I. Const., 1842, Art. VI, § 1.

[100] N. J. Const., 1844, Art. IV, § 2, cl. One.

Nor, in any of these States, was the other House apportioned on a strict principle of equal numbers: Connecticut gave each of its counties a minimum of two senators [101] and Vermont, one; [102] New Jersey assured each county a representative; [103] and in Rhode Island, which gave at least one representative to each town or city, no town or city could have more than one-sixth of the total number in the House.[104]

B. Among the ten late Confederate States affected by the Reconstruction Acts, in only four did it appear that apportionment of both state legislative houses would or might be based strictly on population.[105]   In North Carolina,[106] South Carolina,[107] Louisiana,[108] and Alabama,[109] each county (in the case of Louisiana, each parish) was assured at least one seat in the lower House irrespective of numbers—a distribution which exhausted, respectively,

[101] Conn. Const., 1818, Amend. II.

[102] Vt. Const., 1793, Amend. 23.

[103] N. J. Const., 1844, Art. IV, § 3, cl. One.

[104] R. I. Const., 1842, Art. V, § 1.

[105] Ark. Const., 1868, Art. V, §§ 8, 9; Va. Const., 1864, Art. IV, § 6 (this constitution was in effect when Virginia ratified the Fourteenth Amendment); Va. Const., 1870, Art. V, § 4 (this was Virginia's Reconstruction-Act convention constitution); Miss. Const., 1868, Art. IV, §§ 33 to 35; Tex. Const., 1868, Art. III, §§ 11, 34.   The Virginia Constitutions and Texas' provisions for apportioning its lower chamber do not in terms require equality of numbers, although they call for reapportionment following a census.   In Arkansas, the legislature was authorized, but not commanded, to reapportion periodically; it is not clear that equality was required.

[106] N. C. Const., 1868, Art. II, §§ 6, 7.   See Art. II, § 5, for Senate apportionment based on numbers.

[107] S. C. Const., 1868, Art. I, § 34; Art. II, §§ 4 to 6.

[108] La. Const., 1868, Tit. II, Arts. 20, 21.   See Tit. II, Arts. 28 to 30, for Senate apportionment based on numbers.

[109] Ala. Const., 1867, Art. VIII, § 1.   See Art. VIII, § 3, for Senate apportionment based on numbers.

on the basis of the number of then-existing counties, three-quarters, one-quarter, two-fifths and three-fifths of the maximum possible number of representatives, before a single seat was available for assignment on a population basis; and in South Carolina, moreover, the Senate was composed of one member elected from each county, except that Charleston sent two.[110]  In Florida's House, each county had one seat guaranteed and an additional seat for every thousand registered voters up to a maximum of four representatives;[111] while Georgia, whose Senate seats were distributed among forty-four single-member districts each composed of three contiguous counties,[112] assigned representation in its House as follows: three seats to each of the six most populous counties, two to each of the thirty-one next most populous, one to each of the remaining ninety-five.[113]  As might be expected, the one-representative-per-county minimum pattern has proved incompatible with numerical equality,[114] and Georgia's

---

[110] S. C. Const., 1868, Art. II, § 8.

[111] Fla. Const., 1868, Art. XIV, par. 1.  See Art. XIV, par. 2, for Senate apportionment.

[112] Ga. Const., 1868, Art. III, § 2.  The extent of legislative authority to alter these districts is unclear, but it appears that the structure of three contiguous counties for each of forty-four districts is meant to be permanent.

[113] Ga. Const., 1868, Art. III, § 3.  The extent of legislative authority to alter the apportionment is unclear, but it appears that the three-tiered structure is meant to be permanent.

[114] See, e. g., Durfee, Apportionment of Representation in the Legislature: A Study of State Constitutions, 43 Mich. L. Rev. 1091, 1097 (1945); Short, States That Have Not Met Their Constitutional Requirements, 17 Law & Contemp. Prob. 377 (1952); Harvey, Reapportionments of State Legislatures—Legal Requirements, 17 Law & Contemp. Prob. 364, 370 (1952).  For an excellent case study of numerical inequalities deriving solely from a one-member-per-county minimum provision in Ohio, see Aumann, Rural Ohio Hangs On, 46 Nat. Mun. Rev. 189, 191–192 (1957).

county-clustering system has produced representative-ratio disparities, between the largest and smallest counties, of more than sixty to one.[115]

C. The constitutions [116] of the thirteen States which Congress admitted to the Union after the ratification of the Fourteenth Amendment showed a similar pattern. Six of them required or permitted apportionment of both Houses by population, subject only to qualifications concerning local boundaries.[117] Wyoming, apportioning by population, guaranteed to each of its counties at least one seat in each House,[118] and Idaho, which prescribed (after the first legislative session) that apportionment should be "as may be provided by law," gave each county at least one representative.[119] In Oklahoma, House members were apportioned among counties so as to give one

[115] Dauer and Kelsay, Unrepresentative States, 44 Nat. Mun. Rev. 571, 574 (1955). (This is the effect of a later Georgia constitutional provision, Ga. Const., 1945, § 2–1501, substantially similar to that of 1868.) The same three-tiered system has subsequently been adopted in Florida, Fla. Const., 1885, Art. VII, §§ 3, 4, where its effects have been inequalities of the order of eighty to one. Dauer and Kelsay, *supra*, at 575, 587.

[116] The constitutions discussed are those under which the new States entered the Union.

[117] Colo. Const., 1876, Art. V, §§ 45, 47; N. D. Const., 1889, Art. 2, §§ 29, 35; S. D. Const., 1889, Art. III, § 5; Wash. Const., 1889, Art. II, §§ 3, 6; Utah Const., 1895, Art. IX, §§ 2, 4; N. M. Const., 1911, Art. IV, following § 41. The Colorado and Utah Constitutions provide for reapportionment "according to ratios to be fixed by law" after periodic census and enumeration. In New Mexico the legislature is authorized, but not commanded, to reapportion periodically. North Dakota does not in terms demand equality in House representation; members are to be assigned among the several senatorial districts, which are of equal population.

[118] Wyo. Const., 1889, Art. III, Legislative Department, § 3; Art. III, Apportionment, §§ 2, 3.

[119] Idaho Const., 1889, Art. III, § 4.

seat for half a ratio, two for a ratio and three-quarters, and one for each additional ratio up to a maximum of seven representatives per county.[120]  Montana required reapportionment of its House on the basis of periodic enumerations according to ratios to be fixed by law [121] but its counties were represented as counties in the Senate, each county having one senator.[122]  Alaska [123] and Hawaii [124] each apportioned a number of senators among constitutionally fixed districts; their respective Houses were to be periodically reapportioned by population, subject to a moiety rule in Alaska [125] and to Hawaii's guarantee of one representative to each of four constitutionally designated areas.[126]  The Arizona Constitution assigned representation to each county in each house, giving one or two senators and from one to seven representatives to each, and making no provision for reapportionment.[127]

---

[120] Okla. Const., 1907, Art. V, § 10 (b) to (j).  See Art. V, §§ 9 (a), 9 (b) for Senate apportionment based on numbers.

[121] Mont. Const., 1889, Art. VI, §§ 2, 3.

[122] Mont. Const., 1889, Art. V, § 4; Art. VI, § 4.  The effective provisions are, first, that there shall be no more than one senator from each county, and, second, that no senatorial district shall consist of more than one county.

[123] Alaska Const., 1956, Art. VI, § 7; Art. XIV, § 2.  The exact boundaries of the districts may be modified to conform to changes in House districts, but their numbers of senators and their approximate perimeters are to be preserved.

[124] Hawaii Const., 1950, Art. III, § 2.

[125] Alaska Const., 1956, Art. VI, §§ 3, 4, 6.  The method of equal proportions is used.

[126] Hawaii Const., 1950, Art. III, § 4.  The method of equal proportions is used, and, for sub-apportionment within the four "basic" areas, a form of moiety rule obtains.

[127] Ariz. Const., 1910, Art. IV, Pt. 2, § 1.  On the basis of 1910 census figures, this apportionment yielded, for example, a senatorial-ratio differential of more than four to one between Mohave and Cochise or between Mohave and Maricopa Counties.  II Thirteenth Census of the United States (1910), 71–73.

4. *Contemporary apportionment.* Detailed recent studies are available to describe the present-day constitutional and statutory status of apportionment in the fifty States.[128] They demonstrate a decided twentieth-century trend away from population as the exclusive base of representation. Today, only a dozen state constitutions provide for periodic legislative reapportionment of both houses by a substantially unqualified application of the population standard,[129] and only about a dozen more prescribe such reapportionment for even a single chamber. "Specific provision for county representation in at least one house of the state legislature has been increasingly adopted since the end of the 19th century. . . ."[130] More than twenty States now guarantee each county at least one seat in one of their houses regardless of population, and in nine others county or town units are given equal representation in one legislative branch, whatever the number of each unit's inhabitants. Of course, numerically considered, "These provisions invariably result in over-representation of the least populated areas. . . ."[131] And in an effort to curb the political dominance of metropolitan regions, at least ten States now limit the maximum entitlement of any single county (or, in some cases, city)

---

[128] The pertinent state constitutional provisions are set forth in tabular form in XIII Book of the States (1960–1961), 54–58; and Greenfield, Ford and Emery, Legislative Reapportionment: California in National Perspective (University of California, Berkeley, 1959), 81–85. An earlier treatment now outdated in several respects but still useful is Durfee, *supra,* note 114. See discussions in Harvey, *supra,* note 114; Shull, Political and Partisan Implications of State Legislative Apportionment, 17 Law & Contemp. Prob. 417, 418–421 (1952).

[129] Nebraska's unicameral legislature is included in this count.

[130] Greenfield, Ford and Emery, *supra,* note 128, at 7.

[131] Harvey, *supra,* note 114, at 367. See Tabor, The Gerrymandering of State and Federal Legislative Districts, 16 Md. L. Rev. 277, 282–283 (1956).

in one legislative house—another source of substantial numerical disproportion.[132]

Moreover, it is common knowledge that the legislatures have not kept reapportionment up to date, even where state constitutions in terms require it.[133]  In particular, the pattern of according greater per capita representation to rural, relatively sparsely populated areas—the same pattern which finds expression in various state constitutional provisions,[134] and which has been given effect in England and elsewhere [135]—has, in some of the States, been made the law by legislative inaction in the face of

[132] See, e. g., Mather and Ray, The Iowa Senatorial Districts Can Be Reapportioned—A Possible Plan, 39 Iowa L. Rev. 535, 536–537 (1954).

[133] See, e. g., Walter, Reapportionment and Urban Representation, 195 Annals of the American Academy of Political and Social Science 11, 12–13 (1938); Bone, *supra*, note 87.  Legislative inaction and state constitutional provisions rejecting the principle of equal numbers have both contributed to the generally prevailing numerical inequality of representation in this country.  Compare Walter, *supra*, with Baker, One Vote, One Value, 47 Nat. Mun. Rev. 16, 18 (1958).

[134] See, e. g., Griffith 116–117; Luce 364–367, 370; Merriam, American Political Ideas (1929), 244–245; Legislation, Apportionment of the New York State Senate, 31 St. John's L. Rev. 335, 341–342 (1957).

[135] In 1947, the Boundary Commission for England, ". . . impressed by the advantages of accessibility [that large compact urban regions] . . . enjoy over widely scattered rural areas . . . came to the conclusion that they could conveniently support electorates in excess of the electoral quota, and would in the majority of cases prefer to do so rather than suffer severance of local unity for parliamentary purposes"—that "in general urban constituencies could more conveniently support large electorates than rural constituencies . . . ."  Initial Report of the Boundary Commission for England [Cmd. 7260] (1947), 5.  See also Mackenzie 110–111; De Grazia, General Theory of Apportionment, 17 Law & Contemp. Prob. 256, 261–262 (1952).

population shifts.[136] Throughout the country, urban and suburban areas tend to be given higher representation ratios than do rural areas.[137]

The stark fact is that if among the numerous widely varying principles and practices that control state legislative apportionment today there is any generally prevailing feature, that feature is geographic inequality in relation to the population standard.[138] Examples could be endlessly multiplied. In New Jersey, counties of

---

[136] See Walter, *supra,* note 133; Walter, Reapportionment of State Legislative Districts, 37 Ill. L. Rev. 20, 37–38 (1942). The urban-rural conflict is often the core of apportionment controversy. See Durfee, *supra,* note 114, at 1093–1094; Short, *supra,* note 114, at 381.

[137] Baker, Rural Versus Urban Political Power (1955), 11–19; MacNeil, Urban Representation in State Legislatures, 18 State Government 59 (1945); United States Conference of Mayors, Government Of the People, By the People, For the People (ca. 1947).

[138] See, in addition to the authorities cited in notes 130, 131, 136 and 137, *supra,* and 140 to 144, *infra,* (all containing other examples than those remarked in text), Hurst, The Growth of American Law, The Law Makers (1950), 41–42; American Political Science Assn., Committee on American Legislatures, American State Legislatures (Zeller ed. 1954), 34–35; Gosnell, Democracy, The Threshold of Freedom (1948), 179–181; Lewis, Legislative Apportionment and the Federal Courts, 71 Harv. L. Rev. 1057, 1059–1064 (1958); Friedman, Reapportionment Myth, 49 Nat. Civ. Rev. 184, 185–186 (1960); 106 Cong. Rec. 14901–14916 (remarks of Senator Clark and supporting materials); H. R. Rep. No. 2533, 85th Cong., 2d Sess. 24; H. R. Doc. No. 198, 84th Cong., 1st Sess. 38–40; Hadwiger, Representation in the Missouri General Assembly, 24 Mo. L. Rev. 178, 180–181 (1959); Hamilton, Beardsley and Coats, Legislative Reapportionment in Indiana: Some Observations and a Suggestion, 35 Notre Dame Law. 368–370 (1960); Corter, Pennsylvania Ponders Apportionment, 32 Temple L. Q. 279, 283–288 (1959). Concerning the classical gerrymander, see Griffith, passim; Luce 395–404; Brooks, Political Parties and Electoral Problems (3d ed. 1933), 472–481. For foreign examples of numerical disproportion, see Hogan, Election and Representation (1945), 95; Finer, Theory and Practice of Modern Government (Rev. ed. 1949), 551–552.

thirty-five thousand and of more than nine hundred and five thousand inhabitants respectively each have a single senator.[139]   Representative districts in Minnesota range from 7,290 inhabitants to 107,246 inhabitants.[140]   Ratios of senatorial representation in California vary as much as two hundred and ninety-seven to one.[141]   In Oklahoma, the range is ten to one for House constituencies and roughly sixteen to one for Senate constituencies.[142]   Colebrook, Connecticut—population 592—elects two House representatives;   Hartford—population   177,397—also elects two.[143]   The first, third and fifth of these examples are the products of constitutional provisions which subordinate population to regional considerations in apportionment; the second is the result of legislative inaction; the fourth derives from both constitutional and legislative sources.   A survey made in 1955, in sum, reveals that less than thirty percent of the population inhabit districts sufficient to elect a House majority in thirteen States and a Senate majority in nineteen States.[144]   These figures show more than individual variations from a generally accepted standard of electoral equality.   They show that there is not—as there has never been—a standard by

---

[139] Baker, *supra,* note 137, at 11.   Recent New Jersey legislation provides for reapportionment of the State's lower House by executive action following each United States census subsequent to that of 1960.   N. J. Laws 1961, c. 1.   The apportionment is to be made on the basis of population, save that each county is assured at least one House seat.   In the State's Senate, however, by constitutional command, each county elects a single senator, regardless of population. N. J. Const., 1947, Art. IV, § II, par. 1.

[140] Note, 42 Minn. L. Rev. 617, 618–619 (1958).

[141] Greenfield, Ford and Emery, *supra,* note 128, at 3.

[142] University of Oklahoma, Bureau of Government Research, The Apportionment Problem in Oklahoma (1959), 16–29.

[143] 1 Labor's Economic Rev. 89, 96 (1956).

[144] Dauer and Kelsay, Unrepresentative States, 44 Nat. Mun. Rev. 571, 572, 574 (1955).

which the place of equality as a factor in apportionment can be measured.

Manifestly, the Equal Protection Clause supplies no clearer guide for judicial examination of apportionment methods than would the Guarantee Clause itself. Apportionment, by its character, is a subject of extraordinary complexity, involving—even after the fundamental theoretical issues concerning what is to be represented in a representative legislature have been fought out or compromised—considerations of geography, demography, electoral convenience, economic and social cohesions or divergencies among particular local groups, communications, the practical effects of political institutions like the lobby and the city machine, ancient traditions and ties of settled usage, respect for proven incumbents of long experience and senior status, mathematical mechanics, censuses compiling relevant data, and a host of others.[145]

[145] See the Second Schedule to the House of Commons (Redistribution of Seats) Act, 1949, 12 & 13 Geo. VI, c. 66, as amended by the House of Commons (Redistribution of Seats) Act, 1958, 6 & 7 Eliz. II, c. 26, § 2, and the English experience described in text at notes 50 to 61, *supra*. See also the Report of the Assembly Interim Committee on Elections and Reapportionment, California Assembly (1951) (hereafter, California Committee Report), 37: "The geographic—the socio-economic—the desires of the people—the desires of the elected officeholders—the desires of political parties—all these can and do legitimately operate not only within the framework of the 'relatively equal in population districts' factor, but also within the factors of contiguity and compactness. The county and Assembly line legal restrictions operate outside the framework of theoretically 'equal in population districts.' All the factors might conceivably have the same weight in one situation; in another, some factors might be considerably more important than others in making the final determination." A Virginia legislative committee adverted to ". . . many difficulties such as natural topographical barriers, divergent business and social interests, lack of communication by rail or highway, and disinclinations of communities to breaking up political ties of long standing, resulting in some cases of districts requesting to remain with populations more than their averages rather than have their equal

Legislative responses throughout the country to the reapportionment demands of the 1960 Census have glaringly confirmed that these are not factors that lend themselves to evaluations of a nature that are the staple of judicial determinations or for which judges are equipped to adjudicate by legal training or experience or native wit. And this is the more so true because in every strand of this complicated, intricate web of values meet the contending forces of partisan politics.[146] The practical significance of apportionment is that the next election results may differ because of it. Apportionment battles are overwhelmingly party or intra-party contests.[147] It will add a virulent source of friction and tension in federal-state relations to embroil the federal judiciary in them.[148]

representation with the changed conditions." Report of the Joint Committee on the Re-apportionment of the State into Senatorial and House Districts, Virginia General Assembly, House of Delegates, H. Doc. No. 9 (1922), 1–2. And the Tennessee State Planning Commission, concerning the problem of congressional redistricting in 1950, spoke of a "tradition [which] relates to the sense of belonging—loyalties to groups and items of common interest with friends and fellow citizens of like circumstance, environment or region." Tennessee State Planning Commission, Pub. No. 222, Redistricting for Congress (1950), first page.

[146] See, e. g., California Committee Report, at 52.

". . . [T]he reapportionment process is, by its very nature, political. . . . There will be politics in reapportionment as long as a representative form of government exists . . . .

"It is impossible to draw a district boundary line without that line's having some political significance. . . ."

[147] See, e. g., Celler, Congressional Apportionment—Past, Present, and Future, 17 Law & Contemp. Prob. 268 (1952), speaking of the history of congressional apportionment:

". . . A mere reading of the debates [from the Constitutional Convention down to contemporary Congresses] on this question of apportionment reveals the conflicting interests of the large and small states and the extent to which partisan politics permeates the entire problem."

[148] See Standards for Congressional Districts (Apportionment), Hearings before Subcommittee No. 2 of the Committee on the

## IV.

Appellants, however, contend that the federal courts may provide the standard which the Fourteenth Amendment lacks by reference to the provisions of the constitution of Tennessee. The argument is that although the same or greater disparities of electoral strength may be suffered to exist immune from federal judicial review in States where they result from apportionment legislation consistent with state constitutions, the Tennessee Legislature may not abridge the rights which, on its face, its own constitution appears to give, without by that act denying equal protection of the laws. It is said that the law of Tennessee, as expressed by the words of its written constitution, has made the basic choice among policies in favor of representation proportioned to population, and that it is no longer open to the State to allot its voting power on other principles.

This reasoning does not bear analysis. Like claims invoking state constitutional requirement have been rejected here and for good reason. It is settled that whatever federal consequences may derive from a discrimination worked by a state statute must be the same as if the same discrimination were written into the

---

Judiciary, House of Representatives, 86th Cong., 1st Sess. 23, concerning a proposed provision for judicial enforcement of certain standards in the laying out of districts:

"Mr. KASEM. You do not think that that [a provision embodying the language: 'in as compact form as practicable'] might result in a decision depending upon the political inclinations of the judge?

"Mr. CELLER. Are you impugning the integrity of our Federal judiciary?

"Mr. KASEM. No; I just recognize their human frailties."

For an instance of a court torn, in fact or fancy, over the political issues involved in reapportionment, see *State ex rel. Lashly* v. *Becker*, 290 Mo. 560, 235 S. W. 1017, and especially the dissenting opinion of Higbee, J., 290 Mo., at 613, 235 S. W., at 1037.

State's fundamental law. *Nashville, C. & St. L. R. Co. v. Browning,* 310 U. S. 362. And see *Castillo v. McConnico,* 168 U. S. 674; *Coulter v. Louisville & N. R. Co.,* 196 U. S. 599, 608–609; *Owensboro Waterworks Co. v. Owensboro,* 200 U. S. 38; *Hebert v. Louisiana,* 272 U. S. 312, 316–317; *Snowden v. Hughes,* 321 U. S. 1, 11. Appellants complain of a practice which, by their own allegations, has been the law of Tennessee for sixty years. They allege that the Apportionment Act of 1901 created unequal districts when passed and still maintains unequal districts. They allege that the Legislature has since 1901 purposefully retained unequal districts. And the Supreme Court of Tennessee has refused to invalidate the law establishing these unequal districts. *Kidd v. McCanless,* 200 Tenn. 273, 292 S. W. 2d 40; appeal dismissed here in 352 U. S. 920. In these circumstances, what was said in the *Browning* case, *supra,* at 369, clearly governs this case:

> ". . . Here, according to petitioner's own claim, all the organs of the state are conforming to a practice, systematic, unbroken for more than forty years, and now questioned for the first time. It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice cannot supplant constitutional guarantees, but it can establish what is state law. The Equal Protection Clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text. . . . [T]he Equal Protection Clause is not a command of candor. . . ."

Tennessee's law and its policy respecting apportionment are what 60 years of practice show them to be, not what appellants cull from the unenforced and, according to its own judiciary, unenforceable words of its Constitution. The statute comes here on the same footing, therefore, as would the apportionment laws of New Jersey, California or Connecticut,[149] and is unaffected by its supposed repugnance to the state constitutional language on which appellants rely.[150]

In another aspect, however, the *Kidd* v. *McCanless* case, *supra,* introduces a factor peculiar to this litigation, which only emphasizes the duty of declining the exercise of federal judicial jurisdiction. In all of the apportionment cases which have come before the Court, a consideration which has been weighty in determining their non-justiciability has been the difficulty or impossibility of devising effective judicial remedies in this class of case. An injunction restraining a general election unless the legislature reapportions would paralyze the critical centers of a State's political system and threaten political dislocation whose consequences are not foreseeable. A declaration devoid

---

[149] See text at notes 139–143, *supra.*

[150] Decisions of state courts which have entertained apportionment cases under their respective state constitutions do not, of course, involve the very different considerations relevant to federal judicial intervention. State-court adjudication does not involve the delicate problems of federal-state relations which would inhere in the exercise of federal judicial power to impose restrictions upon the States' shaping of their own governmental institutions. Moreover, state constitutions generally speak with a specificity totally lacking in attempted utilization of the generalities of the Fourteenth Amendment to apportionment matters. Some expressly commit apportionment to state judicial review, see, *e. g.,* N. Y. Const., 1938, Art. III, § 5, and even where they do not, they do precisely fix the criteria for judicial judgment respecting the allocation of representative strength within the electorate. See, *e. g., Asbury Park Press. Inc.,* v. *Woolley,* 33 N. J. 1, 161 A. 2d 705.

of implied compulsion of injunctive or other relief would be an idle threat.[151] Surely a Federal District Court could not itself remap the State: the same complexities which impede effective judicial review of apportionment *a fortiori* make impossible a court's consideration of these imponderables as an original matter. And the choice of elections at large as opposed to elections by district, however unequal the districts, is a matter of sweeping political judgment having enormous political implications, the nature and reach of which are certainly beyond the informed understanding of, and capacity for appraisal by, courts.

In Tennessee, moreover, the *McCanless* case has closed off several among even these unsatisfactory and dangerous modes of relief. That case was a suit in the state courts attacking the 1901 Reapportionment Act and seeking a declaration and an injunction of the Act's enforcement or, alternatively, a writ of mandamus compelling state election officials to hold the elections at large, or, again alternatively, a decree of the court reapportioning the State. The Chancellor denied all coercive relief, but entertained the suit for the purpose of rendering a declaratory judgment. It was his view that despite an invalidation of the statute under which the present legislature was elected, that body would continue to possess *de facto* authority to reapportion, and that therefore the maintaining of the suit did not threaten the disruption of the government. The Tennessee Supreme Court agreed that no coercive relief could be granted; in particular, it said, "There is no provision of law for election of our General Assembly by an election at large over the State." 200 Tenn., at 277, 292 S. W. 2d, at 42. Thus, a legislature elected at

---

[151] Appellants' suggestion that, although no relief may need be given, jurisdiction ought to be retained as a "spur" to legislative action does not merit discussion.

large would not be the legally constituted legislative authority of the State. The court reversed, however, the Chancellor's determination to give declaratory relief, holding that the ground of demurrer which asserted that a striking down of the statute would disrupt the orderly process of government should have been sustained:

"(4) It seems obvious and we therefore hold that if the Act of 1901 is to be declared unconstitutional, then the *de facto* doctrine cannot be applied to maintain the present members of the General Assembly in office. If the Chancellor is correct in holding that this statute has expired by the passage of the decade following its enactment then for the same reason all prior apportionment acts have expired by a like lapse of time and are non-existent. Therefore we would not only not have any existing members of the General Assembly but we would have no apportionment act whatever under which a new election could be held for the election of members to the General Assembly.

.        .        .        .        .

"The ultimate result of holding this Act unconstitutional by reason of the lapse of time would be to deprive us of the present Legislature and the means of electing a new one and ultimately bring about the destruction of the State itself." 200 Tenn., at 281–282, 292 S. W. 2d, at 44.

A federal court enforcing the Federal Constitution is not, to be sure, bound by the remedial doctrines of the state courts. But it must consider as pertinent to the propriety or impropriety of exercising its jurisdiction those state-law effects of its decree which it cannot itself control. A federal court cannot provide the authority requisite to make a legislature the proper governing body of the State of Tennessee. And it cannot be doubted that the strik-

ing down of the statute here challenged on equal protection grounds, no less than on grounds of failure to reapportion decennially, would deprive the State of all valid apportionment legislation and—under the ruling in *McCanless*—deprive the State of an effective law-based legislative branch. Just such considerations, among others here present, were determinative in *Luther* v. *Borden* and the Oregon initiative cases.[152]

Although the District Court had jurisdiction in the very restricted sense of power to determine whether it could adjudicate the claim, the case is of that class of political controversy which, by the nature of its subject, is unfit for federal judicial action. The judgment of the District Court, in dismissing the complaint for failure to state a claim on which relief can be granted, should therefore be affirmed.

Dissenting opinion of MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER joins.

The dissenting opinion of MR. JUSTICE FRANKFURTER, in which I join, demonstrates the abrupt departure the majority makes from judicial history by putting the federal courts into this area of state concerns—an area which, in this instance, the Tennessee state courts themselves have refused to enter.

It does not detract from his opinion to say that the panorama of judicial history it unfolds, though evincing a steadfast underlying principle of keeping the federal courts out of these domains, has a tendency, because of variants in expression, to becloud analysis in a given case. With due respect to the majority, I think that has happened here.

Once one cuts through the thicket of discussion devoted to "jurisdiction," "standing," "justiciability," and "po-

---

[152] See note 24, *supra*.

litical question," there emerges a straightforward issue which, in my view, is determinative of this case. Does the complaint disclose a violation of a federal constitutional right, in other words, a claim over which a United States District Court would have jurisdiction under 28 U. S. C. § 1343 (3) and 42 U. S. C. § 1983? The majority opinion does not actually discuss this basic question, but, as one concurring Justice observes, seems to decide it *"sub silentio." Ante,* p. 261. However, in my opinion, appellants' allegations, accepting all of them as true, do not, parsed down or as a whole, show an infringement by Tennessee of any rights assured by the Fourteenth Amendment. Accordingly, I believe the complaint should have been dismissed for "failure to state a claim upon which relief can be granted." Fed. Rules Civ. Proc., Rule 12 (b)(6).

It is at once essential to recognize this case for what it is. The issue here relates not to a method of state electoral apportionment by which seats in the *federal* House of Representatives are allocated, but solely to the right of a State to fix the basis of representation in its *own* legislature. Until it is first decided to what extent that right is limited by the Federal Constitution, and whether what Tennessee has done or failed to do in this instance runs afoul of any such limitation, we need not reach the issues of "justiciability" or "political question" or any of the other considerations which in such cases as *Colegrove* v. *Green,* 328 U. S. 549, led the Court to decline to adjudicate a challenge to a state apportionment affecting seats in the federal House of Representatives, in the absence of a controlling Act of Congress. See also *Wood* v. *Broom,* 287 U. S. 1.

The appellants' claim in this case ultimately rests entirely on the Equal Protection Clause of the Fourteenth Amendment. It is asserted that Tennessee has violated the Equal Protection Clause by maintaining in effect a

system of apportionment that grossly favors in legislative representation the rural sections of the State as against its urban communities. Stripped to its essentials the complaint purports to set forth three constitutional claims of varying breadth:

(1) The Equal Protection Clause requires that each vote cast in state legislative elections be given approximately equal weight.

(2) Short of this, the existing apportionment of state legislators is so unreasonable as to amount to an arbitrary and capricious act of classification on the part of the Tennessee Legislature, which is offensive to the Equal Protection Clause.

(3) In any event, the existing apportionment is rendered invalid under the Fourteenth Amendment because it flies in the face of the Tennessee Constitution.

For reasons given in Mr. Justice Frankfurter's opinion, *ante*, pp. 325–327, the last of these propositions is manifestly untenable, and need not be dealt with further. I turn to the other two.

## I.

I can find nothing in the Equal Protection Clause or elsewhere in the Federal Constitution which expressly or impliedly supports the view that state legislatures must be so structured as to reflect with approximate equality the voice of every voter. Not only is that proposition refuted by history, as shown by my Brother Frankfurter, but it strikes deep into the heart of our federal system. Its acceptance would require us to turn our backs on the regard which this Court has always shown for the judgment of state legislatures and courts on matters of basically local concern.

In the last analysis, what lies at the core of this controversy is a difference of opinion as to the function of representative government. It is surely beyond argument that those who have the responsibility for devising a system of representation may permissibly consider that factors other than bare numbers should be taken into account. The existence of the United States Senate is proof enough of that. To consider that we may ignore the Tennessee Legislature's judgment in this instance because that body was the product of an asymmetrical electoral apportionment would in effect be to assume the very conclusion here disputed. Hence we must accept the present form of the Tennessee Legislature as the embodiment of the State's choice, or, more realistically, its compromise, between competing political philosophies. The federal courts have not been empowered by the Equal Protection Clause to judge whether this resolution of the State's internal political conflict is desirable or undesirable, wise or unwise.

With respect to state tax statutes and regulatory measures, for example, it has been said that the "day is gone when this Court uses the . . . Fourteenth Amendment to strike down state laws . . . because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 488. I would think it all the more compelling for us to follow this principle of self-restraint when what is involved is the freedom of a State to deal with so intimate a concern as the structure of its own legislative branch. The Federal Constitution imposes no limitation on the form which a state government may take other than generally committing to the United States the duty to guarantee to every State "a Republican Form of Government." And, as my Brother FRANKFURTER so conclusively proves (*ante,* pp. 308–317), no intention to fix immutably the

means of selecting representatives for state governments could have been in the minds of either the Founders or the draftsmen of the Fourteenth Amendment.

In short, there is nothing in the Federal Constitution to prevent a State, acting not irrationally, from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people. I would have thought this proposition settled by *MacDougall* v. *Green*, 335 U. S. 281, in which the Court observed (at p. 283) that to "assume that political power is a function exclusively of numbers is to disregard the practicalities of government," and reaffirmed by *South* v. *Peters*, 339 U. S. 276. A State's choice to distribute electoral strength among geographical units, rather than according to a census of population, is certainly no less a rational decision of policy than would be its choice to levy a tax on property rather than a tax on income. Both are legislative judgments entitled to equal respect from this Court.

## II.

The claim that Tennessee's system of apportionment is so unreasonable as to amount to a capricious classification of voting strength stands up no better under dispassionate analysis.

The Court has said time and again that the Equal Protection Clause does not demand of state enactments either mathematical identity or rigid equality. *E. g., Allied Stores of Ohio* v. *Bowers*, 358 U. S. 522, 527–528, and authorities there cited; *McGowan* v. *Maryland*, 366 U. S. 420, 425–426. All that is prohibited is "invidious discrimination" bearing no rational relation to any permissible policy of the State. *Williamson* v. *Lee Optical Co., supra*, at 489. And in deciding whether such discrimination has been practiced by a State, it must be borne in mind that a "statutory discrimination will not be set aside if any state of facts reasonably may be con-

ceived to justify it." *McGowan* v. *Maryland, supra.* It is not inequality alone that calls for a holding of unconstitutionality; only if the inequality is based on an impermissible standard may this Court condemn it.

What then is the basis for the claim made in this case that the distribution of state senators and representatives is the product of capriciousness or of some constitutionally prohibited policy? It is not that Tennessee has arranged its electoral districts with a deliberate purpose to dilute the voting strength of one race, cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339, or that some religious group is intentionally underrepresented. Nor is it a charge that the legislature has indulged in sheer caprice by allotting representatives to each county on the basis of a throw of the dice, or of some other determinant bearing no rational relation to the question of apportionment. Rather, the claim is that the State Legislature has unreasonably retained substantially the same allocation of senators and representatives as was established by statute in 1901, refusing to recognize the great shift in the population balance between urban and rural communities that has occurred in the meantime.

It is further alleged that even as of 1901 the apportionment was invalid, in that it did not allocate state legislators among the counties in accordance with the formula set out in Art. II, § 5, of the Tennessee Constitution. In support of this the appellants have furnished a Table which indicates that as of 1901 six counties were overrepresented and 11 were underrepresented. But that Table in fact shows nothing in the way of significant discrepancy; in the instance of each county it is only one representative who is either lacking or added. And it is further perfectly evident that the variations are attributable to nothing more than the circumstance that the then enumeration of voters resulted in fractional remainders with respect to which the precise formula of the Tennessee Constitution was in some

instances slightly disregarded. Unless such *de minimis* departures are to be deemed of significance, these statistics certainly provide no substantiation for the charge that the 1901 apportionment was arbitrary and capricious. Indeed, they show the contrary.

Thus reduced to its essentials, the charge of arbitrariness and capriciousness rests entirely on the consistent refusal of the Tennessee Legislature over the past 60 years to alter a pattern of apportionment that was reasonable when conceived.

A Federal District Court is asked to say that the passage of time has rendered the 1901 apportionment obsolete to the point where its continuance becomes vulnerable under the Fourteenth Amendment. But is not this matter one that involves a classic legislative judgment? Surely it lies within the province of a state legislature to conclude that an existing allocation of senators and representatives constitutes a desirable balance of geographical and demographical representation, or that in the interest of stability of government it would be best to defer for some further time the redistribution of seats in the state legislature.

Indeed, I would hardly think it unconstitutional if a state legislature's expressed reason for establishing or maintaining an electoral imbalance between its rural and urban population were to protect the State's agricultural interests from the sheer weight of numbers of those residing in its cities. A State may, after all, take account of the interests of its rural population in the distribution of tax burdens, *e. g., American Sugar Rfg. Co. v. Louisiana,* 179 U. S. 89, and recognition of the special problems of agricultural interests has repeatedly been reflected in federal legislation, *e. g.,* Capper-Volstead Act, 42 Stat. 388; Agricultural Adjustment Act of 1938, 52 Stat. 31. Even the exemption of agricultural activities from state criminal statutes of otherwise general application has not been deemed offensive to the Equal Protection Clause.

*Tigner* v. *Texas,* 310 U. S. 141. Does the Fourteenth Amendment impose a stricter limitation upon a State's apportionment of political representatives to its central government? I think not. These are matters of local policy, on the wisdom of which the federal judiciary is neither permitted nor qualified to sit in judgment.

The suggestion of my Brother FRANKFURTER that courts lack standards by which to decide such cases as this, is relevant not only to the question of "justiciability," but also, and perhaps more fundamentally, to the determination whether any cognizable constitutional claim has been asserted in this case. Courts are unable to decide when it is that an apportionment originally valid becomes void because the factors entering into such a decision are basically matters appropriate only for legislative judgment. And so long as there exists a possible rational legislative policy for retaining an existing apportionment, such a legislative decision cannot be said to breach the bulwark against arbitrariness and caprice that the Fourteenth Amendment affords. Certainly, with all due respect, the facile arithmetical argument contained in Part II of my Brother CLARK's separate opinion (*ante,* pp. 253–258) provides no tenable basis for considering that there has been such a breach in this instance. (See the Appendix to this opinion.)

These conclusions can hardly be escaped by suggesting that capricious state action might be found were it to appear that a majority of the Tennessee legislators, in refusing to consider reapportionment, had been actuated by self-interest in perpetuating their own political offices or by other unworthy or improper motives. Since *Fletcher* v. *Peck,* 6 Cranch 87, was decided many years ago, it has repeatedly been pointed out that it is not the business of the federal courts to inquire into the personal motives of legislators. *E. g., Arizona* v. *California,* 283 U. S. 423, 455 & n. 7. The function of the federal judiciary ends in

matters of this kind once it appears, as I think it does here on the undisputed facts, that the state action complained of could have rested on some rational basis. (See the Appendix to this opinion.)

It is my view that the majority opinion has failed to point to any recognizable constitutional claim alleged in this complaint. Indeed, it is interesting to note that my Brother STEWART is at pains to disclaim for himself, and to point out that the majority opinion does not suggest, that the Federal Constitution requires of the States any particular kind of electoral apportionment, still less that they must accord to each voter approximately equal voting strength. Concurring opinion, *ante*, p. 265. But that being so, what, may it be asked, is left of this complaint? Surely the bare allegations that the existing Tennessee apportionment is "incorrect," "arbitrary," "obsolete" and "unconstitutional"—amounting to nothing more than legal conclusions—do not themselves save the complaint from dismissal. See *Snowden* v. *Hughes,* 321 U. S. 1; *Collins* v. *Hardyman,* 341 U. S. 651. Nor do those allegations shift to the appellees the burden of proving the *constitutionality* of this state statute; as is so correctly emphasized by my Brother STEWART (*ante,* p. 266), this Court has consistently held in cases arising under the Equal Protection Clause that " 'the burden of establishing the *unconstitutionality* of a statute rests on him who assails it.' *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 U. S. 580, 584." (Emphasis added.) Moreover, the appellants do not suggest that they could show at a trial anything beyond the matters previously discussed in this opinion, which add up to nothing in the way of a supportable constitutional challenge against this statute. And finally, the majority's failure to come to grips with the question whether the complaint states a claim cognizable under the Federal Constitution—an issue necessarily presented by appellees' motion to dismiss—

does not of course furnish any ground for permitting this action to go to trial.

From a reading of the majority and concurring opinions one will not find it difficult to catch the premises that underlie this decision. The fact that the appellants have been unable to obtain political redress of their asserted grievances appears to be regarded as a matter which should lead the Court to stretch to find some basis for judicial intervention. While the Equal Protection Clause is invoked, the opinion for the Court notably eschews explaining how, consonant with past decisions, the undisputed facts in this case can be considered to show a violation of that constitutional provision. The majority seems to have accepted the argument, pressed at the bar, that if this Court merely asserts authority in this field, Tennessee and other "malapportioning" States will quickly respond with appropriate political action, so that this Court need not be greatly concerned about the federal courts becoming further involved in these matters. At the same time the majority has wholly failed to reckon with what the future may hold in store if this optimistic prediction is not fulfilled. Thus, what the Court is doing reflects more an adventure in judicial experimentation than a solid piece of constitutional adjudication. Whether dismissal of this case should have been for want of jurisdiction or, as is suggested in *Bell* v. *Hood,* 327 U. S. 678, 682–683, for failure of the complaint to state a claim upon which relief could be granted, the judgment of the District Court was correct.

In conclusion, it is appropriate to say that one need not agree, as a citizen, with what Tennessee has done or failed to do, in order to deprecate, as a judge, what the majority is doing today. Those observers of the Court who see it primarily as the last refuge for the correction of all inequality or injustice, no matter what its nature or source, will no doubt applaud this decision and its break

with the past. Those who consider that continuing national respect for the Court's authority depends in large measure upon its wise exercise of self-restraint and discipline in constitutional adjudication, will view the decision with deep concern.

I would affirm.

## APPENDIX TO OPINION OF MR. JUSTICE HARLAN.

### THE INADEQUACY OF ARITHMETICAL FORMULAS AS MEASURES OF THE RATIONALITY OF TENNESSEE'S APPORTIONMENT.

Two of the three separate concurring opinions appear to concede that the Equal Protection Clause does not guarantee to each state voter a vote of approximately equal weight for the State Legislature. Whether the existing Tennessee apportionment is constitutional is recognized to depend only on whether it can find "any possible justification in rationality" (*ante,* p. 265); it is to be struck down only if "the discrimination here does not fit any pattern" (*ante,* p. 258).

One of the concurring opinions, that of my Brother STEWART, suggests no reasons which would justify a finding that the present distribution of state legislators is unconstitutionally arbitrary. The same is true of the majority opinion. My Brother CLARK, on the other hand, concludes that "the apportionment picture in Tennessee is a topsy-turvical of gigantic proportions" (*ante,* p. 254), solely on the basis of certain statistics presented in the text of his separate opinion and included in a more extensive Table appended thereto. In my view, that analysis is defective not only because the "total representation" formula set out in footnote 7 of the opinion (*ante,* p. 255), rests on faulty mathematical foundations, but, more basically, because the approach taken wholly

ignores all other factors justifying a legislative determination of the sort involved in devising a proper apportionment for a State Legislature.

In failing to take any of such other matters into account and in focusing on a particular mathematical formula which, as will be shown, is patently unsound, my Brother CLARK's opinion has, I submit, unwittingly served to bring into bas-relief the very reasons that support the view that this complaint does not state a claim on which relief could be granted. For in order to warrant holding a state electoral apportionment invalid under the Equal Protection Clause, a court, in line with well-established constitutional doctrine, must find that *none* of the permissible policies and *none* of the possible formulas on which it might have been based could rationally justify particular inequalities.

I.

At the outset, it cannot be denied that the apportionment rules explicitly set out in the Tennessee Constitution are rational. These rules are based on the following obviously permissible policy determinations: (1) to utilize counties as electoral units; (2) to prohibit the division of any county in the composition of electoral districts; (3) to allot to each county that has a substantial voting population—at least two-thirds of the average voting population per county—a separate "direct representative"; (4) to create "floterial" districts (multicounty representative districts) made up of more than one county; and (5) to require that such districts be composed of adjoining counties.[1] Such a framework unavoidably

---

[1] The relevant provisions of the Tennessee Constitution are Art. II, §§ 5 and 6:

"Sec. 5. *Apportionment of representatives.*—The number of Representatives shall, at the several periods of making the enumeration, be apportioned among the several counties or districts, according to the

leads to unreliable arithmetic inequalities under any mathematical formula whereby the counties' "total representation" is sought to be measured. It particularly results in egregiously deceptive disparities if the formula proposed in my Brother CLARK's opinion is applied.

That formula computes a county's "total representation" by adding (1) the number of "direct representatives" the county is entitled to elect; (2) a fraction of any other seats in the Tennessee House which are allocated to that county jointly with one or more others in a "floterial district"; (3) triple the number of senators the county is entitled to elect alone; and (4) triple a fraction of any seats in the Tennessee Senate which are allocated to that county jointly with one or more others in a multicounty senatorial district. The fractions used for items (2) and (4) are computed by allotting to each county in a combined district an equal share of the House or Senate seat, *regardless* of the voting population of each of the counties that make up the election district.[2]

---

number of qualified voters in each; and shall not exceed seventy-five, until the population of the State shall be one million and a half, and shall never exceed ninety-nine; Provided, that any county having two-thirds of the ratio shall be entitled to one member.

"Sec. 6. *Apportionment of senators.*—The number of Senators shall, at the several periods of making the enumeration, be apportioned among the several counties or districts according to the number of qualified electors in each, and shall not exceed one-third the number of representatives. In apportioning the Senators among the different counties, the fraction that may be lost by any county or counties, in the apportionment of members to the House of Representatives, shall be made up to such county or counties in the Senate, as near as may be practicable. When a district is composed of two or more counties, they shall be adjoining; and no counties shall be divided in forming a district."

[2] This formula is not clearly spelled out in the opinion, but it is necessarily inferred from the figures that are presented. Knox County, for example, is said to have a "total representation" of 7.25. It

This formula is patently deficient in that it eliminates from consideration the relative voting power of the counties that are joined together in a single election district. As a result, the formula unrealistically assigns to Moore County one-third of a senator, in addition to its direct representative (*ante,* p. 255), although it must be obvious that Moore's voting strength in the Eighteenth Senatorial District is almost negligible. Since Moore County could cast only 2,340 votes of a total eligible vote of 30,478 in the senatorial district, it should in truth be considered as represented by one-fifteenth of a senator. Assuming, *arguendo,* that any "total representation" figure is of significance, Moore's "total representation" should be 1.23, not 2.[3]

The formula suggested by my Brother CLARK must be adjusted regardless whether one thinks, as I assuredly do not, that the Federal Constitution requires that each vote be given equal weight. The correction is necessary simply to reflect the real facts of political life. It may, of course, be true that the floterial representative's "function

elects (1) three direct representatives (value 3.00); (2) one representative from a two-county district (value .50); (3) one direct senator (value 3.00); and (4) one senator in a four-county district (value .75). See Appendix to opinion of MR. JUSTICE CLARK, *ante,* pp. 262–264.

[3] If this "adjusted" formula for measuring "total representation" is applied to the other "horribles" cited in the concurring opinion (*ante,* p. 255), it reveals that these counties—which purportedly have equal "total representation" but distinctly unequal voting population—do not have the same "total representation" at all. Rather than having the same representation as Rutherford County, Moore County has only about 40% of what Rutherford has. Decatur County has only 55% of the representation of Carter County. While Loudon and Anderson Counties are substantially underrepresented, this is because of their proximity to Knox County, which outweighs their votes in the Sixth Senatorial District and in the Eighth Floterial District.

is to represent the whole district" (*ante*, p. 256). But can it be gainsaid that so long as elections within the district are decided not by a county-unit system, in which each county casts one vote, but by adding the total number of individual votes cast for each candidate, the concern of the elected representatives will primarily be with the most populous counties in the district?

## II.

I do not mean to suggest that *any* mathematical formula, albeit an "adjusted" one, would be a proper touchstone to measure the rationality of the present or of appellants' proposed apportionment plan. For, as the Table appended to my Brother CLARK's opinion so conclusively shows, whether one applies the formula he suggests or one that is adjusted to reflect proportional voting strength within an election district, no plan of apportionment consistent with the principal policies of the Tennessee Constitution could provide proportionately equal "total representation" for each of Tennessee's 95 counties.

The pattern suggested by the appellants in Exhibits "A" and "B" attached to their complaint is said to be a "fair distribution" which accords with the Tennessee Constitution, and under which each of the election districts represents approximately equal voting population. But even when tested by the "adjusted" formula, the plan reveals gross "total representation" disparities that would make it appear to be a "crazy quilt." For example, Loudon County, with twice the voting population of Humphreys County would have *less* representation than Humphreys, and about one-third the representation of Warren County, which has only 73 more voters. Among the more populous counties, similar discrepancies would appear. Although Anderson County has only somewhat over 10% more voters than Blount County, it would have

approximately 75% more representation. And Blount would have approximately two-thirds the representation of Montgomery County, which has about 13% *less* voters.[4]

## III.

The fault with a purely statistical approach to the case at hand lies not with the particular mathematical formula used, but in the failure to take account of the fact that a multitude of legitimate legislative policies, along with circumstances of geography and demography, could account for the seeming electoral disparities among counties. The principles set out in the Tennessee Constitution are just some of those that were deemed significant. Others may have been considered and accepted by those entrusted with the responsibility for Tennessee's apportionment. And for the purposes of judging constitutionality under the Equal Protection Clause it must be remembered that what is controlling on the issue of "rationality" is not what the State Legislature may *actually* have considered but what it may be *deemed* to have considered.

For example, in the list of "horribles" cited by my Brother CLARK (*ante,* p. 255), *all* the "underrepresented" counties are semiurban: all contain municipalities of over 10,000 population.[5] This is not to say, however, that the

---

[4] These disparities are as serious, if not more so, when my Brother CLARK's formula is applied to the appellants' proposal. For example, if the seven counties chosen by him as illustrative are examined as they would be represented under the appellants' distribution, Moore County, with a voting population of 2,340, is given more electoral strength than Decatur County, with a voting population of 5,563. Carter County (voting population 23,302) has 20% *more* "total representation" than Anderson County (voting population 33,990), and 33% *more* than Rutherford County (voting population 25,316).

[5] Murfreesboro, Rutherford County (pop. 16,017); Elizabethton, Carter County (pop. 10,754); Oak Ridge, Anderson County (pop. 27,387). Tennessee Blue Book, 1960, pp. 143–149.

presence of any such municipality within a county necessarily demands that its proportional representation be reduced in order to render it consistent with an "urban versus rural" plan of apportionment. Other considerations may intervene and outweigh the Legislature's desire to distribute seats so as to achieve a proper balance between urban and rural interests. The size of a county, in terms of its total area, may be a factor.[6] Or the location within a county of some major industry may be thought to call for dilution of voting strength.[7] Again, the combination of certain smaller counties with their more heavily populated neighbors in senatorial or "floterial" districts may result in apparent arithmetic inequalities.[8]

More broadly, the disparities in electoral strength among the various counties in Tennessee, both those relied upon by my Brother CLARK and others, may be

---

[6] For example, Carter and Washington Counties are each approximately 60% as large as Maury and Madison Counties in terms of square miles, and this may explain the disparity between their "total representation" figures.

[7] For example, in addition to being "semi-urban," Blount County is the location of the City of Alcoa, where the Aluminum Company of America has located a large aluminum smelting and rolling plant. This may explain the difference between its "total representation" and that of Gibson County, which has no such large industry and contains no municipality as large as Maryville.

[8] For example, Chester County (voting population 6,391) is one of those that is presently said to be overrepresented. But under the appellants' proposal, Chester would be combined with populous Madison County in a "floterial district" and with four others, including Shelby County, in a senatorial district. Consequently, its total representation according to the Appendix to my Brother CLARK's opinion would be .19. (*Ante,* p. 262.) This would have the effect of disenfranchising all the county's voters. Similarly, Rhea County's almost 9,000 voters would find their voting strength so diluted as to be practically nonexistent.

accounted for by various economic,[9] political,[10] and geographic [11] considerations. No allegation is made by the appellants that the existing apportionment is the result of any other forces than are always at work in any legislative process; and the record, briefs, and arguments in this Court themselves attest to the fact that the appellants could put forward nothing further at a trial.

By disregarding the wide variety of permissible legislative considerations that may enter into a state electoral apportionment my Brother CLARK has turned a highly complex process into an elementary arithmetical puzzle.

[9] For example, it is primarily the eastern portion of the State that is complaining of malapportionment (along with the Cities of Memphis and Nashville). But the eastern section is where industry is principally located and where population density, even outside the large urban areas, is highest. Consequently, if Tennessee is apportioning in favor of its agricultural interests, as constitutionally it was entitled to do, it would necessarily reduce representation from the east.

[10] For example, sound political reasons surely justify limiting the legislative chambers to workable numbers; in Tennessee, the House is set at 99 and the Senate at 33. It might have been deemed desirable, therefore, to set a ceiling on representation from any single county so as not to deprive others of individual representation. The proportional discrepancies among the four counties with large urban centers may be attributable to a conscious policy of limiting representation in this manner.

[11] For example, Moore County is surrounded by four counties each of which has sufficient voting population to exceed two-thirds of the average voting population per county (which is the standard prescribed by the Tennessee Constitution for the assignment of a direct representative), thus qualifying for direct representatives. Consequently Moore County must be assigned a representative of its own despite its small voting population because it cannot be joined with any of its neighbors in a multicounty district, and the Tennessee Constitution prohibits combining it with nonadjacent counties. See note 1, *supra*.

It is only by blinking reality that such an analysis can stand and that the essentially legislative determination can be made the subject of judicial inquiry.

## IV.

Apart from such policies as those suggested which would suffice to justify particular inequalities, there is a further consideration which could rationally have led the Tennessee Legislature, in the exercise of a deliberate choice, to maintain the status quo. Rigidity of an apportionment pattern may be as much a legislative policy decision as is a provision for periodic reapportionment. In the interest of stability, a State may write into its fundamental law a permanent distribution of legislators among its various election districts, thus forever ignoring shifts in population. Indeed, several States have achieved this result by providing for minimum and maximum representation from various political subdivisions such as counties, districts, cities, or towns. See Harvey, Reapportionments of State Legislatures—Legal Requirements, 17 Law & Contemp. Probs. (1952), 364, 368–372.

It is said that one cannot find any rational standard in what the Tennessee Legislature has failed to do over the past 60 years. But surely one need not search far to find rationality in the Legislature's continued refusal to recognize the growth of the urban population that has accompanied the development of industry over the past half decade. The existence of slight disparities between rural areas does not overcome the fact that the foremost apparent legislative motivation has been to preserve the electoral strength of the rural interests notwithstanding shifts in population. And I understand it to be conceded by at least some of the majority that this policy is not

rendered unconstitutional merely because it favors rural voters.

Once the electoral apportionment process is recognized for what it is—the product of legislative give-and-take and of compromise among policies that often conflict— the relevant constitutional principles at once put these appellants out of the federal courts.